UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| INLINE PACKAGING, LLC | ) | No.: |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **COMPLAINT** |
| | ) | |
| GRAPHIC PACKAGING | ) | **JURY TRIAL DEMANDED** |
| INTERNATIONAL, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Inline Packaging, LLC ("Inline") for its Complaint against Defendant Graphic Packaging International, Inc. ("Graphic" or "Defendant"), states and alleges as follows:

## NATURE OF SUIT

1.     This is an action involving claims for unfair competition, including tortious interference with contracts and prospective business relations, misappropriation of trade secrets, and monopolization.

2.     Inline manufactures, among other things, susceptor food packaging, a type of "active" packaging that converts microwave energy, in microwave ovens, to high surface temperatures that crisp and brown foods.  Inline competes with Graphic in the susceptor food packaging market.

3.     Graphic has engaged in predatory discount bundling practices that are aimed at eliminating the ability for its smaller competitors to compete on the basis of price.  By offering large-unit bundles of both paperboard food packaging and susceptor

food packaging, Graphic is able to out-price its smaller competitors and squeeze them out of the susceptor food packaging market.

4.      Graphic has deliberately interfered with its smaller competitors' business relationships with food company buyers by informing buyers that Graphic holds patents for certain packages, when in fact some or all of such patents were expired, invalid, or inapplicable.   In some cases, Graphic has also manufactured packaging using the packaging inventions of other competitors in the marketplace.

5.      Graphic has intentionally failed to mark its packaging with patent numbers in an effort to bait its competitors into expending resources bidding for and creating similar packaging for food company buyers.   After a competitor does so, Graphic threatens and sometimes initiates sham litigation to unjustifiably raise rivals' costs and harm rivals' reputation with food company buyers.

6.      Inline believes this and related conduct has been undertaken in a complex and deliberate scheme to maintain monopoly power.   On information and belief, Graphic has embarked on a long-term, systematic campaign of anticompetitive conduct in the susceptor food packaging market.

7.      Graphic's anticompetitive conduct has foreclosed competition in the susceptor food packaging market, which has harmed Inline in the form of lost business opportunities, and harmed consumers in the form of higher prices and lower quality packaging.

**JURISDICTION**

8.      This Court has subject-matter jurisdiction over all causes of action asserted herein under 28 U.S.C. § 1331 and § 1367(a). In the alternative, this Court has jurisdiction under 28 U.S.C. § 1332.

9.      This Court has personal jurisdiction over the parties, which both have substantial contacts with the State of Minnesota due to their consistent, continuous physical presence there.  Both parties have physical offices and manufacturing facilities in Minnesota.

10.      This Court is a proper venue under 28 U.S.C. § 1391(b)(1).

**PARTIES**

11.      Inline is a Delaware limited liability company with its principal place of business located at 1205 18th Ave. S., Princeton, MN 55371.  Inline operates solely out of its Princeton, MN facility.

12.      Inline's six owner-members, both natural and corporate, reside in Minnesota, Florida, and Ohio: J.D. Watkins Enterprises, Inc. is a Minnesota corporation with its principal place of business in Minnesota, Gene J. Monnin is a resident of Ohio, William F. Reimer Revocable Trust is a trust established in Minnesota, James Watkins GRAT is a trust established in Minnesota, Jeffrey T. Watkins is a resident of Minnesota, and Roger P. Monnin is a resident of Florida.  No member has residency status, under 28 U.S.C. § 1332, in Georgia or Delaware.

13.     Inline is a packaging company that manufacturers, among other things, susceptor food packaging.  It has been operating in the susceptor food packaging industry for approximately 13 years.

14.     Inline is a small player in the susceptor food packaging industry, with sales of susceptor food packaging totaling about $4 million each year.

15.     Inline sells to well-known food companies such as Nestlé, which package foods using Inline's products under popular brands such as Lean Cuisine.

16.     Graphic is a Delaware corporation with its principal place of business located at 1500 Riveredge Pkwy, Suite 100, Atlanta, GA 30328.

17.     Graphic is one of the largest paperboard packaging companies in the United States.  Graphic maintains a 95% or greater share of the susceptor food packaging market for crisping and browning susceptor packaging.

18.     In 2014, Graphic's total domestic sales of paperboard packaging, which includes susceptor food packaging, were approximately $3.4 billion.  On information and belief, Graphic's annual, domestic susceptor food packaging revenues total about $210 million.

19.     As of December 31, 2014, Graphic had a portfolio of over 1,900 U.S. and foreign patents.  On information and belief, in 2008, Graphic held over 1,300 U.S. and foreign patents.  Graphic has engaged in an aggressive effort to apply for and acquire patents related to food packaging, including susceptor food packaging.

## FACTUAL BACKGROUND

20.     Inline and Graphic are competitors in the susceptor food packaging industry.  In particular, Inline and Graphic have competed for supply contracts with food company buyers such as Nestlé, Heinz, Little Lady Foods, Nation Pizza Products, Smuckers, and others.

21.     Inline and Graphic primarily compete with each other in the manufacture and supply of susceptor food packaging, specifically that which crisps and browns.

22.     On information and belief, Inline is more efficient at producing susceptor food packaging and can sell high-quality susceptor food packaging at lower prices than Graphic, without selling below cost.

### Discount Bundling

23.     Graphic operates not only in the susceptor food packaging market, but also in the market for paperboard food packaging, which provides paperboard or cardboard packaging for consumer food products.  The paperboard food packaging market is up to 400 times larger than the susceptor food packaging market.  Inline does not participate in the paperboard food packaging market to any significant degree.

24.     Graphic has and continues to maintain its monopoly in the susceptor food packaging market by, in part, offering packaging bundles to large food company buyers. These bundles include both paperboard food packaging and susceptor food packaging. Graphic offers large bundles at a discount, so that the paperboard food packaging, susceptor food packaging, or both are sold at a discount in very large quantities.

25.     The quantities of susceptor food packaging ordered as part of these bundles is much smaller than the quantities of paperboard food packaging since the needs of food company buyers for paperboard food packaging is much greater than the need for susceptor food packaging.

26.     Because of the high volume of paperboard food packaging sold by Graphic in these discounted bundles, the discount on the paperboard portion of the bundle represents a very significant cost savings for food company buyers who purchase paperboard food packaging—but only if they also agree to purchase susceptor food packaging from Graphic.

27.     Food company buyers who receive these bundled discounts are therefore reluctant to purchase susceptor food packaging from Graphic's smaller competitors, like Inline, unless the smaller competitor can offer a price on susceptor food packaging low enough to offset the savings that food company buyers receive on the much-higher volumes of paperboard food packaging they purchase from Graphic in discounted bundles.

28.     Because food company buyers commonly purchase far greater volumes of paperboard than susceptor food packaging, smaller competitors cannot profitably offer susceptor food packaging at a price low enough to compete with the discounts available on paperboard food packaging through Graphic's bundles.  In this manner, Graphic has significantly decreased Inline's and other competitors' ability and opportunities to compete with Graphic on pricing for susceptor food packaging.

**Sham Litigation and Threats Thereof**

29.     Graphic is well-known in both the susceptor food packaging and broader paperboard food packaging markets for being litigious and threatening both existing competitors and potential new entrants with patent infringement and other claims.

30.     On information and belief, Graphic has maintained its dominant position in the susceptor food packaging market in part by engaging in aggressive and predatory litigation tactics against its smaller rivals and potential new entrants.  Prior to this time and currently, Graphic's tactics have foreclosed on the ability for Inline and other smaller competitors to compete with Graphic on the bases of quality, price, and/or superior business acumen.

31.     For example, Graphic has threatened competitors and food company buyers with patent infringement, sometimes of expired or inapplicable patents.  On information and belief, it has used and misused its intellectual property as a means to monopolize the market through litigation and threats of litigation by raising rivals' costs, both financial and reputational, without regard to the end result of such litigation and/or threatened litigation.

32.     According to a (now former) Graphic representative, Graphic has instructed its sales representatives to spend fifty percent of their time looking for opportunities to make demands or litigate infringement and the other fifty percent of their time looking for new sales opportunities.

33.     Graphic has, among other conduct, wielded its large patent and intellectual property arsenal by issuing cease and desist and demand letters to its competitors, alleging infringement.

34.     On information and belief, Graphic has been successful in deterring competition from potential new entrants into the susceptor food packaging market by threatening patent infringement or making overtures thereof.

35.     On information and belief, these and related tactics have been successful in deterring competitors and food company buyers from moving forward with a new deal, making an offer or bid to supply susceptor food packaging, and/or continuing operations.

36.     On information and belief, due to the exorbitant costs of litigation, Graphic's smaller competitors are usually unable or unwilling to resist and either acquiesce to Graphic's demands or settle.   Graphic's size and considerable financial resources render its threats real, immediate, and dangerous.

37.     On information and belief, both competitors and food company buyers are reluctant to openly resist Graphic's anticompetitive conduct not only due to potential costs and market characteristics, but also because Graphic's size disincentivizes resistance; large food company buyers need Graphic not only for susceptor food packaging needs, but also for paperboard and other food packaging needs.

38.     In particular, food company buyers are extremely reluctant to openly resist or disregard Graphic's threats against Graphic's smaller competitors (also the food company buyers' alternative sources of susceptor food packaging supply) due to reliance

on Graphic for susceptor and other food packaging; Graphic is often a "one-stop-shop" for many food company buyers.

## Interference with Business Relationships

39.    On information and belief, Graphic is well-known for asserting its intent to commence litigation against rivals, including susceptor food packaging rivals, in communications with food company buyers as a way to deter its customers from entering into or expanding business relationships with Graphic's competitors.

40.    Graphic relies on food company buyers' unwillingness to be involved in expensive and time consuming litigation, as well as Graphic's dominant position in other markets and ability to withhold packaging supply from food company buyers, to successfully employ this strategy.

41.    For example, in a competitive bid process in 2014, Inline was awarded the right to supply approximately 1.1 billion units of susceptor food packaging products. Despite this, Inline has received orders for only approximately ten percent of the units that it had agreed to supply during the pendency of the contracts.  On information and belief, after Inline won the bids, Graphic expressed to the food company buyer that Graphic intended to sue Inline and therefore the food company buyer should not source the susceptor products from Inline.  On information and belief, Graphic's conduct led to Inline receiving orders for units of susceptor food packaging products far below the amounts agreed to in the bid award.  On information and belief, Graphic has secured orders for the same units that Inline was awarded through the bid process despite losing or failing to engage in the bid process.

42.     Also, for example, Inline sought to manufacture susceptor food packaging for Nation Pizza Products.  Inline representatives have met with Nation Pizza Products representatives to discuss supplying susceptor food packaging.   On information and belief, Inline has been unsuccessful in securing a supply contract due to Graphic's overtures to Nation Pizza Products that Graphic would sue Inline in the event that Inline was awarded such a contract.  On information and belief, Inline has thus been essentially "locked out" from dealing with Nation Pizza Products due to its fear of retaliatory action or suit by Graphic.

43.     On information and belief, Graphic has foreclosed competition from existing smaller competitors by misrepresenting to food company buyers that it alone holds the patent rights to produce certain susceptor food packaging or that other competitors are violating its patents by manufacturing certain packaging for such food company buyers.  However, when doing so, it has cited invalid, expired, or inapplicable patents.  This has dissuaded food company buyers from even negotiating or dealing with Graphic's smaller competitors or potential new entrants.   In most instances, Graphic's tactics have caused litigation-cautious food company buyers to refrain from challenging Graphic's claims.

44.     On information and belief, Graphic has demonstrated an intent to maintain and exercise its dominant market position against rivals through the use of, among other conduct, overtures and statements to food company buyers that other competitors, including Inline, are infringing on Graphic's patents and other intellectual property.

45.     This and related conduct has foreclosed on the ability for Graphic's smaller competitors to even attempt to receive business from food company buyers.  It has also foreclosed competition in the susceptor food packaging industry from food company buyers that might otherwise decide to make their own susceptor food packaging at lower costs than prices offered by Graphic.

### Misappropriation and Misuse of Intellectual Property

46.     On information and belief, Graphic has misappropriated the designs and ideas of its competitors in the industry.  Graphic has been issued patents that are invalid due to prior art, sale, and use by its customers and its smaller competitors.  Graphic has thereby misappropriated the investments its customers and smaller competitors have made, to their own exclusion from the market.

47.     On information and belief, Graphic has been aggressively applying for patents that are likely invalid due to prior art, prior sales, and prior use in the industry.

48.     Graphic has applied for and been issued patents for susceptor food packaging common to the industry, which inventions Inline has previously sold or seen in the marketplace.  In some cases, its patents are for packaging inventions produced and sold in the industry for multiple years prior to the patent being applied for.

49.     For example, Graphic was issued United States Patent No. 8,809,754 on August 19, 2014.  This patent is for a basic susceptor carton with a peel-back lid.  Inline sold and saw this packaging article in the marketplace multiple years in advance of Graphic's applications for the patent.

50.   For another example, Graphic was issued United States Patent No. 9,066,375 on June 23, 2015. This patent relates to susceptor food packaging articles. Inline sold some of the claimed packaging articles in the marketplace multiple years in advance of Graphic's applications for the patent.

51.   On information and belief, Graphic has used these types of obvious and generic patents to deter competition and to threaten competitors and/or food company buyers. On information and belief, this conduct has, in part, enabled Graphic to secure supply contracts for most of the susceptor food packaging market's needs.

52.   On information and belief, Graphic has misappropriated other susceptor packaging manufacturers' designs and trade secrets to its own benefit. On information and belief, Graphic has presented these designs as its own, in an effort to maintain its stranglehold over food company buyers in the susceptor food packaging market.

53.   For example, Graphic has produced susceptor food packaging for Weight Watchers' Smart Ones pizza that copies a design created by Inline for Weight Watchers' Smart Ones pizza. In 2008, Heinz, distributor of Weight Watchers' pizza, requested Inline, which was manufacturing a susceptor sheet for Weight Watchers' pizza, to investigate redesigning the sheet. Inline created a more efficient design that was cheaper to manufacture, but just as effective at crisping and browning pizzas. Inline shared the design with Heinz under the condition that it remain confidential. Inline subsequently learned in 2013 that Graphic began copying the packaging designed by Inline for Heinz, without Inline's permission. On information and belief, Graphic knew or should have known that the design created by Inline, bearing its name, but provided by Heinz, was

confidential and that Heinz owed a duty to Inline to maintain the design's secrecy and/or limit its use.  Graphic continues to misappropriate Inline's design.

54.     Through tactics such as those described above, Graphic has foreclosed competition from existing rivals and potential rivals in the susceptor food packaging market.

### Baiting/Submarine Patent Activities

55.     Graphic has demanded that competitors cease and desist from continuing to manufacture packaging after it has been issued a patent that allegedly covers such packaging.  On information and belief, in some cases, Graphic has waited until after such packaging has become commonplace in the market to apply for such patents, and then waited months or years after being issued such patents to threaten or bring an action against its competitors, despite prior knowledge of allegedly infringing competitor products in the marketplace.

56.     Graphic has intentionally failed to disclose its intellectual property holdings during bid processes and other similar circumstances to both its smaller competitors and food company buyers in an effort to bait competitors into investing substantial resources, making commitments, and beginning production.  On information and belief, after such costs are made, Graphic routinely threatens or litigates sham or predatory infringement actions, further and unjustifiably raising rivals' costs.

57.     Inline has been a victim of Graphic's baiting and submarine patent tactics.

58.     For example, Graphic chose not to competitively bid against Inline for a substantial susceptor food packaging supply contract in early 2014.  Graphic lost to

Inline's early bids in a series of similar lots for bidding and discontinued making bids thereafter.  On information and belief, Graphic stopped bidding because it decided to foreclose Inline from competing in the market through threats of litigation based upon undisclosed patents that Graphic held and/or had applied for, rather than competing through a bidding process and lowering its own margins.  These threats were communicated by Graphic to the food company buyer.

## RELEVANT PRODUCT MARKET

59.    Graphic and Inline both operate in the susceptor food packaging market.

60.    Susceptor food packaging is a type of "active" packaging that converts microwave energy, in microwave ovens, to high surface temperatures.  Specifically, the susceptor food packaging market includes only active packaging that crisps and browns foods, which effect cannot be achieved using standard paperboard packaging.

61.    Susceptor food packaging is used in many microwaveable products that require crisping and browning for optimal palatability such as pizza, rolls, taquitos, Hot Pockets, turnovers, sub-sandwiches, hoagies, corn dogs, enchiladas, calzones, pies, small entrees, and more.

62.    Susceptor food packages come in many varieties: sleeves, tubs, wraps, cartons, trays, pads, roll stock, and patches.  Food companies buy susceptor food packaging from independent manufacturers such as Inline and Graphic.

63.    On information and belief, the susceptor food packaging industry is comprised of a small number of market participants.  The industry is highly concentrated.

64.     Graphic is the largest operator in the industry and manufactures not only susceptor food packaging, but also other kinds of paperboard packaging in the larger packaging macro-industry.  It is one of the largest participants in the broader packaging industry.

65.     The susceptor food packaging industry is subject to many barriers to entry. Manufacturers are required to make large up-front investments in facilities, machinery, and raw materials.  Often, participation in the industry requires the ownership of various intellectual property, such as patents, trade design secrets, and copyrights.  Relatedly, an additional barrier to entry is the need to employ engineers, floor staff, designers, and other individuals with technical backgrounds.  These costs are already absorbed by incumbents in the market.  Additionally, economies of scale and technical know-how make it difficult for new entrants to compete with established manufacturers

66.     The most salient barrier to entry is the requirement to form long-term sales relationships with major food companies and distributors.  These relationships can take two to five years to cultivate before resulting in an actual supply contract.  Since supplier needs are often met through long-term requirements and related contracts, the ability for new entrants to penetrate the market is extremely difficult because it requires securing rare, elusive packaging supply contracts.

67.     Susceptor food packaging has no similarly-priced or effective interchangeable substitutes in the packaging industry.  It is the most cost-effective solution to crisp and brown microwaveable foods.

68.     Because of its price and performance optimality, there are no other economical substitutes for susceptor food packaging.  Even where other packaging materials can provide acceptable performance at similar prices, few buyers will switch from using susceptor food packaging to alternative packaging because doing so is time consuming, costly, and potentially risky.

69.     Alternatives may not fit food safety guidelines and regulations. Alternatives may also threaten the value proposition of the food to the typical consumer by inadequately heating, crisping, or browning food.

70.     On information and belief, buyers of susceptor food packaging would likely not switch to an alternative material in response to a small but significant increase in susceptor food packaging prices, to the extent that such increases would not render such companies unprofitable.

71.     On information and belief, due to the barriers of entry in the industry, general food packaging manufacturers are dissuaded from adapting their production facilities because of the difficulty of doing so mechanically, but also the difficulty of securing a deal for such products in the first place.

72.     On information and belief, due to Graphic's predatory and anticompetitive conduct, such as that complained of herein, the susceptor food packaging market has a pervasive reputation that small competitors and new entrants to the markets will likely be the recipients of threats of or actual infringement litigation.

73.     The susceptor food packaging market is the relevant product market within the meaning of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.* (2012).

## RELEVANT GEOGRAPHIC MARKET

74.     Susceptor food packaging can be distributed anywhere within the United States, and buyers generally do not discriminate on the basis of a manufacturer's location.

75.     Susceptor food packaging manufacturers compete in the broad United States geographic area.   Potential new entrants may generally establish a presence anywhere in the continental United States.   Susceptor food packaging products are generally sold nationwide through distributors and food companies.

76.     Due to relatively high transportation costs, unfavorable and unpredictable currency exchange rates, cultural barriers, the difficulty of developing packaging remotely or across distances, the need to develop significant sales relationship, and other cost and market disadvantages to importing or exporting packaging materials, a small but significant increase in the prices of domestic susceptor food packaging would likely not cause foreign suppliers to increase United States sales in sufficient volumes to make such a price increase unprofitable.

77.     On information and belief, Graphic's conduct has and will have a not insubstantial effect on both state and interstate commerce.

## ANTICOMPETITIVE EFFECTS

78.     Food manufacturers across the United States look for the best prices and quality when sourcing packaging materials.   Consumers of packaged foods are highly price-sensitive with respect to food purchases.   As a result, cost-effective packaging is essential for success in the susceptor food packaging and microwaveable food markets.

79.    Despite price sensitivity, penny increases in price are usually easily absorbed and translate into thousands to millions in additional sales revenue due to the scale and quantity of food products sold.

80.    Packaged prepared food has increased in demand in recent years due to consumer demand for convenient food.  Graphic's conduct threatens the price and quality of these products, which also threatens consumer demand for the entire market of microwaveable food products.

**Discount Bundling**

81.    On information and belief, by bundling susceptor food packaging with other discounted paperboard packaging, Graphic has gathered a premium price on susceptor food packaging, with artificially-high margins as high as 60% or more.

82.    On information and belief, Graphic's discount bundles have foreclosed competition in the susceptor food packaging market.

83.    Because Graphic's bundles for both susceptor food packaging and paperboard food packaging are sold in large volumes, and either kind of packaging or both is sold at a discount, when a food company buyer purchases packaging through Graphic's discounted bundle, the cost savings are massive.

84.    The cost savings are so large that Graphic's competitors operating in the susceptor food packaging market, but not the paperboard food packaging market, such as Inline, are precluded from securing contracts with food company buyers who purchase susceptor and paperboard packaging through Graphic's discount bundle because, in order

to do so, Inline and other smaller competitors would need to sell their susceptor food packaging at a loss.

85.    Because Graphic is able to provide such substantial overall cost savings in a bundled sale for both kinds of packaging, it is able to charge a premium price for susceptor food packaging.

86.    Despite the fact that Graphic's smaller competitors, including Inline, who are just as if not more efficient than Graphic at manufacturing susceptor food packaging, are willing to sell susceptor food packaging at a lower price and with a lower margin, the cost savings of the overall discount bundle cannot be overcome; the smaller competitors cannot absorb the differential between the bundled and unbundled prices of the products through their own discounts.

87.    The discount bundles thus effectively force Graphic's smaller competitors out of the market.  This conduct, in conjunction with Graphic's other anticompetitive conduct, has allowed Graphic to maintain its monopoly in the susceptor food packaging market.

88.    The barriers to entry of the susceptor food packaging market, along with Graphic's historical and continued conduct to deter new entrants, have precluded a free market solution to this discount bundle problem.

## Sham Litigation and Threats Thereof

89.    On information and belief, Graphic's litigious conduct has enabled it to maintain and increase its sizable market share, which stands at approximately 95% or more of the susceptor food packaging market.

90.     By asserting its intellectual property rights and monopoly power, both through sham litigation and threats thereof, Graphic has been able to secure a more-premium price for susceptor food packaging.   This is both because the conduct has reduced competitive pressure on Graphic and because threats of litigation against Graphic's smaller competitors have dissuaded risk-averse food company buyers from purchasing susceptor food packaging from manufacturers other than Graphic.

91.     On information and belief, even where Graphic's patents are valid, non-expired, or applicable, Graphic's infringement litigation and threats thereof are merely concealed attempts to interfere with competitors like Inline.   On information and belief, Graphic's conduct is designed and purposed on raising its competitors' costs so as to reduce their ability to compete.

92.     By investigating, responding, and defending against such threats, Inline's (and other smaller competitors') overhead expenses increase.   Further, such conduct is designed to denigrate their reputation in the marketplace, so as to interfere with both existing and prospective business relationships with partners and food company buyers. Relatedly, the conduct is purposed on dissuading Graphic's own customers and partners from contracting with competitors like Inline.

93.     Using this predatory litigation strategy, Graphic is likely to maintain or increase its monopoly power in the susceptor food packaging market and its dominant, if not monopolistic, position in the broader food packaging market.   On information and belief, it may achieve close to 100% market share if its conduct continues without challenge.

94.    On information and belief, Graphic's large size, strength in the marketplace, essential facilities and supply, and packaging industry connections have all enabled it to abuse both competitors and food company buyers in the susceptor food packaging marketplace through sham infringement litigation and threats thereof.

95.    On information and belief, Graphic's litigious conduct was and is designed solely to deter or delay competitors from entry into or expansion in the susceptor food packaging market, among other food packaging markets and sub-markets.  In particular, Graphic's sham litigation and threats thereof are concealed attempts to interfere directly with the business relationships of its competitors through the judicial process, without regard to the outcome of such process.

96.    Graphic's conduct has foreclosed competition not on the basis of superior products, business acumen, or historical accident.  Instead, the conduct has foreclosed competition by bullying smaller rivals through threats of and actual litigation against competitors, among other conduct.  The conduct has also dissuaded food company buyers from contracting with Graphic's smaller competitors, like Inline.

97.    On information and belief, Graphic's conduct has led to artificially-high susceptor food packaging costs, which have in turn led to artificially-high microwaveable food prices.  Increased susceptor food packaging costs have affected national food companies.  The packaging moves through multiple states and is sold nationwide.  It is possible that tens of millions of consumers of microwaveable food goods in the United States may be and have been affected, indirectly, by Graphic's conduct.

## Interference with Business Relationships

98.     On information and belief, Graphic's aggressive strategy of interfering with the prospective and actual contractual relations between Graphic's competitors and food company buyers has unreasonably and unfairly impaired the opportunity of rivals, like Inline, to compete with Graphic in the relevant market.

99.     Graphic's conduct has taken advantage of the barriers to entry in the susceptor food packaging market, most notably the need for strong sales relationships and the disinclination of food company buyers to become involved in expensive and time consuming litigation.  By threatening litigation and making such threats known to food company buyers, Graphic has precluded access to food company buyers by smaller competitors.   It has also precluded the ability for new entrants to develop sales relationships with food company buyers because food company buyers are unwilling or unable to challenge Graphic's claims.

100.   On information and belief, once Graphic has excluded rivals from competing for supply contracts with food company buyers, it is able to charge higher prices and achieve profit margins much greater than would result from competitive bidding processes.  On information and belief, the lack of free competition has led to higher microwaveable food prices which has threatened demand for the entire microwaveable food market, hurting both susceptor food packaging manufacturers and food companies alike.

101.   Graphic's interference has, in addition to other conduct, enabled it to maintain its dominant position in the susceptor food packaging market.

## Misappropriation and Misuse of Intellectual Property

102.   Graphic's misappropriation of trade secrets and other ideas, as well as Graphic's patenting of commonplace market articles, has enabled it to engage in predatory infringement litigation and threats thereof.   Issuance of such intellectual property has also enabled Graphic to interfere with its smaller competitors' relationships, both existing and prospective, with food company buyers.

103.   In short, Graphic's misappropriation of other competitors' designs and ideas, as well as others already existing in the market, has allowed it to profit on the shoulders of its smaller competitors and food company buyers.   In some instances Graphic has misappropriated trade secrets.

104.   Graphic's conduct has turned smaller competitors' ideas against their original makers.   This has enabled Graphic to raise rivals' costs, as previously described, and preclude their continued existence or entrance into the susceptor food packaging market, also as previously described.

105.   This conduct by Graphic has not only foreclosed competition, but also enabled Graphic to secure more-premium pricing for its products, leading to unjustifiably high prices for consumers.

## Baiting/Submarine Patent Activities

106.   By intentionally failing to disclose its intellectual property holdings and by intentionally failing to mark packaging with its patents, Graphic has baited its competitors into investing substantial resources, making commitments, and beginning production.

107.   On information and belief, after such costs are invested, Graphic routinely threatens or litigates sham or predatory infringement actions, further and unjustifiably raising rivals' costs.   Such threats force competitors or potential new entrants to, among other things, perform costly legal analysis and/or engage in costly redesign and development efforts to avoid the heavy costs of patent infringement actions.   When sued by Graphic, rivals are forced to investigate, respond to, and defend themselves from allegations and threats of infringement.

108.   Because patent infringement litigation is extremely expensive and life-threatening to small competitors such as Inline, they are forced either to cease competition with Graphic, exit the market, or settle with Graphic.   All of these options lead to higher costs.   If a smaller competitor ceases competition with Graphic, it loses its investments in ramping up production of the packaging at issue.   Exiting the market means losing investments in machinery, inventory, personnel, reputation, and more. Settling increases the cost of production.

109.   The anticompetitive nature of this conduct is further exacerbated and unjustifiable when the patents cited by Graphic in its litigation or threats thereof are invalid, expired, or inapplicable.   On information and belief, this is often the case.

110.   Due to the presumption of validity held by patents and the fact that most of Graphic's smaller competitors, including Inline, have little to no additional resources with which to engage in an intellectual property battle, Graphic's conduct has the effect of precluding competition from said smaller competitors either on the basis of price or sheer access to opportunities for supply contracts.

## Overall Scheme of Anticompetitive Conduct

111.    On information and belief, Graphic's bundling, sham threats and litigation, baiting tactics, and interference have caused Inline and other smaller competitors to lose existing and potential business.

112.    On information and belief, this conduct has excluded potential new rivals and forced smaller competitors to exit the market.

113.    On information and belief, Graphic's conduct forms an overall scheme designed specifically to maintain Graphic's monopoly power in the susceptor food packaging market.  Graphic's monopoly power in this market has already enabled it to secure monopolistic prices in some contracts.

114.    Graphic's conduct has no pro-competitive benefit; it has not resulted in lower prices or better products for food company buyers or consumers.  Instead, it has resulted in higher prices and reduced quality to both buyers and consumers, through reduced packaging sourcing options.

115.    Graphic's conduct has not increased efficiency or enhanced consumer appeal for susceptor food packaging.

116.    On information and belief, Graphic's conduct directed at Inline has no legitimate business purpose and has no effect on improving Graphic's efficiency or effectiveness at manufacturing susceptor food packaging.

117.    Graphic's conduct also does not provide any additional benefits to consumers.  Instead, the conduct has led to increased prices and lower quality.

118.    Inline has recently discovered and begun to discover the full breadth of Graphic's anticompetitive scheme of conduct.  Inline has recently begun to realize the extensive anticompetitive effect of Graphic's multifaceted scheme of conduct and the damages Inline has individually sustained as a consequence thereof, in addition to those sustained by competitors and consumers.

119.    On information and belief, Graphic is continuing to engage in the same scheme of conduct, which Inline reasonably believes continues to harm Inline and consumers by foreclosing competition in the susceptor food packaging market.  This conduct is a direct, proximate, and continuing cause of monetary loss to Inline in an as yet not fully calculated amount.

120.    Because of the breadth and extent of this scheme of conduct and the hidden effects of the same, Inline cannot by itself fully determine the sales, relationships, and potential customers it has lost as a result.

## COUNT I:  TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

121.    Inline realleges and incorporates by reference the allegations stated in paragraphs 1-120 of this Complaint as if fully set forth herein.

122.    Inline had a reasonable expectation of economic advantage from continued business relations with food company buyers that have engaged Inline to provide susceptor food packaging and/or from business relationships with prospective food packaging buyers.

123.   Graphic was aware of Inline's expected, advantageous economic relations with continuing and/or prospective food company buyers.

124.   Graphic intentionally, tortiously and illegally interfered with Inline's reasonable expectations of continued and/or future economic advantage by engaging in the conduct complained of herein, and Inline was damaged thereby.

125.   In the absence of Graphic's interfering conduct, it was reasonably probable that Inline would have realized its expected economic advantage or benefit.

126.   As a result of Graphic's wrongful conduct, Inline is entitled to recover damages in an amount to be determined at trial.

## COUNT II:  TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS

127.   Inline realleges and incorporates by reference the allegations stated in paragraphs 1-120 of this Complaint as if fully set forth herein.

128.   Inline has a reasonable expectation of continued business relations with its customer that engaged Inline to provide susceptor food packaging pursuant to awarded bids.

129.   Graphic was aware that Inline has a contractual relationship with this customer.

130.   With full knowledge of those agreements, Graphic intentionally caused Inline's customer to breach its agreements with Inline.

131.   The aforementioned interference was not justified and damaged Inline.

132.   As a result of Graphic's wrongful conduct, Inline is entitled to recover damages in an amount to be determined at trial.

## COUNT III:  MISAPPROPRIATION OF TRADE SECRETS, MINN. STAT. § 325C.01

133.   Inline realleges and incorporates by reference the allegations stated in paragraphs 1-120 of this Complaint as if fully set forth herein.

134.   Inline developed a trade secret consisting of a pattern or design that derived independent actual or potential economic value from not being generally known to the public and not being readily ascertainable by proper means, by persons who can obtain economic value from its disclosure or use, and was the subject of efforts that were reasonable under the circumstances to maintain its secrecy.

135.   Graphic acquired knowledge of Inline's trade secret and used the trade secret without Inline's express or implied consent.

136.   Graphic knew, at the time of use, that its knowledge of Inline's trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or was derived from or through a person who owed a duty to Inline to maintain its secrecy or limit its use.

137.   Graphic willfully and maliciously misappropriated Inline's trade secret. Inline is thus entitled to attorney's fees under Minn. Stat. § 325C.04 and exemplary damages under § 325.03(b).

138.   As a result of Graphic's wrongful conduct, Inline is entitled to recover damages in an amount to be determined at trial and appropriate injunctive relief.

## COUNT IV:  VIOLATION OF MINN. STAT. § 325D.52
## MAINTENANCE OR USE OF A MONOPOLY POWER

139.    Inline realleges and incorporates by reference the allegations stated in paragraphs 1-120 of this Complaint as if fully set forth herein.

140.    Graphic's use of its monopoly power by engaging in the anticompetitive conduct complained of herein in an effort to affect free and open competition in susceptor food packaging in the State of Minnesota, constitutes an unreasonable restraint of trade in violation of Minn. Stat. § 325D.52.

141.    Graphic's violation of Minn. Stat. § 325D.52 entitles Inline to treble damages in an amount to be determined at trial pursuant to Minn. Stat. § 325D.57.

142.    Graphic's violation of Minn. Stat. § 325D.52 subjects Graphic to a civil penalty of not more than $50,000.00 pursuant to Minn. Stat. § 325D.56.

143.    Graphic's violation of Minn. Stat. § 325D.52 entitles Inline to recover its costs and disbursements, including reasonable attorneys' fees, in having to prosecute this matter pursuant to Minn. Stat. § 325D.57.

## COUNT V:  VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2

144.    Inline realleges and incorporates by reference the allegations stated in paragraphs 1-120 of this Complaint as if fully set forth herein.

145.    Graphic's use of its monopoly power by engaging in the anticompetitive conduct complained of herein was undertaken to monopolize susceptor food packaging in the United States, having the effect of destroying free and open competition in the market in violation of 15 U.S.C. § 2.

146.    Graphic's anticompetitive conduct has resulted in food company buyers and consumers paying prices for susceptor food packaging which are higher than if those buyers had the ability to obtain competitive services through Inline and others, and the selection of susceptor food packaging manufacturers is lower than they would be if the restriction on competition unlawfully imposed by Graphic did not exist.

147.    Graphic's above-described anticompetitive conduct has and will continue to cause harm to Inline and free and open competition in the marketplace in violation of Section 2 of the Sherman Antitrust Act.

148.    As a result of Graphic's conduct, Inline is entitled to recover treble damages in an amount to be determined at trial plus attorneys' fees and costs pursuant to 15 U.S.C. § 15.

## PRAYER FOR RELIEF

**WHEREFORE**, Inline requests relief from this Court as follows:

A.    A jury trial on all issues so triable.

B.    On Count I of the Complaint, judgment in favor of Inline and against Graphic for damages in an amount to be determined at trial.

C.    On Count II of the Complaint, judgment in favor of Inline and against Graphic for damages in an amount to be determined at trial.

D.    On Count III of the Complaint, judgment in favor of Inline and against Graphic for damages in an amount to be determined at trial, injunctive relief against Graphic for a reasonable period of time in order to eliminate Graphic's commercial

advantage derived from its misappropriation of Inline's trade secret under Minn. Stat. § 325C.02(a), Inline's attorney's fees under § 325C.04, exemplary damages under § 325C.03(b), and a protective order preserving the secrecy of Inline's trade secret by reasonable means under § 325C.05.

E.    On Count IV of the Complaint, judgment in favor of Inline and against Graphic for treble damages in an amount to be determined at trial, plus a civil penalty of not more than $50,000.00 pursuant to Minn. Stat. § 325D.56, plus all costs and disbursements, including reasonable attorneys' fees, in having to prosecute this matter.

F.    On Count V of the Complaint, judgment in favor of Inline and against Graphic for treble damages in an amount to be determined at trial, plus all costs and disbursements, including reasonable attorneys' fees, in having to prosecute this matter.

G.    Prejudgment interest.

H.    An Order awarding any further relief deemed equitable and just by this Court.

Date: July 31, 2015.                    WINTHROP & WEINSTINE, P.A.

                                        *s/Justice Ericson Lindell*
                                        Robert R. Weinstine (#0115435)
                                        Justice Ericson Lindell (#312071)

                                        225 South Sixth Street, Suite 3500
                                        Minneapolis, MN 55402-4629
                                        rweinstine@winthrop.com
                                        jlindell@winthrop.com
                                        T (612) 604-6400 | F (612) 604-6800

                                        *Attorneys for Plaintiff*
                                        *Inline Packaging, LLC*

10688489v1