# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Inline Packaging, LLC,

               Plaintiff,

     v.

Graphic Packaging International, Inc.,

               Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 15-3183 ADM/LIB

_____

Brent Lorentz, Esq., Robert Weinstine, Esq., and Justice Lindell, Esq., Winthrop & Weinstine, PA, Minneapolis, MN, on behalf of Plaintiff.

Amanda Ames, Esq., David Hamilton, Esq., and Jason Hicks, Esq., Womble Carlyle Sandridge & Rice, LLP, Washington, D.C., and Felicia Boyd, Esq., Barnes & Thornburg LLP, Minneapolis, MN, on behalf of Defendant.

_____

## I.  INTRODUCTION

On November 24, 2015, the undersigned United States District Judge heard oral argument on Defendant Graphic Packaging International, Inc.'s ("Graphic") Motion to Dismiss [Docket No. 25].  Plaintiff Inline Packaging, LCC ("Inline") opposes the Motion.  For the reasons stated herein, Defendant's Motion is granted in part and denied in part.

## II.  BACKGROUND

Inline and Graphic compete in the susceptor food packaging industry.  Compl. [Docket No. 1] ¶ 2.  Susceptor food packaging is a type of active food packaging that converts microwave energy to high surface temperatures which in turn crisps and browns foods.  Id. ¶ 60.  Inline identifies itself as a small player, whereas Graphic is one of the largest paperboard packaging companies in the United States with at least a 95% share of the susceptor food packaging market.  Id. ¶¶ 13–14, 17.  Inline and Graphic primarily compete within this susceptor food packaging market for supply contracts with companies such as Nestle, Heinz, Little Lady Foods, Nation

Pizza Products, and Smuckers.  Id. ¶¶ 20–21.

Inline alleges that Graphic, in response to price competition from Inline and others, engages in anticompetitive conduct to maintain a monopolizing position in the crisping and browning susceptor packaging market.  Id. ¶¶ 23–58, 81–110.  Inline posits that Graphic's conduct produces no pro-competitive benefits and, because of this conduct, Inline has lost both existing and potential customers.  Id. ¶¶ 111, 114.  Inline asserts five claims against Graphic:  (1) Count I—Tortious Interference with Prospective Business Relations; (2) Count II—Tortious Interference with Existing Contractual Relations; (3) Count III—Misappropriation of Trade Secrets; (4) Count IV—Violation of Minn. Stat. § 325D.52 for Maintenance or Use of a Monopoly Power; and (5) Count V—Violation of the Sherman Antitrust Act, 15 U.S.C. § 2.  Id. ¶¶ 121–48.  Graphic moves to dismiss the Complaint in its entirety.

### III.  DISCUSSION

#### A.  Motion to Dismiss Standard

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true.  Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1994); Ossman v. Diana Corp., 825 F. Supp. 870, 879–80 (D. Minn. 1993).  Any ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party.  Ossman, 825 F. Supp. at 880.

A pleading must contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but not 'shown'—'that the pleader is entitled to relief.'" Id. (quoting Fed. R. Civ. P. 8(a)(2)).

**B. Antitrust Claims**

Inline asserts antitrust claims against Graphic under both Minn. Stat. § 325D.52 (Count IV) and the Sherman Antitrust Act, 15 U.S.C. § 2 (Count V). Section 2 of the Sherman Act imposes liability on "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. To establish a § 2 violation, Inline must plausibly allege that Graphic (1) "possessed monopoly power in the relevant market," and (2) "willfully acquired or maintained this monopoly power by anticompetitive conduct as opposed to gaining that power as a result of a superior product, business acumen, or historical accident." Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1060 (8th Cir. 2000). "Minnesota anti-trust law is interpreted consistent with the federal court's construction of the Sherman Act." Lamminen v. City of Cloquet, 987 F. Supp. 723, 734 (D. Minn. 1997) (citing State by Humphrey v. Road Constructors, Inc., 474 N.W.2d 224, 225 n.1 (Minn. Ct. App. 1991)); see also Lorix v. Crompton Corp., 736 N.W.2d 619, 626 (Minn. 2007) ("As the purposes of Minnesota and federal antitrust law are the same, it is sensible to interpret them consistently.").

Inline's antitrust claims are premised on several theories of anticompetitive behavior, including:  (1) discount bundling; (2) baseless threats of sham litigation; and (3) submarine patent activities.  Graphic counters that none of these three antitrust theories advanced by Inline are legally viable, nor are they supported by sufficient factual allegations.  Graphic additionally moves for dismissal based on Inline's failure to plead a relevant market and Inline's lack of standing to assert an antitrust claim.  The Court will address each argument in turn.

## 1.  Relevant Market

To state a viable claim under Section 2 of the Sherman Act, Inline has the burden of identifying a valid relevant market.  Double D. Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 560 (8th Cir. 1998).  A relevant market has components of both a product market and a geographic market.  Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 345 (8th Cir. 1995).  "The relevant product market includes all reasonably interchangeable products. The geographic market is defined by considering the commercial realities faced by consumers.  It includes the geographic area in which consumers can practically seek alternative sources of product."  Double D. Spotting Serv., 136 F.3d at 560 (internal citations omitted).  "Without a well-defined relevant market, a court cannot determine the effect that an allegedly illegal act has on competition."  Little Rock Cardiology Clinic PA v. Baptist Health, 591 F.3d 591, 596 (8th Cir. 2009) (citing FTC v. Freeman Hosp., 69 F.3d 260, 270–71 (8th Cir. 1995)).  Generally, "proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers."  Double D. Spotting Servs., 136 F.3d at 560 (quoting Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997)).  However, this rule does not equate to "a per se prohibition against dismissal of antitrust claims for failure to plead a relevant

4

market under Fed. R. Civ. P. 12(b)(6)." Id. (quoting Queen City Pizza, 124 F.3d at 436).  Here, Inline defines the product market as the "susceptor food packaging market" and the geographic market as the United States.  Graphic disputes these market designations.

Inline has sufficiently pled both the product and geographic components of a relevant market to withstand a motion to dismiss.  As to the product market, Graphic contends that the "susceptor food packaging market" is too narrow.  Graphic argues that the Complaint refers to the larger markets of "paperboard food packaging" and "microwaveable foods," and that it is "obvious from any trip down a grocery store aisle" that "susceptor technology is only one way for food products to be packaged and microwaves are only one way to cook food."  Mem. Supp. Mot. Dismiss [Docket No. 27] 9.  As such, Graphic contends that Inline has not adequately pled facts to identify the susceptor food packaging market as an independently relevant product market because variations in product type do not automatically equate to differing product markets.  See Craftsman Limousine, Inc. v. Ford Motor Co., 491 F.3d 380, 389–90 (8th Cir. 2007) (finding that a speciality limousine market was not distinguishable from the general market of limousines).

Graphic's position is without merit.  "The relevant product market should include 'products that have reasonable interchangeability for the purpose for which they are produced.'" Little Rock Cardiology Clinic PA, 591 F.3d at 596 (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956)).  As alleged in the Complaint, susceptor food packaging serves the specialized purpose of crisping and browning foods when microwaved. See Compl. ¶ 60.  The Complaint further alleges that this packaging is unique in the marketplace as it "includes only active packaging that crisps and browns foods, which effect cannot be

5

achieved using standard paperboard packaging." Id.  Thus, the purposes of susceptor food

packaging and paperboard packaging are not necessarily interchangeable.  Moreover, the

Complaint adequately alleges why there is a lack of reasonable substitutes for susceptor

packaging—there are no similarly-priced or effective ways to crisp and brown microwaveable

foods.  Id. ¶ 67.  These allegations are sufficient at the this stage.  Inline has "alleged specific

facts that support a narrow product market in a way that is plausible and bears a rational relation

to the methodology courts prescribe."  Anchor Wall Sys., Inc. v. Rockwood Retaining Walls,

Inc., No. 06-0466, 2007 WL 4465195, at *7 (D. Minn. Dec. 18, 2007) (quotation and citation

omitted).

Turning next to the alleged geographic market, Graphic argues that Inline has not

sufficiently alleged facts in the Complaint to designate the United States as the relevant

geographic market.  Graphic suggests that it participates, along with Inline, in the worldwide

market, as both companies compete for contracts with international food companies (such as

Nestle) and companies based in the United States that conduct business worldwide (such as

Heinz and Smuckers).

Courts define the relevant geographic market as "the geographic area to which consumers

can practically turn for alternative sources of the product and in which the antitrust defendants

face competition."  Morgenstern v. Wilson, 29 F.3d 1291, 1296 (8th Cir. 1994) (citing Baxley-

DeLamar Monuments, Inc., v. Am. Cemetery Ass'n, 938 F.2d 846, 850 (8th Cir. 1991)).  The

Complaint alleges, with sufficient specificity, that factors such as transportation costs, currency

exchange rates, and developing packaging designs remotely are hurdles to consumers looking to

the international market for alternative susceptor packaging.  See Compl. ¶ 76.  These facts

support a plausible conclusion that the relevant market is not international.

Inline has properly pled the required components of product and geographic market. Further, given that proper market definition is best determined through "a factual inquiry into the commercial realities faced by consumers," the record at this early stage of the proceedings is sufficient for the case to proceed.  See Double D. Spotting Servs., Inc., 136 F.3d at 560.

### 2. Bundle Discounts

Inline claims that by offering packaging bundles to consumers, Graphic is engaging in anticompetitive behavior.  Compl. ¶¶ 23–28.  This theory of antitrust conduct centers on Graphic's alleged ability to provide differing types of packaging to food company buyers (customers) in a bundled discount.  Id. ¶ 24.  The Complaint alleges Graphic is a large player in the paperboard/cardboard packaging market, a market that is 400 times larger than the susceptor food packaging market.  Id. ¶ 23.  Inline does not participate in the paperboard market.  Id.

### a. Bundling Susceptor and Paperboard Packaging

Specifically, Inline claims that Graphic offers significant discounts if customers purchase large quantities of bundled  paperboard packaging and susceptor packaging.  Id.  According to Inline, the volume of susceptor food packaging ordered in such bundles is significantly smaller compared to paperboard packaging, as paperboard packaging is in much higher demand from food company buyers.  Id. ¶ 25.  Due to the high quantity of paperboard packaging within the bundles, buyers receive a significant discount on the paperboard products—but only if they agree to purchase the susceptor packaging included in the bundle.  Id. ¶ 26.  Stated differently, to receive a discount food company buyers must purchase both the susceptor packaging and paperboard packaging together.  Id.

Inline claims that due to the discount provided through bundle packaging, food company buyers are discouraged from purchasing separate susceptor food packaging from Graphic's smaller competitors like Inline, even though Inline is more efficient at producing susceptor food packaging.  Id. ¶¶ 22, 27.  In sum, Inline alleges that "[b]ecause food company buyers commonly purchase far greater volumes of paperboard than susceptor food packaging, smaller competitors cannot profitably offer susceptor food packaging at a price low enough to compete with the discounts available on paperboard food packaging through Graphic's bundles."  Id. ¶ 28.

### b.  Standard for Discount Bundling Theory

In theory, "[b]undling is the practice of offering, for a single price, two or more goods or services that could be sold separately.  A bundled discount occurs when a firm sells a bundle of goods or services for a lower price than the seller charges for the goods or services purchased individually."  Cascade Health Sol. v. PeaceHealth, 515 F.3d 883, 894 (9th Cir. 2008) (citations omitted).  These bundled discounts can in turn be utilized by entities to increase their market share in the competitive product.

The law surrounding bundled discounts as a theory of anticompetitive behavior, however, is far from clearly established.  Indeed, the Eighth Circuit has not explicitly addressed the viability of such a claim.  In Concord Boat Corp. v. Brunswick Corp., the Eighth Circuit referenced several out-of-circuit discount bundling cases, appearing to at least implicitly recognize the theory.  207 F.3d 1039, 1062 (8th Cir. 2000) ("Because only one product . . . is at issue here and there are no allegations of tying or bundling with another product, we do not find these cases persuasive.").  Of those circuits which have expressly recognized discount bundling as a form of anticompetitive behavior, there is no consensus on the standard utilized to evaluate

discount bundling claims.

In LePage's Inc. v. 3M, the Third Circuit examined a bundled rebate program that allowed 3M to leverage its monopoly power in Scotch Brand tape to impact other categories in which the plaintiff also competed.  324 F.3d 141 (3d Cir. 2003).  3M argued that as a matter of law, above-cost pricing could not give rise to an antitrust claim because price reduction, so long as it is not below cost, is the type of conduct antitrust laws serve to promote.  Id. at 147.  The Third Circuit rejected this argument, noting that competitors may be unable to compensate buyers for the discount on the competitive product, even in scenarios when the bundled discount scheme is above costs.  See id. at 155 (quoting Phillip E. Areeda & Herbet Hovenkamp, Antitrust Law ¶ 794, at 83 (Supp. 2002)).

In contrast, in Cascade Health, the Ninth Circuit adopted a "discount attribution" standard for analyzing bundled discounts under § 2 of the Sherman Act:

> To prove a bundled discount was exclusionary or predatory for the purposes of a monopolization or attempted monopolization claim under § 2 of the Sherman Act, the plaintiff must establish that, after allocating the discount given by the defendant on the entire bundle of products to the competitive product or products, the defendant sold the competitive product or products below its average variable cost of producing them.

Cascade Health, 515 F.3d at 910.  Therefore, critical to the discount attribution standard is the component that the defendant is pricing the competitive product below cost.  As stated by the Ninth Circuit, "[t]his standard makes the defendant's bundled discounts legal unless the discounts have the potential to exclude a hypothetical equally efficient producer of the competitive product."  Id. at 906 (citation omitted).[1]

----

[1]  At the hearing, Graphic referenced Southeast Missouri Hosp. v. C.R, Bard, Inc., 616 F.3d 888 (8th Cir. 2010) ("Bard I").  In Bard I, the Eighth Circuit did analyze a discount

To add to this mix, in <u>Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.</u>, the Supreme Court held that to prevail on a predatory pricing claim, a plaintiff must prove that (1) "the prices complained of are below an appropriate measure of its rival's costs" and (2) "that the competitor had . . . a dangerous probability, of recouping its investment in below-cost prices." 509 U.S. 209, 222–24 (1993).  In 2009, the Supreme Court reiterated this holding in <u>Pacific Bell Telephone Co. v. Linkline Communications, Inc.</u>, when it stated that "low prices are only actionable under the Sherman Act when the prices are below cost and there is a dangerous probability that the predator will be able to recoup the profits it loses from the low prices.  555 U.S. 438, 457 (2009) (citing <u>Brooke Grp.</u>, 509 U.S. at 222–24).

### c. Application of Standards to Inline's Discount Bundling Theory

Graphic argues that the bundled discount theory cannot advance the antitrust claims here for several reasons.  According to Graphic, this theory should be evaluated under the <u>Linkline</u> standard which it fails because Inline has alleged neither that Graphic's prices are below cost nor that there is a dangerous probability that Graphic will recoup its lost profits.

Graphic maintains that the <u>LePage</u> test for bundling is an outlier, and that the other circuit courts to have addressed the issue, such as the Ninth Circuit in <u>Cascade,</u> require some below cost pleading component, which Inline has failed to do.  In response, Inline posits that Graphic is

---

bundling theory wherein the Court seemed to, at least implicitly, endorse a discount bundling test requiring a below cost pricing component after attributing the entire discount on all products within a package to the competitive product.  <u>See</u> <u>Bard I</u>, 616 F.3d at 893.  However, <u>Bard I</u> was vacated shortly after its publication and decided on alternative grounds while making no reference to the discount bundling theory.  <u>See</u> <u>Southeast Missouri Hosp. v. C.R. Bard, Inc.</u>, 642 F.3d 608 (8th Cir. 2011) ("<u>Bard II</u>").  Due to the Eighth Circuit's <u>Bard II</u> decision, this Court will place no precedential value on <u>Bard I</u> in determining how the Eighth Circuit may, in the future, evaluate a discount bundling antitrust claim.

conflating the standard for a run-of-the-mill predatory pricing claim with a bundling claim and urges this Court to adopt the standard in LePage—that a plaintiff is not required to show that a competitive product is priced below cost to establish a discount bundling claim.  Inline further argues that even if this Court were to look to a discount attribution standard as articulated in Cascade, the Complaint can be read to reasonably infer that Graphic is selling susceptor packaging below cost.

The Court agrees with Inline's contention that a predatory pricing claim can be different than a bundled discount theory of anticompetitive behavior.  Since the Supreme Court's holding in Linkline, courts have continued to address these claims under separate standards.  See Vesta Corp. v. Amdocs Mgmt. Ltd., No. 3:14-1142, 2015 WL 5178073, at *14–19 (D. Or., Sept. 3, 2015) (evaluating a predatory pricing claim under the Brooke Group standard and a bundled discounts claim under the Cascade standard); Universal Surveillance Corp. v. Checkpoint Sys., Inc., No. 5:11-1755, 2015 WL 6561241, at *5–6 (N.D. Ohio Oct. 19, 2015) (noting that when a discount is offered on a single product, it is evaluated under "antitrust's ordinary predatory pricing rule" (the Brooke Group standard), whereas a bundled discount offered on more than one product is evaluated under Cascade); see also Safeway Inc. v. Abbott Labs., 2010 WL 147988, at * 4 (N.D. Cal. Jan. 12, 2010) (dismissing an argument that Linkline rejected attribution tests like those set forth in Cascade).  Because the Court is not convinced that the Brooke Group/Linkline standard for predatory pricing is applicable here, Inline is not required to plead that Graphic has a dangerous probability of recouping its costs.

As to Graphic's contention that Inline has failed to plead the component of below cost allegations, even if this Court were to adopt the discount attribution test articulated in Cascade,

11

Inline's claim does not fail.  In the Complaint, Inline specifically alleges that it is more efficient than Graphic in manufacturing susceptor packaging, yet Inline cannot profitably offer susceptor food packaging at a price sufficiently low to compete with the discounts provided in Graphic's bundles.  See Compl. ¶¶ 22, 28.  These allegations lead to the logical inference that Graphic is selling below its cost; if Inline is more efficient than Graphic at making susceptor packaging and cannot sell the packaging for a profit to compete with Graphic's bundles, Graphic too must be selling below cost because it is less efficient than Inline.  At this stage, the Court must construe the Complaint and "all reasonable inferences arising therefrom" in Inline's favor and will do so here.  Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986) (citation omitted).  Inline's discount bundling claim survives dismissal at this time.

### 3.  Sham Litigation

Inline additionally bases its antitrust claims on a theory of "sham litigation."  Under this theory, Inline claims that Graphic directed baseless threats of litigation at Inline and Inline's customers which amounted to anticompetitive behavior.  Graphic moves for dismissal of the sham litigation theory based on pleading deficiencies and protection under the Noerr-Pennington doctrine.

### a.  Graphic's Litigation Threats

Inline alleges Graphic is well-known as a litigious participant in both the susceptor and paperboard food packaging markets.  Compl. ¶ 29.  According to Inline, Graphic is able to achieve its "dominant position in the susceptor food packaging market in part by engaging in aggressive and predatory litigation tactics against its smaller rivals and potential new entrants."  Id. ¶ 30.  Inline alleges that Graphic engages in two forms of sham litigation threats to achieve

market monopolization:  (1) Graphic directly threatens its competitors and their customers with patent infringement pertaining to expired or inapplicable patents; and (2) Graphic communicates directly with Inline's customers to threaten potential suit against Inline and, in so doing, deters those customers from pursuing business with Inline and gains the business for itself.  Id. ¶¶ 31, 39–42.

As to the first category of behavior, Inline claims that Graphic has directly threatened its competitors and food company buyers with patent infringement suits, including threats made related to expired or inapplicable patents.  Id. ¶ 31.  Through this misuse of intellectual property, Inline alleges Graphic is able to monopolize the market.  Id.

As to the second category, the Complaint identifies at least two instances where Graphic communicated with Inline's customers by threatening litigation against Inline to reduce Inline's business.  Inline alleges that in 2014 after being awarded a bid for 1.1 billion units of susceptor food packaging products from a food company buyer, the buyer ultimately ordered only ten percent of the product in the contract.  Id. ¶ 41.  Inline attributes Graphic's communications with the food company buyer for the reduction; that is, Graphic communicated to the food company buyer that it was planning to sue Inline and therefore the customer should not contract with Inline for susceptor products.  Id.   The Complaint further describes an occasion where Inline was unsuccessful in securing a contract from Nation Pizza Products due to Graphic's assertion to Nation Pizza Products that it would sue Inline if Inline was awarded the Nation Pizza Products contract.  Id. ¶ 42.

### b.  The Noerr-Pennington Doctrine

Graphic argues that the sham litigation theory of anticompetitive conduct is barred by

Noerr-Pennington immunity.  Inline responds that although the doctrine may arguably apply to communications pertaining to litigation directly between Graphic and Inline, it does not extend to Graphic's communications with Inline's customers about threatened litigation against Inline. Even if Noerr-Pennington was applicable, Inline contends that the sham litigation exception saves the claim.

The Noerr-Pennington doctrine derives from two cases wherein the Supreme Court established that the right to petition under the First Amendment includes a litigant's right to bring a suit in federal or state court.  See E.R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965). Generally, under the doctrine, the act of filing a lawsuit is viewed as a form of petitioning activity and is therefore immune from antitrust liability.  Hinshaw v. Smith, 436 F.3d 997, 1003 (8th Cir. 2006).  Because "[t]he right to petition means more than simply the right to communicate directly with the government," the Noerr-Pennington doctrine "necessarily includes those activities reasonably and normally attendant to effective petitioning."  In re IBP Confidential Bus. Documents Litig., 755 F.2d 1300, 1310 (8th Cir. 1985) (citations omitted).

Protection under Noerr-Pennington is not limitless, and an exception exists to the immunity it provides.  Under the doctrine, immunity does not extend when the petitioning effort taken, or lawsuit filed, is a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor."  Noerr, 365 U.S. at 144.  This exception applies when the petitioning activities at issue are "so clearly baseless as to amount to an abuse of process."  South Dakota v. Kansas City S. Indus., Inc., 880 F.2d 40, 51 (8th Cir. 1989) (quoting Razorback Ready Mix Concrete Co. v. Weaver, 761 F.2d 484, 487 (8th Cir.

14

1985)).  "The sham exception is narrow, and the . . . party attempting to invoke the exception

bears a heavy burden of demonstrating that the [activities are] objectively meritless."  <u>CBS</u>

<u>Interactive Inc. v. Nat'l Football League Players Ass'n, Inc.</u>, 259 F.R.D. 398, 413 (D. Minn.

2009) (internal quotation omitted).

### c. Application of <u>Noerr-Pennington</u>

The parties first contest whether the allegations alleged here are even covered by <u>Noerr-</u>

<u>Pennington</u>.  As noted above, the Complaint focuses on alleged threats of litigation directed both

to Inline and Inline's customers.  Inline urges this Court to adopt the reasoning of the Tenth

Circuit articulated in <u>Cardtoons, L.C. v. Major League Baseball Players Ass'n</u>, where the court

concluded that the right to petition the government under the First Amendment did not extend to

immunize private threats of litigation.  208 F.3d 885, 893 (10th Cir. 2000).  Inline acknowledges

that other circuit courts have held to the contrary, but argues that no court has extended <u>Noerr-</u>

<u>Pennington</u> to communications with customers who were not actually the target of the threatened

litigation.  Graphic maintains that all allegations asserted are immunized by the doctrine.

In <u>Cardtoons</u>, a designer of parody baseball cards sought a declaratory judgment that the

cards produced were not in violation of the Major League Baseball Players Association's

publicity rights and additionally sought damages for tortious interference.  <u>Id.</u> at 886–87.

Cardtoons initiated the declaratory judgment action due to a cease and desist letter sent by the

League Association.  <u>Id.</u>  The League Association argued that it was immune under the <u>Noerr-</u>

<u>Pennington</u> doctrine.  The Tenth Circuit disagreed, holding that "[a] letter from one private party

to another private party simply does not implicate the right to petition [the government],

regardless of what the letter threatens."  <u>Id.</u> at 892.  The court distinguished the case, involving

15

tort claims, with other circuits' decisions pertaining to antitrust claims.

In contrast to Cardtoons, multiple circuit courts have held that the Noerr-Pennington doctrine does protect pre-litigation activities such as pre-suit demand letters, so long as such letters are not a "sham." For example, in Sosa v. DIRECTTV, Inc., the Ninth Circuit concluded that DIRECTTV was immune from RICO liability under the Noerr-Pennington doctrine for sending settlement demand letters to individuals who had allegedly improperly utilized its satellite signal. 437 F.3d 923, 935 (9th Cir. 2006). In so deciding, the court emphasized that although the letters themselves where not petitions, the First Amendment "may nevertheless preclude burdening them so as to preserve the breathing space required for the effective exercise of the rights it protects." Id. at 933. The court therefore held that "conduct incidental to the prosecution" of a lawsuit was protected under the Noerr-Pennington doctrine, stating "where the underlying litigation fell within the protection of the Petition Clause, such incidental conduct would also be protected." Id. at 935. Other circuit courts have similarly concluded that pre-litigation activity reasonably attendant to litigation is protected under the doctrine. See e.g., Primetime 24 Joint Venture v. Nat'l Broad. Co. Inc., 219 F.3d 92, 100 (2d Cir. 2000); McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552, 1560 (11th Cir. 1992); Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358, 1366–67 (5th Cir. 1983).

Here, Graphic argues that Cardtoons is an outlier and inapplicable. Graphic seems to interpret the litigation threats referenced in the Complaint as communications from Graphic to Inline and Inline's customers directly threatening patent enforcement litigation. As such, Graphic maintains that the Court should adhere to the reasoning of Sosa and other judges within this district in finding that the pre-litigation activities here are protected under Noerr-Pennington.

Specifically, Graphic argues that because 35 U.S.C. § 287(a) requires that potential infringers be notified before a patentee can recover damages, pre-litigation notice letters would necessarily be encompassed under Noerr-Pennington.  See Select Comfort Corp. v. Sleep Better Store, LLC, 838 F. Supp. 2d 889, 899-900 (D. Minn. 2012) (distinguishing Cardtoons and finding pre-litigation letters "reasonably attendant to litigation, especially where the trademark statute explicitly provides for such pre-suit notification to alleged infringers").

    The reasoning articulated in Sosa and adopted by the majority of circuit courts to consider this question is sound.  The Supreme Court has cautioned that when determining whether conduct falls within the protection of Noerr-Pennington, a court must give adequate "breathing space" to the right to petition.  See BE & K Constr. Co. v. NLRB, 536 U.S. 516, 531 (2002).  Accordingly, it follows that "adequate breathing space" would include conduct necessarily relating to initiating a lawsuit.  Inline seems to acknowledge this.  See Mem. Opp'n Mot. Dismiss [Docket No. 31] 21.  Therefore, to the extent Inline is alleging that Graphic made direct threats of patent enforcement litigation to Inline, such actions would be entitled to Noerr-Pennington protection unless deemed to be merely a sham.

    However, Inline's allegations go beyond direct threats of litigation from Graphic to its competitors such as Inline.  The Complaint also alleges that Graphic communicated with Inline's customers, threatening suit against Inline should these customers continue to work with Inline.  Graphic has not identified any cases, and this Court has found none, supporting the extension of Noerr-Pennington to scenarios where those receiving the communications were third parties not directly threatened with litigation.  Alleged actions against third parties who were not directly threatened with litigation are seemingly unrelated to Graphic's ability to petition a court for

17

redress for Inline's wrongdoing.  Moreover, even if such actions came within the purview of Noerr-Pennington, Inline has, for the purposes of this Motion, sufficiently alleged that Graphic's conduct was a sham.

### d.  Sham Allegations

As noted above, the Noerr-Pennington doctrine does not apply when the litigation at issue is found to be "a mere sham intended to disguise tortious or anticompetitive liability." Datascope Corp. v. Vascular Sols., Inc., 165 F. Supp. 2d 933, 936 (D. Minn. 2001).  Here, Inline has adequately pled facts to establish that Graphic's litigation activities constituted a sham so as to preclude immunity under the Noerr-Pennington doctrine.

Unsurprisingly, the parties disagree as to what standard applies.  Graphic recites the test articulated in Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49 (1993) ("PREI").  In that case, the Court found that the sham exception is only applicable when (1) it is established that the litigation is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and (2) the litigation is subjectively motivated by bad faith in the sense that the litigation is initiated as an "anticompetitive weapon."  PREI, 508 U.S. at 60-61 (quotations omitted). The Eighth Circuit has also elaborated on the sham exception test as set forth in PREI:

> It is only where a defendant's resort to the courts is accompanied or characterized by illegal and reprehensible practices such as perjury, fraud, conspiracy with or bribery of government decision makers, or misrepresentation, or is so clearly baseless as to amount to an abuse of process, that the Noerr-Pennington cloak of immunity provides no protection.

Razorback Ready Mix Concrete, 761 F.2d at 487 (emphasis added) (citation omitted).

Inline responds that the PREI standard should only be utilized in instances when a court

is considering whether a single act rises to the level of sham litigation.  According to Inline, because it has alleged a "pattern or practice" of behavior, the proper standard is whether there is "a pattern of baseless, repetitive claims . . . which leads the factfinder to conclude that the administrative or judicial processes have been abused."  California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 513 (1972).

The Eighth Circuit has not yet evaluated the potential interplay between PREI and California Motor.  Indeed, "[i]t is unclear whether PREI distinguished or displaced the sham litigation test first propounded in California Motor."  Waugh Chapel S., LLC v. United Food and Comm. Workers Union Local 27, 728 F.3d 354, 363 (4th Cir. 2013).  However, several circuit courts have drawn a distinction between the two tests.  The Ninth Circuit, for example, has interpreted the tests "as applying to different situations" as "Professional Real Estate Investors provides a strict two-step analysis to assess whether a single action constitutes sham petitioning . . . [whereas] California Motor Transport deals with the case where the defendant is accused of bringing a whole series of legal proceedings."  USS–POSCO Indus. v. Contra Costa Cnty. Bldg. & Const. Trades Council, AFL-CIO, 31 F.3d 800, 810–11 (9th Cir. 1994).

At this stage, however, the Court need not determine which test is applicable, as Inline has sufficiently alleged sham litigation under both standards.  Under the California Motor test, the facts alleged in the Complaint relating to Graphic's litigation activity amount to a pattern or practice.  Inline claims that on at least two occasions Graphic targeted Inline by notifying Inline's customers that it planned to sue Inline and this was done with the "intent to maintain and exercise [Graphic's] dominant market position."  Compl. ¶ 44.  Additionally, Inline generally alleges that Graphic threatened competitors and food company buyers with infringement suits

about "expired or inapplicable patents." Id. ¶ 31.   This activity, taken together, pleads a "pattern of baseless, repetitive claims" under California Motor to constitute the sham litigation exception to Noerr-Pennington.

The Complaint also adequately pleads the sham exception under the test articulated in PREI.  Graphic argues that Inline cannot satisfy the PREI standard as it has failed to allege facts plausibly showing that Graphic's litigation activities were objectively unreasonable.  Graphic emphasizes that Inline has not explicitly identified any unsuccessful lawsuit and states that "even if there was an open question about the scope or validity of some of Graphic's patents, the mere existence of such a dispute would fall well short of the requirements of sham litigation."  Mem. Supp. Mot. Dismiss at 20.  However, at this stage, Inline is not required to show that the litigation threatened was actually meritless.  Inline must only allege facts to plausibly establish that Graphic's litigation activity was objectively baseless.  It has done so.  Inline alleges that Graphic threatened enforcement of patents that were invalid, expired, or inapplicable.  See Compl. ¶ 31.  An infringement action based on such patents would be clearly baseless and an abuse of process.  Inline further alleges that these enforcement actions were an anticompetitive weapon.  According to Inline, these litigation threats were utilized as "a means to monopolize the market through litigation and threats of litigation by raising rivals' costs, both financial and reputational."  Id.  These allegations, if true, could establish that Graphic's litigation threats were a sham under the PREI test.  See Reg'l Multiple Listing Serv. of Minn., Inc. v. Am. Home Realty Network, Inc. 960 F. Supp. 2d 958, 978–79  (D. Minn. 2013) (finding that plaintiff had adequately alleged sham litigation when it stated that defendant was asserting a copyright claim over software it allegedly did not design or own).

20

More fundamentally, the Court finds that a decision as to whether Noerr-Pennington immunizes litigation activity here or if any protected activity constitutes a sham is better reserved until after discovery.  See Scooter Store, Inc. v. SpinLife.com, LLC, 777 F. Supp. 2d 1102, 1115 (S.D. Ohio, 2011) ("[W]hether a party's conduct is a genuine attempt to avail itself of the judicial process or is merely a sham is a question of fact that is inappropriate for a motion to dismiss.") (citing Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, 690 F.2d 1240, 1253 (9th Cir. 1982)); Fox News Network, L.L.C. v. Time Warner Inc., 962 F. Supp. 339, 346 (E.D.N.Y. 1997) ("The decision about whether the Noerr-Pennington doctrine applies should be left until after discovery, so as to more fully develop the underling acts and possibly establish an exception." (quotation omitted)).  Here, whether specific communications are covered under Noerr-Pennington immunity can be better deciphered after discovery reveals the contents of such communications and to whom they were directed.  Moreover, discovery will undoubtedly reveal the patents at issue so a determination can be made on whether threatened enforcement litigation was so meritless as to constitute a sham.  For now, Inline has pled sufficient facts to support a claim that the sham exception is applicable.  Graphic's Motion to Dismiss the antitrust claims as it pertains to the sham litigation theory is denied.[2]

---

[2] Graphic also challenges the viability of Inline's bundled discount and sham litigation theories for vagueness and lack of sufficient supporting facts.  For example, Graphic highlights that the Complaint does not identify the actual products contained in the bundled discounts, the prices of those bundles, or the specific lawsuits and contents of litigation threats.  The Complaint is not particularly detailed, but it does state enough facts to raise plausible claims for relief on its face.  See Twombly, 550 U.S. at 570.  The Complaint goes beyond threadbare recitations of the elements of the claims asserted here—it asserts that Graphic bundled susceptor and paperboard packaging and that Graphic made sham litigation threats based on expired or inapplicable patents.  Indeed, Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation."  Iqbal, 129 S. Ct. At 1949 quoting Twombly, 550 U.S. at 55).  Inline has satisfied this pleading standard.

### 4. Submarine Patent Activities

Inline also alleges Graphic violated antitrust law by engaging in "baiting/submarine patent activities."  Compl. ¶¶ 55–58, 106–10.  Inline claims that Graphic purposefully fails to disclose its intellectual property holdings by not marking its packaging with applicable patents.  Id. ¶ 106.  In so doing, Inline posits that Graphic baits its competitors into investing substantial resources into production efforts on products that Graphic has protected by patent.  See id.  In some cases, Inline alleges, "Graphic has waited until after such packaging has become commonplace in the market to apply for such patents, and then waited months or years after being issued such patents to threaten or bring an action against its competitors, despite prior knowledge of allegedly infringing competitor products in the marketplace."  Id. ¶ 55.

The Complaint specifically identifies an occasion where Graphic stopped competing in a bidding process for a large susceptor food packaging supply contract in 2014.  Id. ¶ 58.  Instead of participating in the bidding process, Inline alleges that Graphic threatened Inline with litigation based on an undisclosed patent to foreclose Inline's ability to compete in the market. Id.

Graphic moves to dismiss this theory of antitrust liability, identifying it as "a truly novel argument" and stating that it stands in stark contrast to Inline's sham litigation theory which faults Graphic for actively informing food packaging companies of its patents.  Reply Mem. Supp. Mot. Dismiss [Docket No. 32] at 7 ("While Plaintiff's 'sham litigation' theory faults Graphic for informing customers about its patents, Plaintiff's 'submarine patent' theory does the exact opposite.").

The Court agrees with Graphic that this claim is illogical.  Patent marking is not

mandatory.  See 35 U.S.C. § 287(a) (stating a patentee "may give notice to the public that the

same is patented") (emphasis added).  Under 35 U.S.C. § 287(a), a patentee cannot recover

damages "except on proof that the infringer was notified of the infringement and continued to

infringe thereafter."  Id.  When a patentee does not mark a product, § 287(a) requires actual

notice "to assure that the recipient knew of the adverse patent during the period in which liability

accrues, when constructive notice by marking is absent."  SRI Int'l, Inc. v. Adv. Tech. Labs.,

Inc., 127 F.3d 1462, 1270 (Fed. Cir. 1997).  Thus, marking serves as an option for patentees to

ensure that sufficient notice was provided which is required to recover damages for

infringement.  Inline cannot assert a cognizable antitrust theory based on Graphic's choice not to

mark a product—a choice that is contemplated in patent law.  Although, Inline argues that

Graphic's decision to not mark patented products "has no pro-competitive benefits" and "no

legitimate business purpose," these conclusory statements do not give rise to an antitrust claim.

Given that Graphic is under no legal obligation to mark its products and Inline has provided no

case law to support submarine patent theory as a viable antitrust theory, such claim is dismissed.

### 5. Antitrust Injury/Standing

In their last argument concerning the antitrust claims, Graphic argues that the claims fail

because Inline has not adequately alleged facts to establish that it suffered an antitrust injury and,

therefore, lacks standing.  To properly assert an antitrust action, a plaintiff must have suffered an

antitrust injury—an "injury of the type that the antitrust laws were intended to prevent and that

flows from that which makes defendants' acts unlawful."  In re Canadian Import Antitrust Litig.,

470 F.3d 785, 791 (8th Cir. 2006) (quotation omitted).  "[A]ntitrust injury is a threshold issue

that plaintiffs must establish in order to have standing to sue under the antitrust laws."  Fischer v.

NWA, Inc. 883 F.2d 594, 597 n.5 (8th Cir. 1989). "[A] mere causal connection between an antitrust violation and harm to plaintiff cannot be the basis for antitrust compensation unless the injury is directly related to the harm the antitrust laws were designed to protect." McDonald v. Johnson & Johnson, 722 F.2d 1370, 1374 (8th Cir. 1983).

Here, Inline has pled sufficient facts to demonstrate that it was injured by Graphic's anticompetitive behavior. Specifically, Inline alleges that it lost profits from sales not completed due to Graphic's interference/sham litigation tactics and lost profits from sales unrealized due to Graphic's bundled discounts. See Compl. ¶¶ 28, 41–43, 82, 87, 96, 99. At the pleading stage here, this is adequate. See Fair Isaac Corp. v. Experian Info. Solutions Inc., 645 F. Supp. 2d 734, 748–49 (D. Minn. 2009) (stating that although the plaintiffs' allegations that it "has been injured in its business and property" due to the defendants' antitrust violations were sufficient to survive a motion for judgment on the pleadings for lack of standing, more was needed at the summary judgment stage).

Graphic further challenges Inline's standing for failure to plead injury to competition. See Reply Mem. Supp. Mot. Dismiss at 7 ("The fact that [Inline] may have lost sales, however, does not mean that competition has been harmed."). Indeed, the interplay between injury-to-competition and direct injury to a plaintiff when evaluating antitrust standing is not always clear. "The two concepts are closely related, however, and the Eighth Circuit and decisions from this District largely conflate the two and incorporate an injury-to-competition requirement into the analysis of antitrust standing." TheMLSonline.com. Inc. v. Regional Multiple Listing Serv. of Minn., Inc., 840 F. Supp. 2d 1174, 1180 (D. Minn. 2012). Regardless, the Complaint here contains numerous allegations of injury to competition sufficient to withstand a motion to

dismiss.[3]  See Compl. ¶¶ 28, 34, 51, 54, 80.

## C.  Tortious Interference

Inline also alleges that Graphic tortiously interfered with Inline's prospective and actual

contractual relationships.  To establish tortious interference with an existing contract under

Minnesota law, a plaintiff must show:  (1) the existence of a contract, (2) the defendant's

knowledge of the contract, (3) the defendant's intentional procurement of the breach of contract,

(4) the defendant acted without justification, and (5) damages.  Kjesbo v. Ricks, 517 N.W.2d

585, 588 (Minn. 1994).  A claim for tortious interference with prospective economic advantage

also has five elements:  "(1) the existence of a reasonable expectation of economic advantage

belonging to the plaintiff; (2) the defendant's knowledge of that expectation; (3) the defendant's

wrongful interference with that expectation; (4) a reasonable probability that the plaintiff would

have realized the expectation absent the defendant's conduct; and (5) damages."  Daum v. Planit

Sols., Inc., 619 F. Supp. 2d 652, 658 (D. Minn. 2009) (citations omitted).  Liability for a tortious

interference with prospective economic advantage claim rests on whether the actor's conduct

was improper.  Fox Sports Net N., L.L.C. v. Minn. Twins P'ship, 319 F.3d 329, 337 (8th Cir.

2003) (citation omitted).  "For purposes of this tort, improper means are those that are

independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact,

restraint of trade or any other wrongful act recognized by statute or common law."  Harman v.

---

[3] Graphic additionally argues that Inline lacks standing to assert antitrust claims based on threats and litigation directed at third-party manufacturers.  See Disenos Artisticos E. Industriales, S.A. v. Work, 676 F. Supp. 1254, 1286 (E.D.N.Y. 1987) (stating that the defendant "has no standing to challenge allegedly coercive lawsuits brought against other parties").  The Complaint generally refers to sham litigation activities against "competitors" and "smaller rivals."  Compl. ¶¶ 30, 31.  The Court will resolve this ambiguity in Inline's favor and interpret such statements to be referring to Inline.

Heartland Food Co., 614 N.W.2d 236, 241 (Minn. Ct. App. 2000) (quotation omitted).

Graphic argues that Inline's Complaint asserts only vague and conclusory allegations that are insufficient to state a claim for tortious interference.  The Court disagrees.  Inline has sufficiently alleged both the existence of a contract and a reasonable expectation of business relations.  Furthermore, Inline has pled that Graphic interfered with these contracts or relations.

As to interference with an existing contract, Inline claims that in 2014 it was awarded contracts to supply 1.1 billion units of susceptor packaging products to a food company buyer. Compl. ¶ 41.  Inline alleges that due to Graphic's interference with that contract (i.e., Graphic's threat to the food company buyer that it would file suit against Inline), only ten percent of the product order was actually filled.  Id.  Graphic challenges the sufficiency of these claims, arguing that Inline did not identify the food company supplier, allege the existence of an enforceable contract, Graphic's knowledge of the contract, that the reduction of orders was indeed a breach, and that Graphic caused this breach.

Graphic's argument ignores the language of the Complaint.  Inline specifically alleges the existence of a contract.  The Complaint states Inline was scheduled to supply 1.1 billion units of susceptor packaging and only ten percent of this amount was filled during "the pendency of the contracts."  Id.  The Complaint also references Graphic's knowledge of the contract, in that it alleges Graphic communicated with the food buyer that it "intended to sue Inline and therefore the food company buyer should not source the susceptor products from Inline."  Id.  Inline additionally clearly alleges Graphic's actions caused the reduction of orders.  Id. ("Graphic's conduct led to Inline receiving orders for units of susceptor food packaging products far below the amounts agreed to."); Id. ¶ 129 ("Graphic intentionally caused Inline's customer to breach its

agreements with Inline."). Although Inline did not identify the food company buyer by name, this is not fatal to Inline's claim. Inline's allegations are sufficiently detailed to put Graphic on adequate notice of the claim.

Finally, Graphic argues that Inline did not overtly claim that the reduction in orders constituted a breach of Inline's contract with the food company buyer. The Court finds that a breach can logically be inferred from the pleadings—Inline alleges a contract for 1.1 billion units of susceptor packaging, only ten percent of which was ultimately ordered. Moreover, later in the Complaint a breach is specifically alleged. See Id. ¶ 130 ("With full knowledge of those agreements, Graphic intentionally caused Inline's customer to breach its agreements with Inline."). Although the clarity of the Complaint could be improved, the Court reads the Complaint as a whole and the allegations here, taken together, are sufficient. See Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) ("[T]he complaint should be read as a whole, not parsed piece by piece.").

Additionally, Inline adequately alleges tortious interference with a prospective economic advantage. Inline references a potential business relationship with Nation Pizza Products. According to Inline, after it met with Nation Pizza Products, Graphic communicated to Nation Pizza Products that it would sue Inline if Inline was awarded a contract. See Compl. ¶ 42. The Complaint later alleges that Inline had a reasonable expectation of economic advantage with food company buyers, Graphic was aware of this prospective economic advantage, and Graphic "intentionally, tortiously and illegally" interfered with Inline's expectations. Id. ¶¶ 122–24. Absent Graphic's conduct, Inline asserts "it was reasonably probable that Inline would have realized its expected economic advantage or benefit." Id. ¶ 125. Taking these assertions

27

together, Inline sufficiently pled a claim for tortious interference with a prospective economic

advantage sufficient to survive the motion to dismiss.

Graphic cites to Select Comfort Corp. v. Sleep Better Store, LLC to support its

contention that Inline has failed to allege that Graphic's actions were improper or wrongful. 838

F. Supp. 2d 889 (D. Minn. 2012). In that case, Sleep Better asserted a counterclaim for tortious

interference with a contract against its competitor Select Comfort. Id. at 891. The claim

centered on Select Comfort sending a cease and desist letter for trademark infringement to

Overstock.com regarding the sale of Sleep Better beds, when Overstock was contracted to sell

Sleep Better mattresses on its website. Id. The court dismissed the claim on a motion to dismiss.

Id. at 893–96. The court focused on the justification element of tortious interference—that is,

whether Select Comfort was justified in sending the cease and desist letter to Overstock.com. Id.

The court concluded that "there are no factual allegations in the pleadings to support any claims

that Select Comfort acted with bad faith or employed improper means. Sleep Better's mere

conclusory assertions that Select Comfort's conduct in sending the cease-and-desist letter was

'improper,' 'unjustified,' 'intentional,' and 'willful' do not create a plausible claim of bad faith."

Id. at 895–96.

Select Comfort is distinguishable because here Inline alleges sufficient facts that Graphic

engaged in improper conduct. Inline alleges Graphic's overtures to National Pizza and other

food buyers were wrongful because Graphic threatened suit related to "invalid, expired, or

inapplicable patents." Compl. ¶ 43. This stands in stark contrast to Select Comfort, where Sleep

Better alleged no facts to support its contention that Select Comfort's cease and desist letter

seeking to a protect a trademark was improper. "Ordinarily, whether interference is justified is

28

an issue of fact, and the test is what is reasonable conduct under the circumstances." <u>Kjesbo</u>, 517 N.W.2d at 588.  Discovery will assist in revealing if Graphic's interference was wrongful and unjustified in so far as it was based on clearly invalid or expired patents.  At this stage of litigation, Inline's allegations survive.  To the extent Graphic seeks to dismiss the tortious interference claim, the motion is denied.

### D.  Misappropriation of Trade Secrets

Finally, Graphic seeks dismissal of Inline's misappropriation of trade secrets claim (Count III).  Under the Minnesota Uniform Trade Secrets Act, a trade secret is defined as information that:  (1) is not generally known or readily ascertainable, (2) derives independent economic value from secrecy, and (3) is the subject of reasonable efforts to maintain its secrecy.  Minn. Stat. § 325C.01, subd. 5.  Misappropriation of a trade secret occurs when there is disclosure or use of a trade secret without express or implied consent by a person who, at the time of disclosure or use, knew that the utilization of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.  <u>Id.</u>, subd. 3(ii).

Inline's pleadings for this claim are facially sufficient.  Inline alleges that in 2008, Heinz, as the distributor of Weight Watchers' pizza, requested that Inline redesign a susceptor sheet for Weight Watchers' Smart Ones pizza.  Compl. ¶ 53.  Inline claims that it created a more efficient design, and shared the design with Heinz "under the condition that it remain confidential."  <u>Id.</u> Inline alleges that Graphic copied this susceptor sheet design Inline had created for Heinz without Inline's permission.  <u>Id.</u>  Inline further claims that "Graphic knew or should have known that the design created by Inline, bearing its name, but provided by Heinz, was confidential and that Heinz owed a duty to Inline to maintain the design's secrecy and/or limit its use."  <u>Id.</u>

Graphic contends that Inline's misappropriation of trade secrets claim is defective for multiple reasons. Graphic first argues the Complaint neglects to even allege the existence of a trade secret. Again, Graphic's argument misses the mark and attempts to rely on evidentiary failings prior to discovery. The Complaint generally alleges the design at issue comprising the trade secret—the susceptor sheet for Weight Watchers' Smart Ones pizza. See id. ¶ 53. The Complaint is vague for obvious reasons regarding the specifics of this design; a plaintiff is not required to divulge the explicit content of a trade secret in a complaint. As this Court has previously stated, "[i]n the context of pleading a claim for the misappropriation of trade secrets, a plaintiff is understandably hesitant to reveal the exact parameters of the trade secrets it believes have been misappropriated because a trade secret made public is not a secret." TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc., No. 13-1356, 2013 WL 6827348, at *3 (D. Minn. 2013) (citations omitted).

Graphic further maintains that Inline failed to allege any reasonable efforts it took to maintain the secrecy of its pattern or design. Graphic cites to several cases wherein misappropriation of trade secrets claims were dismissed at the summary judgment stage for lack of evidence that reasonable efforts were taken to maintain the confidentiality of a trade secret. See Coyne's & Co., Inc. v. Enesco, LLC, No. 07-4095, 2010 WL 3269977, at *16 (D. Minn. Aug. 16, 2010) ("Coyne's submits no evidence of the steps it took to maintain confidentiality."); RING Comput. Sys., Inc. v. ParaData Comput. Networks, Inc., No. C4-90-889, 1990 WL 132615, at *2 (Minn. Ct. App. Sept. 18, 1990) ("[S]igning of a confidentiality agreement, without more, is not enough."). But this is not a motion for summary judgment. The Complaint specifically states that Inline shared the design with Heinz on the condition that it remain

confidential, suggesting that Inline took reasonable efforts to maintain the secrecy of its Smart Ones design.  The Complaint later generally alleges that the design "was the subject of efforts that were reasonable under the circumstances to maintain its secrecy."  Compl. ¶ 134.  Taken together, these pleadings rise above a conclusory level.  The particulars of Inline's reasonable steps to ensure the secrecy of its Smart Ones design is a question to be explored during discovery.

Graphic lastly argues that Inline did not adequately allege that Graphic improperly acquired the trade secret, arguing that Inline's claims are exceedingly vague and potentially could assert a misappropriation of trade secrets claim against Heinz, but not Graphic.  The Court finds the Complaint clear on this point.  The Complaint states that in 2013 "Graphic began copying the packaging designed by Inline for Heinz, without Inline's permission" and "Graphic knew or should have known that the design created by Inline, bearing its name, but provided by Heinz, was confidential."  Id. ¶ 53.  As noted above, misappropriation of a trade secret occurs when there is a use of a trade secret without consent by a person who, at the time of the use, knew that the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.  Minn. Stat. § 325C.01, subd. 3(ii).  Here, Inline alleges that Graphic utilized a trade secret (the Smart Ones susceptor packaging design) and at the time of use, knew that the design was given with an expectation of confidentiality from Heinz.  Nothing more is required at this stage.  Graphic's Motion to Dismiss the misappropriation of trade secrets claim is denied.[4]

_____

[4] In a footnote to its opposition brief, Inline states that while the design for the Smart Ones pizza packaging would have become public once Heinz started utilizing it commercially, Graphic saved "valuable time" in developing a competing design by not waiting until the design

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that Defendant Graphic Packaging International, Inc.'s Motion to

Dismiss [Docket No. 25] is **GRANTED in part** and **DENIED in part** as follows:

    A.      To the extent Graphic seeks dismissal of Inline's antitrust claims in Counts IV

           and V that are based on its submarine patent theory, the Motion is granted; and

    B.      In all other respects, the Motion is denied.

                               BY THE COURT:

                                 _____s/Ann D. Montgomery_____
                               ANN D. MONTGOMERY
                               U.S. DISTRICT JUDGE

Dated:  February 23, 2016.

---

became public.  Additionally, the footnote states that Graphic's misappropriation caused Inline to "abandon an existing patent application for the design."  Mem. Opp'n Mot. Dismiss at 9, n.4. In its reply memorandum, Graphic responds that these facts are fatal to Inline's claim because once information is disclosed in the patent application process, it becomes public and therefore can no longer be classified as a trade secret.  Reply Supp. Mot. Dismiss at 9 (citing B.E. Meyers & Co., Inc. v. United States, 47 Fed. Cl. 375, 378–79 (Fed. Cl. 2000)).  Although the existence of a patent application for the Smart Ones design may eventually be relevant in determining the existence of a trade secret, none of these facts are in the Complaint.  On a motion to dismiss the Court is limited to the facts as asserted in the Complaint.  The Court therefore will not consider these arguments at this time.