## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Inline Packaging, LLC,

               Plaintiff,               Court File No. 15-cv-3183 (ADM/LIB)

    v.                                   **ORDER**

Graphic Packaging International, LLC,

               Defendant.

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment made in accordance with the provisions of 28 U.S.C. § 636(b)(1)(A), and upon Plaintiff Inline Packaging, LLC's Motion to Amend to Plead Punitive Damages, [Docket No. 504]. Plaintiff moves the Court for leave to further amend its Complaint, [Docket No. 1], to plead punitive damages on Counts I, II, and IV. (See, Motion, [Docket No. 504], 1). The Court held a Motion Hearing on January 30, 2018, and took Plaintiff's Motion under advisement as of that date. (Minute Entry, [Docket No. 513]). For the reasons discussed below, the Court **DENIES** Plaintiff's Motion to Amend to Plead Punitive Damages, [Docket No. 504].

## I.    BACKGROUND AND STATEMENT OF RELEVANT FACTS

The parties—and the Court—are familiar with the facts underlying this action. Therefore, only facts relevant to the Motion to Amend to Plead Punitive Damages presently before the Court will be set forth herein.

Plaintiff Inline Packaging, LLC ("Inline") and Defendant Graphic Packaging International, Inc. ("Graphic") compete in the microwave susceptor food packaging market; primarily with respect to microwave susceptor food packaging that crisps and browns the food product. (Order, [Docket No. 505], 1). In the present action, Inline brought claims against

Graphic alleging tortious interference with prospective business relations; tortious interference with existing contractual relations; misappropriation of trade secrets; maintenance or misuse of monopoly power; and violations of section 2 of the Sherman Act, based upon assertions that Graphic engaged in predatory discount bundling, sham litigation, and misappropriation of intellectual property. (Id. at 1-2).

On April 6, 2017, the Court issued an Amended Pretrial Scheduling Order. [Docket No. 199]. On January 17, 2018, Inline timely filed the present Motion to Amend to Plead Punitive Damages. [Docket No. 504]. Inline seeks to amend its Complaint to plead punitive damages on three of its claims:  Counts I and II, which are its Minnesota state law tortious interference with prospective business and existing contractual relationships claims, and Count IV, which is its Minnesota state law based antitrust claim. (See, Mem. in Supp., [Docket No. 381], 1). Additional facts, including a detailed description of the evidence Inline cites in support of its present Motion, are addressed in the Analysis section below.

On January 23, 2018, Graphic filed its Memorandum in Opposition to the present Motion to Amend to Plead Punitive Damages. [Docket No. 506]. Graphic argues that, as a matter of law, punitive damages are unavailable for Inline's Minnesota state law based antitrust claim. (Id. at 2). Graphic also contends that Inline's Motion must be denied because it fails to meet its burden to show that Graphic acted with a deliberate disregard for Inline's rights.[1] (Id.).

---

[1] Graphic additionally contends that the Court should deny the present Motion to Amend to Plead Punitive Damages because "Inline fails to present sufficient evidence to establish a prima facie case of tortious interference with contract or prospective economic advantage . . . ." (Mem. in Opp., [Docket No. 506], 2). However, "when deciding whether punitive damages are available, courts do not need to examine the merits of the underlying claims or determine whether they were properly pleaded. Those questions are best considered in the context of dispositive motions." See, Coy v. No Limits Education, No. 15-cv-93 (BRT), 2016 WL 7888047, *2 (D. Minn. April 1, 2016). Therefore, the Court does not further address Graphic's arguments which are based upon a challenge to the sufficiency of the merits of the underlying claims in this case.

## II.   PLAINTIFF'S MOTION TO AMEND TO PLEAD PUNITIVE DAMAGES, [DOCKET NO. 504]

### A. Standard of Review

Rule 15(a)(2) provides: "[A] party may amend its pleading only with the opposing party's consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Although Rule 15 "'favor[s] liberal allowance of amendment,'" it "'does not mean that the right to amend is absolute.'" Kozlov v. Assoc. Wholesale Grocers, Inc., 818 F.3d 380, 394 (8th Cir. 2016) (quoting Thompson-El v. Jones, 876 F.2d 66, 67 (8th Cir. 1989)).

On the other hand, Minnesota Statute § 549.191 provides:

> After filing the suit a party may make a motion to amend the pleadings to claim punitive damages. The motion must allege the applicable legal basis under section 549.20 or other law for awarding punitive damages in the action and must be accompanied by one or more affidavits showing the factual basis for the claim. At the hearing on the motion, if the court finds prima facie evidence in support of the motion, the court shall grant the moving party permission to amend the pleadings to claim punitive damages.

Minnesota Statute § 549.20, Subd. 1(a), allows punitive damages in civil actions "only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others."

As an initial matter, Inline argues that in determining whether it is allowed to plead punitive damages, this Court should apply the more liberal standard for amending a complaint which is set forth in Federal Rule of Civil Procedure 15 rather than the stricter standard set forth in Minnesota Statutes §§ 549.191; 549.20, Subd. 1(a). (Mem in Supp., [Docket No. 381], 4 n.2; Jan. 30, 2018, Motion Hearing, Digital Record, 1:31-36). In support, Inline cites In re Bair Hugger Forced Air Warming Devices Products Liability Litigation, No. 15-cv-2666 (JNE/FLN),

2017 WL 5187832 (D. Minn. July 27, 2017) ("In re Bair Hugger"), aff'd on other grounds on Oct. 19, 2017. (Mem. in Supp., [Docket No. 381], 4 n.2; Jan. 30, 2018, Motion Hearing, Digital Record, 1:31-36). To fully appreciate In re Bair Hugger, however, the Court must first examine the United States Supreme Court's preceding decision in Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co., 559 U.S. 393 (2010) ("Shady Grove"), upon which the relevant holding in In re Bair Hugger was based. See, In re Bair Hugger, 2017 WL 5187832, at *1.

Shady Grove was a putative class action suit filed in the United States District Court for the Eastern District of New York on behalf of plaintiffs to whom Allstate Insurance Company allegedly owed statutory interest on benefits which had been paid after a statutory deadline for payment. 559 U.S. at 397. The United States District Court for the Eastern District of New York dismissed the case for lack of jurisdiction on the grounds that N.Y. Civ. Prac. Law Ann. § 901(b), "which precludes a suit to recover a 'penalty' from proceeding as a class action," applies in cases brought in Federal Court under diversity jurisdiction, and the statutory interest sought was a "penalty." Id. The Court of Appeals for the Second Circuit affirmed, holding that Federal Rule of Civil Procedure 23, which states that "'[a] class action may be maintained'" if two specifically enumerated conditions are met (both of which were met in Shady Grove), did not conflict with N.Y. Civ. Prac. Law Ann. § 901(b). Id. at 398. The Second Circuit further held that because there was no federal rule addressing the legitimacy of class action suits seeking to recover a penalty and the New York state law was substantive, the New York state law applied in diversity cases such as Shady Grove and prohibited the class action suit initiated therein. Id.

On review, the United States Supreme Court reversed, holding that Rule 23 does directly conflict with N.Y. Civ. Prac. Law Ann. § 901(b) because Rule 23 "empowers a federal court 'to certify a class in each and every case where the Rule's criteria are met'" and, in fact, Federal

Courts must do so; Federal Courts do not have the discretion to decline to certify a class if Rule 23's requirements are satisfied. Id. at 399-400. Therefore, the New York state law, which would prohibit a class action seeking a penalty even if Rule 23's requirements are met, directly conflicted with Rule 23. Id.

The Erie Doctrine prohibits Congress from "declar[ing] substantive rules of common law applicable in a state." See, Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). "Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any [diversity jurisdiction] case is the law of the State." Id. at 78. Congress has enacted the Rules Enabling Act, which gives the United States Supreme Court "'the power to prescribe, by general rules, . . . the practice and procedure in civil actions at law'" as long as such rules "'neither abridge, enlarge, nor modify the substantive rights of any litigant.'" See, Sibbach v. Wilson & Co., 312 U.S. 1, 7-8 (1941) (citation omitted).

A plurality of the Court in Shady Grove concluded that Rule 23 was procedural in nature, it did not violate the Rules Enabling Act, and it operated in Shady Grove to allow the class action to proceed in Federal Court despite the New York state law. Id. at 406-416. Justice Stevens, however, departed from the plurality's rationale in part and would have held that "there are some state procedural rules that federal courts must apply in diversity cases because they function as a part of the State's definition of substantive rights and remedies," but Justice Stevens nonetheless joined in the ultimate holding reversing the Second Circuit and remanding the case for further proceedings. Id. at 416-17.

In re Bair Hugger was a multi-district product liability litigation in which the plaintiffs sought to add claims for punitive damages to each respective complaint. 2017 WL 5187832, at *1. Applying the Shady Grove rationale, United States Magistrate Judge Franklin L. Noel first

5

concluded that Rule 15 conflicts with Minnesota Statute § 549.191. Id. at *3. Magistrate Judge

Noel explained:

> The Court concludes that Rule 15 and the Minnesota punitive damages statute both address the same subject matter, namely whether Plaintiffs may amend their Master Long Form and Short Form Complaints. Federal Rule 15 "answers the question in dispute," and is "sufficiently broad to control the issue before the court." The statutes conflict because the Minnesota procedural rule would not allow for the amendment absent affidavits establishing prima facie evidence of deliberate disregard for the rights and safety of others, where the federal rule has no such procedural requirement. This Court is required to apply Rule 15 provided that it is valid pursuant to the Rules Enabling Act.

Id. at *4 (quoting the syllabus and concurring opinion in Shady Grove). Magistrate Judge Noel

then determined that Rule 15 does not violate the Rules Enabling Act and, thus, he concluded

that it governs amendment to a pleading to seek punitive damages despite the stricter standard set

forth in Minnesota Statute § 549.191. Id.

Inline now argues that, in keeping with In re Bair Hugger, this Court should apply Rule

15's more lenient standard—rather than Minnesota Statute § 549.191's stricter standard—to

determine whether Inline may amend its Complaint to plead punitive damages. (Mem. in Supp.,

[Docket No. 381], 4 n.2; Jan. 30, 2018, Motion Hearing, Digital Record, 1:31-36).

However, with all due respect to the reasoning of In re Bair Hugger, the undersigned

disagrees.

Although Shady Grove was a fractured opinion, containing plurality (with portions that

reached a majority of the Court), concurring, and dissenting opinions, a majority of the United

States Supreme Court agreed that N.Y. Civ. Prac. Law Ann. § 901(b) was in direct conflict with

Rule 23. See, Shady Grove, 559 U.S. at 399-400. The Court explained:

> [Rule 23] says that if the prescribed preconditions are satisfied "[a] class action *may be maintained*" (emphasis added)—not "*a class action may be permitted*." Courts do not maintain actions; litigants do. The discretion suggested by Rule 23's "may" is discretion residing in the plaintiff:  He may bring his claim in a

> class action if he wishes. And like the rest of the Federal Rules of Civil
> Procedure, Rule 23 *automatically* applies "in all civil actions and proceedings in
> the United States district courts."

Id. (emphasis in original). In other words, Rule 23 and N.Y. Civ. Prac. Law Ann. § 901(b)

directly conflicted because Rule 23 mandated that a plaintiff can bring a class action if certain

conditions are met, leaving Federal Courts no discretion to hold otherwise, while in contrast N.Y.

Civ. Prac. Law Ann. § 901(b) required the dismissal of a class action if a plaintiff sought to seek

to recover penalties even if the requirements of Rule 23 were met.

However, the type of direct conflict seen in Shady Grove is simply not present when this

Court compares Rule 15 and Minnesota Statute § 549.191.

Rule 15 is by its very nature, and has long been recognized as being, discretionary. See,

e.g., Foman v. Davis, 371 U.S. 178, 182 (1962) ("[T]he grant or denial of an opportunity to

amend [under Rule 15(a)] is within the discretion of the District Court, [although] outright

refusal to grant the leave without any justifying reason appearing for the denial is not an exercise

of discretion."); Pliscott v. Colvin, No. 13-cv-1390 (SRN/SER), 2014 WL 3955229, *2 (D.

Minn. Aug. 13, 2014) ("The determination as to whether to grant leave [to amend under Rule

15(a)(2)] is entrusted entirely to the discretion of the Court.").

Unlike Rule 23, which vests discretion in the plaintiff and not the Court, Rule 15 vests

discretion in the Court to determine whether "justice . . . requires" allowing the amendment

sought by the moving party.

Shady Grove does not rearticulate in detail the traditional test for determining whether

there is a direct conflict between a Federal Rule and a state law, likely because (in the view of a

majority of the Court) Rule 23 and N.Y. Civ. Prac. Law Ann. § 901(b) so plainly conflicted. See,

559 U.S. at 399-400. Rather, the plurality in Shady Grove articulated the first question as

whether the Federal Rule and the state statute at issue "answer the same question." <u>See</u>, <u>Id.</u> at 401; <u>In re Bair Hugger</u>, 2017 WL 5187832, at *4. However, in his <u>Shady Grove</u> concurrence, Justice Stevens worded the question as:  "whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law." <u>Shady Grove</u>, 559 U.S. at 421 (Stevens, J., concurring). These are different questions. <u>See</u>, <u>Unity Healthcare, Inc. v. Cty. of Hennepin</u>, 308 F.R.D. 537, 546 n. 4 (D. Minn. 2015) (noting this discrepancy and suggesting, without deciding, that Justice Stevens' narrower position may be controlling under <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977)).

In any event, in the view of the undersigned, Federal Rule 15 and Minnesota Statute § 549.191 do not conflict. As already set forth above, unlike the N.Y. state statute and Federal Rule at issue in <u>Shady Grove</u>, application of the M.N. state statute here does not preclude application of the Federal Rule. Moreover, at least one Minnesota United States District Court has already concluded that "[t]here is no direct conflict between Federal Rule 15(a) and section 549.191." <u>See</u>, <u>Security Sav. Bank v. Green Tree Acceptance, Inc.</u>, Civ. No. 3-89-28, 1990 WL 36142, *2 (D. Minn. March 22, 1990). As United States Magistrate Judge Bernard P. Becker held in that case, Rule 15 can "peacefully co-exist" with Minnesota Statute § 549.191. <u>Id.</u> (citations omitted). The Court agrees. The discretion allowed a Federal Court under Rule 15(a) does not preclude or even conflict with the consideration of whether a party has also complied with Minnesota Statute § 549.191.

Although a majority of the United States Supreme Court in <u>Shady Grove</u> agreed that the conflict between Rule 23 and the New York state statute was clear, 559 U.S. at 401, the dissenting opinion in <u>Shady Grove</u> provides guidance for the direction this Court should take when, as here, Federal Rule 15 is not in conflict with the M.N. state statute at issue. Interestingly,

in dissent, Justice Ginsburg concluded that the conflict between Rule 23 and N.Y. Civ. Prac. Law Ann. § 901(b) was not "really necessary." 559 U.S. at 437 (Ginsburg, J., dissenting). She went on to state:

> If . . . no Federal Rule or statute governs the issue, the Rules of Decision Act, as interpreted in Erie, controls. That Act directs federal courts, in diversity cases, to apply state law when failure to do so would invite forum shopping and yield markedly disparate litigation outcomes.

Id. at 438-39.

In the case presently before this Court, the failure to apply Minnesota Statute § 549.191 would invite forum shopping and yield markedly disparate litigation outcomes because it would greatly lower the standard by which Inline must show its entitlement to plead punitive damages on M.N. state law claims, despite this Court's long history of applying Minnesota Statute § 549.191 in materially indistinguishable cases. See, e.g., Sorin Group USA, Inc. v. St. Jude Medical, S.C., Inc., 176 F. Supp. 3d 814, 828 (D. Minn. 2016) ("Because this case is in federal court due to diversity jurisdiction, in order to add punitive damages to its claim, [plaintiff] had to seek leave to amend under Minn. Stat. § 549.191."); Rassier v. Sanner, No. 17-cv-938 (DWF/LIB), 2017 WL 5956909, *7 (D. Minn. Nov. 30, 2017) ("Courts in this district, however, have consistently applied §§ 549.191-.20 to state-law claims."); Streambend Props. III, LLC, v. Sexton Lofts, LLC, 297 F.R.D. 349, 360-61 (D. Minn. 2014) ("Minnesota Statutes sections 549.191 and 549.20 govern the pleading of punitive damages claims based on Minnesota law."); Nat'l Union Fire Ins. Co. of Pittsburgh, PA, v. Donaldson Co., Inc., No. 10-cv-4948 (JRT/TNL), 2016 WL 6902408, *3-7 (D. Minn. June 15, 2016) (applying Minn. Stat. § 549.191 to determine whether punitive damages could be pled); Coy v. No Limits Education, No. 15-cv-93 (BRT), 2016 WL 7888047, *2-6 (D. Minn. April 1, 2016) (same).

The portions of <u>Shady Grove</u> which gained the approval of a majority of the United States Supreme Court do not dictate that Rule 15 conflicts with Minnesota Statute § 549.191, nor do they indicate that <u>Erie</u> concerns mandate anything other than the application in the present case of Minnesota Statute § 549.191. Accordingly, in the absence of binding precedent to the contrary, the undersigned finds that Minnesota Statute § 549.191 provides the relevant standard of proof for the present motion.

Minnesota Statute § 549.191 provides:

> After filing the suit a party may make a motion to amend the pleadings to claim punitive damages. The motion must allege the applicable legal basis under section 549.20 or other law for awarding punitive damages in the action and must be accompanied by one or more affidavits showing the factual basis for the claim. At the hearing on the motion, if the court finds prima facie evidence in support of the motion, the court shall grant the moving party permission to amend the pleadings to claim punitive damages.

Minnesota Statute § 549.20, Subd. 1(a), allows punitive damages in civil actions "only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others." "'The clear-and convincing standard is satisfied when "the evidence is sufficient to permit the Jury to conclude that it is highly probable that the defendant acted with deliberate disregard to the rights or safety of others."'" <u>Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Donaldson Co., Inc.</u>, No. 10-cv-4948 (JRT/TNL), 2016 WL 6902408, *4 (D. Minn. June 15, 2016) (citation omitted).

Minnesota Statute § 549.20 further explains:

> [**Subd. 1**](b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

**Subd. 2. Master and principal.** Punitive damages can properly be awarded against a master or principal because of an act done by an agent only if:

(1) the principal authorized the doing and the manner of the act;

(2) the agent was unfit and the principal deliberately disregarded a high probability that the agent was unfit;

(3) the agent was employed in a managerial capacity with authority to establish policy and make planning level decisions for the principal and was acting in the scope of that employment; or

(4) the principal or a managerial agent of the principal, described in clause (3), ratified or approved the act while knowing of its character and probable consequences.

Of essence in determining vicarious punitive damages is the role of the employee or agent, who must be a "managerial employee[] vested with authority to make policy and planning level decisions for [the principal]" in order for the punitive damages to properly be awarded against the principal.[2] See, Doe YZ v. Shattuck-St. Mary's School, 214 F. Supp. 3d 763, 792-93 (D. Minn. 2016).

In order to show entitlement to plead punitive damages, "'[a] mere showing of negligence is not sufficient; instead, the conduct must be done with malicious, willful, or reckless disregard

---

[2] Inline cites Doe YZ v. Shattuck-St. Mary's School, 214 F. Supp. 3d 763 (D. Minn. 2016), for the contradictory proposition that "because 'a corporation is charged with constructive knowledge of all material facts of which its officer or agent acquires knowledge while acting in the course of employment within the scope of his or her authority,' knowledge on the part of those with managerial capacity will be imputed to the corporation." (Mem. in Supp., [Docket No. 381], 6). However, Doe YZ went on to point out the statutory language in Minn. Stat. § 549.20, subd. 2(3), set forth above—which controls on questions of punitive damages under that statute—and it ultimately held that although the knowledge of employees who are not "managerial employees vested with authority to make policy and planning level decisions . . . is imputable to [the principal] for negligence purposes, it is not imputable to [the principal] for assessing punitive liability." 214 F. Supp. 3d at 792-93. Therefore, contrary to Inline's assertion, the general principles of principal/agent liability do not expand the definitions set forth in Minn. Stat. § 549.20, subd. 2. Inline also argues that it "need not show managerial capacity for vicarious liability under § 549.20, subd. 2, but nevertheless does so herein." (Mem. in Supp., [Docket No. 381], 6). In support, Inline cites Nunn v. Noodles & Co., No. 9-cv-1286 (JNE/JJK), 2010 WL 3170763, *8 n.1 (D. Minn. Aug. 6, 2010), which stated in dicta that the determination whether Plaintiff satisfied the required elements for vicarious liability for punitive damages was not required at the the pleading stage when plaintiff sought to amend her complaint to plead punitive damages. Rather, Nunn held that such a determination was more properly made in a summary judgment motion or at trial. Id. Nunn concluded, however that there was prima facie evidence that supported a finding of vicarious liability for punitive damages under Minn. Stat. § 549.20, subd. 2. Id. The portion of Nunn relied on by Inline is dicta and is not binding on this Court in any event, especially in light of the much more recent ruling in Doe YZ, which addressed the sufficiency of evidence to support vicarious liability on punitive damages in the context of a motion to amend the complaint such as the one presently before the Court. See, 214 F. Supp. 3d at 791-93.

for the rights of others.'" Nat'l Union Fire Ins. Co., 2016 WL 6902408, at *4 (citation omitted).

Moreover,

> Because a prima facie showing is one "that prevails in the absence of evidence invalidating it," "the Court reviews the evidence in support of a Motion to Amend as the Court would review a . . . Motion for Judgment as a Matter of Law" under the Federal Rules of Civil Procedure. In other words, in reaching the determination whether the plaintiff has established a prima facie case for punitive damages, the Court makes no credibility rulings and does not consider any challenge, by cross-examination or otherwise, to the plaintiff's proof, but the Court must carefully scrutinize the evidence presented by the moving party to make sure that it amounts to a prima facie showing that the substantive requirements for punitive damages have been met.

Target Corp. v. LCH Pavement Consultants, LLC, 960 F. Supp. 2d 999, 1010 (D. Minn. 2013)

(citations omitted). "At the present stage, the plaintiff 'is not required to demonstrate an

entitlement to punitive damages *per se*, but only an entitlement to allege such damages.'" Coy v.

No Limits Education, No. 15-cv-93 (BRT), 2016 WL 7888047, *3 (D. Minn. April 1 2016)

(citations omitted). However, the Court is to scrutinize the record to assure the required showing

has been met, and it must do more than to merely "rubber stamp" the movant's allegations.

Ulrich v. City of Crosby, 848 F. Supp. 861, 868–69 (D. Minn. 1994); Swanlund v. Shimano

Indus. Corp., Ltd., 459 N.W.2d 151, 154 (Minn. Ct. App. 1990).

### B.  Analysis

#### (i)  Minnesota-law-based Antitrust Claim

Before addressing whether Inline has shown its entitlement to seek punitive damages on

its Minnesota state law based antitrust claim, the Court must first address the threshold question:

whether, as a matter of law, punitive damages are even available on a Minnesota state law

antitrust claim. Inline asserts that they are, while Graphic asserts the opposite. (Mem. in Supp.,

[Docket No. 381], 7-9; Mem. in Opp., [Docket No. 506], 9-10).

12

The Minnesota Antitrust Law of 1971, Minn. Stat. § 325D.49, *et seq.*, provides that "any person . . . injured directly or indirectly by a violation of [the Minnesota Antitrust Law of 1971], shall recover three times the actual damages sustained . . . ." Minn. Stat. § 325D.57. Inline's antitrust claim on which it now seeks punitive damages is Count IV of its Complaint, which alleges a violation of Minn. Stat. § 325D.52. (See, Compl., [Docket No. 1], 29).

Inline acknowledges that the Minnesota statute quoted above is similar to the Federal Clayton Act, which provides treble damages for Sherman Act violations. (Mem. in Supp., [Docket No. 381], 7). See, 15 U.S.C. § 15(a) ("any person who shall be injured . . . by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained . . ."). Inline further concedes that some federal courts—including the Eighth Circuit—have held that punitive damages are <u>not</u> recoverable in addition to the treble damages authorized under the Clayton Act. (Mem. in Supp., [Docket No. 381], 7). See, McDonald v. Johnson & Johnson, 722 F.2d 1370, 1384 (8th Cir. 1983) ("Punitive damages beyond the statutory trebled damages cannot be awarded for an antitrust violation [because to do so] would at the very least become duplication."). Nevertheless, Inline argues that applying such reasoning to the present case would conflict with the Minnesota Supreme Court's holding in Phelps v. Commonwealth Land Title Ins. Co., 537 N.W.2d 271, 277 (Minn. 1995), that "multiple compensatory damages are not duplicative of punitive damages where at least one objective of multiple compensatory damages is nonpunitive." (Mem. in Supp., [Docket No. 381], 7).

As Graphic points out, however, Phelps did not address punitive damages sought in relation to a claim under the Minnesota Antitrust Act; rather, Phelps addressed punitive damages sought in relation to a claim under the Minnesota Human Rights Act ("MHRA"). (Mem. in Opp., [Docket No. 506], 10); see, Phelps, 537 N.W.2d at 273-77.

The <u>Phelps</u> holding that an "award of both punitive damages and double actual damages does not constitute an unfair double recovery for punitive damages" was based in large part upon the specific legislative history of the MHRA, legislative history which has no effect on the interpretation of the Minnesota Antitrust Act. <u>See</u>, <u>Id.</u> Moreover, as Graphic also points out, the MHRA specifically authorizes compensatory damages "in addition to punitive damages in an amount not more than $8,500"; the Minnesota Antitrust Act does not. <u>See</u>, <u>Phelps</u>, 537 N.W.2d at 273-74. Because of these material differences, <u>Phelps</u> is not binding on this Court's analysis of whether punitive damages are available in conjunction with Inline's claim under the Minnesota antitrust laws.

To the contrary, at least one Federal Court within the District of Minnesota has already rejected the idea that Minnesota state law antitrust claims may result in recovery of punitive damages. <u>See</u>, <u>Insignia Systems, Inc. v. News America Marketing In-Store, Inc.</u>, No. 4-cv-4213 (JRT/AJB), 2008 WL 11349956, *2 (D. Minn. Nov. 7, 2008) As the Court noted in <u>Insignia Systems, Inc.</u>, "'[t]he Minnesota Supreme Court has consistently held that the Minnesota Antitrust Law should be construed with the federal courts' construction of the federal antitrust laws.'" <u>Id.</u>, at *2 (quoting <u>Keating v. Philip Morris, Inc.</u>, 417 N.W.2d 132, 136 (Minn. 1987)). And, as Inline itself concedes, the Eighth Circuit has long held that punitive damages may not be awarded for a federal antitrust claim. <u>See</u>, <u>McDonald</u>, 722 F.2d at 1381). Moreover, neither party identifies nor has this Court's independent research found any case from either the Minnesota Supreme Court or the Minnesota Intermediate Court of Appeals which directly addresses, much less allows, punitive damages under the Minnesota Antitrust Law. Thus, there is no indication from the Minnesota Supreme Court or the Minnesota Court of Appeals that punitive damages are treated differently under the Minnesota Antitrust Law than they are under the Clayton Act.

Accordingly, the undersigned concludes that, under the law of Minnesota, antitrust claims brought under Minnesota state law may not also lead to an award of punitive damages. See, Insignia Systems, Inc., 2008 WL 11349956, at *2 (holding that "none of [the plaintiff's] claims allow an award for punitive damages" when the only remaining claims were brought under the federal Lanham Act and the Minnesota Deceptive Trade Practice Act"); McDonald, 722 F.2d at 1381 (citing Minnesota punitive damages law in a case involving a violation of section 2 of the Sherman Act and noting that "[p]unitive damages beyond the statutory trebled damages cannot be awarded for an antitrust violation").

Therefore, to the extent that Inline seeks to amend Count IV of its Complaint to plead punitive damages in relation to its state claim under the Minnesota Antitrust Law, Inline's Motion to Amend to Plead Punitive Damages, [Docket No. 504], is **DENIED**.

### (ii)    Tortious Interference with Business Claims

Inline also seeks to plead punitive damages on Count I of its Complaint—Tortious Interference with Prospective Business Relations—and Count II of its Complaint—Tortious Interference with Existing Contractual Relations. (See, Compl., [Docket No. 1], 26-27; Mem. in Supp., [Docket No. 381], 1, 40-42). Unlike claims under the Minnesota Antitrust Law, punitive damages are available on tortious interference claims brought under Minnesota state law. See, Sorin Group USA, Inc. v. St. Jude Medical Center, S.C., Inc., No. 14-cv-4023 (JRT/JSM), Docket No. 114 (granting motion to amend complaint to plead punitive damages on tortious interference with existing contractual rights claim); Loyalton Group, Inc. v. Burton Energy Group, Inc., No. 9-cv-58 (DSD/JJK), 2009 WL 10678552, *7 (D. Minn. Sept. 25, 2009) ("[I]nterference with prospective contractual relations may support a  claim for punitive damages.").

Graphic does not argue that punitive damages are not available on these claims as a matter of law; rather, Graphic argues that Inline has failed to establish the requisite prima facie case to show its entitlement to now plead punitive damages as to these claims. (Mem. in Opp., [Docket No. 506], 9-41).

First, however, the Court must resolve some preliminary challenges Graphic raises with regards to the documents Inline has filed with the Court in support of its present Motion to Amend to Plead Punitive Damages.

### a.  Preliminary evidentiary questions

#### 1)  Expert Reports

Graphic argues that the Court should not consider the expert reports submitted by Inline in support of its present Motion to Amend its Complaint to add Punitive Damages. (Mem. in Opp., [Docket No. 506], 8-9). In support, Graphic cites to Berczyk v. Emerson Tool Co., 291 F. Supp. 2d 1004 (D. Minn. 2003). (Mem. in Opp., [Docket No. 506], 8). In Berczyk, Magistrate Judge Raymond Erickson considered the plaintiffs' motion to amend their complaint in order to add punitive damages. 291 F. Supp. 2d at 1007. After addressing the various affidavits the plaintiffs had filed in support of their motion, Judge Erickson turned to the "opinion evidence of [plaintiff's] expert," and he stated:

> At best, [the expert's] report is an unsworn letter, which carries little evidentiary weight. Even apart from its non-evidentiary status, the [expert's] report does not constitution "clear and convincing" evidence. We apply no Daubert gatekeeping function, here, for the Defendants have not challenged [the expert's] expertise. Rather, we simply abide by our obligation to assess [the expert's] opinions, consistent with the prohibition that we not "rubber stamp" the showings advanced by a moving party. [The expert's] opinion is rife with concessions that he had been "advised" of certain predicates to his opinion, or that he had an "understanding" as to certain predicate facts. . . .
> . . . .
> As best as we can discern [the expert's] report is predicated on many of the same documents that we found to be an inadequate basis on which to establish

a claim of deliberate disregard. We find little to suggest that the inadequacies of those showings can be rectified by the expedient of passing them through a retained expert.

291 F. Supp. 2d at 1015.

In the present case, Graphic contends that the expert reports Inline offers are similarly based on the underlying documents that Inline has also submitted to the Court, which—if those underlying documents are inadequate to show punitive damages—renders the Expert Reports of little to no weight on whether Inline has made a sufficient showing of deliberate disregard to justify pleading punitive damages. (Mem. in Opp., [Docket No. 506], 8-9).

For its part, Inline argues that the Court may (and should) consider its Expert Reports, and Inline cites to In re Levaquin Prod. Liab. Litig., No. No. 8-cv-5743 (JRT), 2010 WL 7852346 (D. Minn. Nov. 9, 2010). (Mem. in Supp., [Docket No. 381], 4). In re Levaquin also addressed a motion to amend the complaint to assert a claim for punitive damages, and the defendants in that case argued that Berczyk categorically stood "for the proposition that an expert report cannot be considered evidence warranting a right to assert punitive damages." 2010 WL 7852346, at *11. Judge John R. Tunheim (now Chief Judge) rejected this argument, stating that Berczyk instead "reaffirms the principle that prima facie evidence of punitive damages cannot be based on conjecture and conclusion." Id. The plaintiffs in In re Levaquin had "included over 100 exhibits including medical research, deposition testimony, internal email communications, and expert reports," so Chief Judge Tunheim found that it was sufficiently different from Berczyk that the expert reports were not automatically excluded from the Court's consideration. Id.

The circumstances and arguments present in In re Levaquin are materially different than those before the Court in the present Motion. Graphic does not cite Berczyk for the proposition

that all expert reports are per se improper for consideration on a motion to amend a complaint to add punitive damages. Rather, Graphic asserts that in the present case, the expert reports are cited only to the extent that they characterize and summarize facts which are ostensibly available in the underlying documents to which Inline has access and which have separately been submitted to the Court in support of the present Motion. (Mem. in Opp., [Docket No. 506], 8-9). Moreover, in light of additional prior case law from the United States District Court for the District of Minnesota, this Court finds Graphic's argument more persuasive.

In Stepnes v. Ritschel, No. 8-cv-5296, 2010 WL 7093500, *6 n. 3 (D. Minn. April 13, 2010), then Magistrate Judge Keyes noted that where there is "nothing more than argument dressed up as factual averment," an affidavit submitted in support of a motion to amend a complaint to assert punitive damages "add[s] nothing to the prima facie showing" required to succeed on such a motion. The affidavit to which Judge Keyes was referring did "not testify[] about a fact, but [it] characterize[ed] the other evidence in the record. . . . These characterizations of the evidence and conclusory statements persist[ed] through the" affidavit and "they [were] not evidence." Id. However, Judge Keyes nevertheless "considered the items in the . . . Affidavit that can be considered evidence in reaching its determination." (Emphasis added). Id. Similarly, in Hoffman v. Enterprise Leasing Co. of Minn., No. 13-cv-255 (JNE/SER), 2014 WL 12601037, *5 (D. Minn. June 26, 2014), Magistrate Judge Rau quoted Stepnes and came to a similar conclusion; he stated that expert reports which "are merely 'characterizations of evidence and conclusory statements'" . . . do not add to a prima facie showing."

Many of Inline's citations to the Expert Report by Alan W. Kowalchyk, (Kroll Dec., Exh. 81, [Docket No. 463], 2-48), and the Rebuttal Expert Report by Alan W. Kowalchyk, (Kroll Dec., Exh. 82, [Docket No. 464], 2-29), simply cite to portions of those expert reports which

merely recite facts Kowalchyk gleaned from underlying documents, characterizes evidence, or makes conclusions about what individuals related to Graphic "should have" known or done. (See, e.g. Mem. in Supp., [Docket No. 381], 27 n. 12, citing Expert Report of Kowalchyk, [Docket No. 81], 6-7, which asserts that Biddle "should have known" information and makes conclusions about whether Graphic's behavior supports a legal claim). Inline also cites to portions of Kowalchyk's Rebuttal Expert Report which are no more than Kowalchyk's personal opinions about whether the inventorship of the elements regarding a patent the ownership of which is a putative issue. (See, Mem. in Supp., [Docket No. 381], 32, citing a portion of Kowalchyk's Rebuttal Expert Report, [Docket No. 464], 16-17, which is entitled "Specific Opinions a) Fitzwater Did Not Invent The Allegedly Patentable Combination of Elements Claimed in the Graphic Patents" and details the reasons for this opinion).

At other points, Inline cites wholesale to its expert reports as a summary of and characterization for other evidence it wishes the Court to consider. (See, e.g., Mem. in Supp., [Docket No. 381], 33, citing generally to "Exh. 81, ¶¶ 37-99; Exh. 82, ¶¶ 27-61, which is a total of 32 pages, in support of the sentence: "Graphic applied for multiple patents from 2005 to 2013 that incorporate and claim the three major categories of concepts and ideas Brower and others at Nestle provided under Projects Quantum and Roxanne and the JDA"). Although the cited pages in the expert reports summarize the evidence as Kowalchyk sees it, this sort of summarization is not "evidence" which the Court ought to consider in support of Inline's present Motion to Amend to Plead Punitive Damages. [3]

---

[3] The section of this Order which sets forth the Court's analysis of the merits of the Motion to Amend to Plead Punitive Damages presently before the Court also includes, at times, Inline's citations to the expert reports when necessary to set forth alleged facts which are required to understand Inline's arguments. For example, as "evidence" of the relationship between the various patent applications and issued patents involved in the present litigation, Inline cites only to a portion of the expert report that summarizes the evidence from the record which was available to the author of that expert report; Inline does not indicate to the Court where in the submissions currently before it that same information is to be found; if at all. (See, Mem. in Supp., [Docket No. 381], 33 citing Kroll Dec., Exh. 81,

In light of the nature of the expert reports and the certain portions thereof to which Inline cites, the Court follows the collective rationale in Berczyk, In re Levaquin, Stepnes, and Hoffman, and the Court declines to consider those portions of the expert reports which contain no more than mere characterization of evidence, conclusory statements, or opinions as to the culpability, liability, or intent of Graphic. To the extent that Inline cites expert reports for evidence which should be considered, those portions of the expert reports are discussed below in the analysis of the sufficiency of Inline's argument that it is entitled to plead punitive damages in the present case.

### 2)  Consideration of "the record as a whole"

Graphic also urges the Court to "consider the whole record to place Plaintiff's proffer in context." (Mem. in Opp., [Docket No. 506], 7). Essentially, Graphic asks the Court to consider "the full testimony" of witnesses for whom Inline has provided excerpts of deposition transcripts. (Id.). In support, Graphic cites to Greer v. Walsh Construction Co., No. 15-cv-465 (PAM/JSM), 2016 WL 6892109 (D. Minn. Feb. 23, 2016). (Id.). In Greer, Magistrate Judge Janie S. Mayeron considered a motion to amend the complaint to assert punitive damages, and she stated:  "[T]he court is entitled to look at the record as a whole—not to search for rebuttal or impeachment evidence, but to ensure that the evidence is presented in its proper context." 2016 WL 6892109, at *7 (citing Stepnes, 2010 WL 7093560, at *7 n.4). In Stepnes, Magistrate Judge Jeffrey J. Keyes noted:

> To consider only those select portions of a deposition transcript a litigant chooses to place before the court on a motion to amend to add a claim of punitive damages and ignore other portions of that transcript because they are attached to the

[Docket No. 463], 19-62; Exh. 82, [Docket No. 464], 12-21). However, because those patent applications and issued patents are referenced as well in evidence which is properly before the Court in the context of the present Motion to Amend to Plead Punitive Damages, the Court has considered the facts alleged therein, not for their value in determining whether Inline has made a prima facie showing of entitlement to punitive damages, but merely as necessary to understand the facts underlying the present litigation.

opposing party's opposition would only encourage plaintiffs to mischaracterize the evidentiary record by selective presentation. Just as the court in [Olson v. Snap Products, Inc., 29 F. Supp. 2d 1027 (D. Minn. 1998)] "seriously doubt[ed]" that its role could be "anything more than a rubber stamp were [it] to allow the Plaintiff to exclude his own personal testimony from [its] consideration, simply because he has chosen not to submit the evidence for [its] review," we cannot have a "fair appraisal" of Plaintiffs' prima facie case here without considering portions of [a] deposition that place [that] testimony in context.

Stepnes, 2010 WL 7093560, at *7 n.4.

This reasoning is highly persuasive and applicable to the present Motion to Amend to Plead Punitive Damages. To the extent that Inline cites an excerpt of a deposition, the Court may review the surrounding portions of that deposition to place that excerpt in context; it need not constrain itself only to the particular, limited excerpt as cited by Inline. As needed to explain the Court's rationale below, this Order includes such context to clarify deposition testimony as necessary.

However, Graphic expands its argument in an effort to persuade the Court to consider additional depositions, declarations, and the like. (See, e.g., Mem. in Opp., [Docket No. 506], 12, 21-22, 37). Graphic describes this as providing "context" for the Court, but the Court's job in deciding the present Motion is not to weigh the evidence in support of Inline's argument against the evidence Graphic points to in an attempt to contradict that evidence. Graphic provides a citation to Smith v. Morales, No. A07-2377, 2008 WL 4909630, *4 (Minn. Ct. App. Nov. 18, 2008), in which the Minnesota Court of Appeals (which is not a court of binding precedent, in any event) held in reviewing the denial of a motion to add a claim for punitive damages: "while appellant was entitled to have his evidence treated as unrebutted by the district court, meaning not subject to cross-examination or other challenge, the district court was permitted to weigh the evidence." (Mem. in Opp., [Docket No. 506], 5). Graphic interprets this to mean that this Court should similarly weigh all of the evidence of record, even that which it offers in direct rebuttal to

Inline's submissions, to determine whether there is a prima facie case to support a claim for punitive damages. (Id.).

To do so as Graphic suggests, however, would run afoul of the long-established standard that in the context of a motion seeking to amend a complaint to add a claim for punitive damages, "the Court makes no credibility rulings and does not consider any challenge, by cross-examination or otherwise, to the plaintiff's proof." Target Corp., 960 F. Supp. 2d at 1010 (D. Minn. 2013) (citations omitted). Despite Graphic's argument, its presentation of directly contradictory evidence is a "challenge . . . to the plaintiff's proof" which the Court will not consider. The distinguishing difference between the present case and Smith, supra, is that in Smith, "appellant submitted both his version of the facts and the versions of the officers involved . . . [which] . . . differ greatly from the appellant's account." See, Smith, 2008 WL 4909630, at *4. The Minnesota Court of Appeals held that the district court had properly considered and weighed all of the evidence submitted by the moving party. Graphic asks the Court not to simply consider and weigh all evidence submitted by Inline; but instead to consider and weigh the directly contradictory evidence submitted by Graphic—the party opposing the motion. To do so here, even in light of Smith, would be improper.

**b.  Has Inline made the required prima facie showing?**

As already set forth above, in order to be entitled to plead punitive damages, Inline must provide evidence which, if unrebutted, clearly and convincingly allows a conclusion that Graphic (1) was aware of or intentionally disregarded facts that created a high probability of injury to Inline's rights, and (2) deliberately proceeded to act in conscious disregard, intentional disregard, or with indifference to that high probability of injury to Inline's rights. See, Minn. Stat. § 549.20, Subd. 1(a)-(b).

Inline's argument can be summarized as follows:   Graphic knew or intentionally disregarded facts about the invalidity of certain patents, and Graphic nevertheless deliberately asserted those patents to Nestle and in litigation against Inline. Graphic knew that its assertion of those invalid patents created a high probability of injury to Inline's right to business relations without interference, and in asserting the patents anyway, Graphic deliberately acted in conscious disregard, intentional disregard, or indifference to that high probability of injury.

### Evidence Presented to the Court

Inline relies on the following evidence, as more fully detailed below, to support its proposed punitive damages claim:

1. Testimony from the April 2017 and July 2017 depositions of Jeffrey Voyzey, Graphic's Director of Business Development.
2. Testimony from the April 2017 Rule 30(b)(6) deposition of Graphic through its 30(b)(6) representative, Jeffrey Sloat.
3. Testimony from the May 2017 deposition of Kelly Fitzwater, a structural designer at Graphic from 2003 to at least 2007.
4. Testimony from the July 2017 deposition and portions of the November 2017 Declaration of Corey Brower, who was Graphic's principal contact at customer companies Chef America and Nestle.
5. Testimony from the July 2017 deposition of John Best, Graphic's vice president of sales and commercial development.
6. Testimony from the July 2017 deposition of Jim Seefeldt, Graphic's Vice-President of Sales.
7. Testimony from the July 2017 deposition of William Sedlacek, former Vice President and General Manager of Graphic's Microwave Division and current Vice-President of Innovation and Business Development for Graphic.
8. Testimony from the August 2017 deposition of Barry Biddle, Graphic's assistant general counsel and chief intellectual property counsel.
9. Testimony from the September 2017 deposition of Jeffrey Watkins, President of Inline.
10. Portions of the December 2017 Declaration of Lou Judge, who has been involved with procurement at Nestle since 1982 and has been Nestlé's Group Manager of Strategic Procurement since 2010.
11. An unsigned, undated, one-page document entitled "PPD Sales Tactical Challenges."
12. Pages from what appear to be power point presentations created for Graphic.
13. An Interoffice Memo dated June 12, 2001, authored by Brower and distributed to Voyzey and others.
14. Electronic appointment requests sent by Voyzey.

15. A Development Agreement[4] entered into by Graphic and Nestle in March 2005.
16. An email dated September 30, 2005 between Brower, Fitzwater, and Voyzey.
17. An October 2, 2005, internal Graphic email.
18. A form entitled "Graphic Packaging Corporation Invention Disclosure," dated October 7, 2005, and signed by Fitzwater.
19. A May 25, 2007, email from Biddle regarding patent applications.
20. An unsigned "update" of events in October 2008 prepared by an unknown Graphic employee.
21. Graphic's "Monthly Report" for April 2009, which was prepared by Best.
22. June 2009 emails between Tim Klisares, Graphic Sales Manager; Seefeldt; Lou Judge, a Nestle employee who was involved with procurement at Nestle since 1982; and additional Graphic employees whose roles at Graphic are unknown.
23. Internal Graphic emails from October 2009.
24. A November 2011 "project summary" by Voyzey regarding microwave susceptor sleeve business at Nestle.
25. Internal Graphic emails from November and December 2011.
26. An April 13, 2012, email from Klisares to Judge, and another email exchange that day between Klisares and Seefeldt.
27. A series of internal Graphic emails dated June 20 through 22, 2012.
28. An August 28, 2012, email from Judge to Watkins.
29. Multiple internal Graphic emails from May, September, and December 2013.
30. Screenshots purporting to show bids from the January 2014 ARIBA bidding for Nestle business.
31. A February 7, 2014, internal Nestle email.
32. A February 13, 2014 email from Kathryn Carlson, a Nestle employee, to Judge and Seefeldt, among others.
33. Multiple internal Graphic emails dated February 16 and 17, 2014.
34. An indemnification agreement dated February 20, 2014, which Watkins signed on behalf of Inline at Nestle's request.
35. Internal Graphic emails from March and June 2014.
36. Internal Graphic emails from October and December 2015.
37. Internal Graphic emails from May, September, and November 2015.
38. A May 6, 2015, email from Seefeldt to Judge, with a copy of the cease-and-desist letter Graphic had served on Inline attached.
39. Internal Graphic emails from January and February 2016.
40. A March 11, 2016, email from Seefeldt to Carlson.
41. An internal Nestle email dated June 28, 2016.
42. Multiple internal Graphic "sample requests," also referred to as a "CAD Requests" or "drawing request forms," which served to request drawings from Graphic designers.
43. Drawings that resulted from such requests.
44. Excerpts from Graphic's internal "Code of Business Conduct and Ethics."

---

[4] Inline refers to this as the "Joint Development Agreement," or the "JDA." (See, Mem. in Supp., [Docket No. 381], 29).

(Mem. in Supp., [Docket No. 381]; Exhibits 1 through 119, [Dockets No. 384-501] (all filed under seal)). The Court has carefully considered the large volume of Exhibits individually, as well as a whole, and it finds that Inline has failed to demonstrate a prima facie case to support amending their Complaint to assert a claim for punitive damages as to Counts I and II. The Court discusses each of Inline's asserted bases for punitive damages in more detail below.

### Evidence Which Inline Asserts Shows that Graphic Knew the Patented Designs Were Not Invented Solely by Fitzwater

Jeffrey Voyzey testified that in 2000 or 2001, Graphic and the company Chef America began Project Quantum, which was aimed at designing new microwave susceptor sleeves for Hot Pockets. (Kroll Dec., Exh. 17, [Docket No. 399], 3). Voyzey was Graphic's project leader for Project Roxanne, and Corey Brower was his principal contact at Chef America. (Id. at 3-4). Voyzey agreed that it was correct to say that he "worked with Mr. Biddle[, Graphic's assistant general counsel and chief intellectual property counsel,] on patent-related issues that arose in connection with Project Roxanne," as well as "contract-related issues." (Id. at 10). Generally, Voyzey agreed with the assertion that he kept Biddle "in the loop on what was going on in Project Roxanne." (Kroll Dec., Exh. 17, [Docket No. 399], 26-27). (Id. at 11). More specifically, Voyzey agreed that he participated in quarterly patent review meetings with Biddle and he was kept apprised of patent developments, including designs or concepts for which patent protection was being applied or on which patents had been granted. (Id. at 15). He testified that "[i]t wouldn't be uncommon" for Biddle to participate in meetings regarding Project Roxanne. (Kroll Dec., Exh. 17, [Docket No. 399], 10).

Voyzey further agreed that in 2002 or 2003, Nestle acquired Chef America, and "at some point" Project Quantum "morphed into" Project Roxanne, but Brower remained Voyzey's principal contact at Nestle on Project Roxanne. (Id. at 3, 19). A slide from an internal, undated

(but which appears to have been produced in 2004 or 2005) Graphic power point presentation lists one of the goals for Project Roxanne as "Multi[-]year protection in the market." (Kroll Dec., Exh. 88, [Docket No. 470], 2).

Nestle acquired Chef America in 2002. (Kroll Dec., Exh. 83, [Docket No. 465], 3). Brower was the person responsible for communicating changes and suggestions to Graphic on behalf of Chef America and, after its acquisition, on behalf of Nestle. (Id. at 6). Brower described the design and development as a collaborative process. (Id. at 12-13). Brower further testified that during both Project Quantum and Project Roxanne, he often had his own ideas and suggestions about what the packaging should include, and he commonly communicated to Graphic—typically through Voyzey—what particular features Nestle wanted in the sleeves. (Id. at 4, 6). Brower stated in his Declaration that after he communicated Nestlé's desired changes to Voyzey, Graphic would provide samples of the desired designs as requested. (Kroll Dec., Exh. 85, [Docket No. 467], 4-5).

In his testimony, Voyzey agreed that it was fair to say that he and Brower worked jointly on ideas and designs and that Brower provided feedback from Nestle on proposals or designs. (Kroll Dec., Exh. 17, [Docket No. 399], 4). Voyzey further agreed that Brower provided comments, feedback, and suggestions on drawings or samples from Graphic and, broadly speaking, Voyzey would incorporate Brower's comments into what Voyzey asked Graphic designers to draw. (Id. at 21). John Best, Graphic's vice president of sales and commercial development, also testified that Graphic worked with Brower similarly to how Graphic worked with all of its customers:  Brower "provid[ed] feedback on performance from the samples [Graphic] had provided, and [gave] direction on what he needed to see improvement in." (Kroll Dec., Exh. 3, [Docket No. 387], 3, 5-6).

Brower authored an Interoffice Memo dated June 12, 2001 ("the June 2001 Memo"), which was distributed to Voyzey, among others, and which summarized design concepts and anticipated "next steps" as discussed during a June 11, 2001, Project Quantum meeting involving representatives from Chef America and Graphic. (Kroll Dec., Exh. 84, [Docket No. 466], 2-3). Brower testified that the June 2001, Memo indicated that at that time, Chef America had told Graphic that it was interested in pillow packs (also known as end closures), tear strips, and gussets, and that the Hot Pocket Sleeve Chef America used at the time already had gussets. (Kroll Dec., Exh. 83, [Docket No. 465], 5, 8). In his Declaration, Brower stated:

> "As reflected in [the June 2001Memo], Chef America specifically requested that Graphic provide microwave susceptor sleeves that included closable end panels, a tear strip, gussets, and apertures. Notably, the microwave susceptor sleeve being sold in 2001 already had gussets and apertures, so Chef America directed Graphic to add end panels and a tear strip to the design.

(Kroll Dec., Exh. 85, [Docket No. 467], 5).

Voyzey similarly testified that the Hot Pocket sleeve Graphic made for Chef America in 2001, had gussets and an aperture but did not have a tear strip or end closures. (Kroll Dec., Exh. 17, [Docket No. 399], 5, 18). Voyzey also testified that the meeting in June 2001, reflected that Chef America was considering tear strips, end closures, and a new bottom panel for the new Hot Pockets sleeve design. (Id. at 6). Voyzey further testified that in 2001, Deb Pair, a designer at Graphic at the time, prepared Drawing 50019D, which was the design for a Hot Pocket Sleeve with pillow packs. (Id. at 8).

In March 2005, Graphic and Nestle entered into a (Joint) Development Agreement[5] to develop "certain thermal insulating, hand held microwave sleeve packaging for hand held food products and/or new cost reducing processes for producing Nestlé's existing microwave sleeve for hand held products." (Kroll Dec., Exh. 87, [Docket No. 469], 2). Biddle and Voyzey were

---

[5] See, fn. 4, supra.

27

both involved, to some extent, in the negotiation and approval of the Joint Development Agreement. ((Kroll Dec., Exh. 17, [Docket No. 399], 10; Kroll Dec., Exh. 33, [Docket No. 415], 6, 9-10; Kroll Dec., Exh. 87, [Docket No. 469], 11). Best testified that although he was not directly involved in negotiating the Joint Development Agreement, he was "kept aware of the status of it through updates from [Biddle] and [Voyzey]." (Kroll Dec., Exh. 3, [Docket No. 387], 7).

According to Biddle's testimony, "[a]ny development work that was performed under Project Roxanne was pursuant to the [joint] development agreement." (Kroll Dec., Exh. 33, [Docket No. 415], 16). Among other things, in the Joint Development Agreement, Nestle agreed to "[f]urnish GPI [Graphic] written criteria and concepts for the Packaging." (Kroll Dec., Exh. 87, [Docket No. 469], 2). The Joint Development Agreement defined "Improvements" as "any modifications, alterations, changes, improvements, enhancements, adaptations or derivative works of or to the Packaging." (Id. at 2).  The Joint Development Agreement further provided:

> Patentable inventions that are invented jointly by the parties hereto shall be owned jointly by the parties in accordance with the law governing such jointly owned patents, and subject to Section 5.1 above," but "[a]ny Improvements developed solely by one party shall be owned solely by that party, shall be incorporated into the Packaging, and shall be subject to the exclusivity provision contained in Section 5.1 above.

(Id. at 6).

Voyzey testified that he understood the Joint Development Agreement to state that if Graphic solely developed a concept, Graphic would own it, but if there was an invention or a concept developed by both Nestle and Graphic, it would be jointly owned by them. (Kroll Dec., Exh. 17, [Docket No. 399], 17). Specifically, Voyzey testified that he understood "solely" to mean "no one else had a hand in that development." (Id.).

Voyzey agreed in his testimony that one way for Graphic to have multi-year protection in the market, which was identified in the previously mentioned PowerPoint presentation as a goal of Project Roxanne, was to patent the sleeve design. (Kroll Dec., Exh. 17, [Docket No. 399], 12). Voyzey further testified that by March 2005 he was "considering patent protection as a means of [o]btaining multi[-]year protection for sleeves produced by Graphic for Nestle." (Id. at 17).

Graphic structural designer Kelly Fitzwater testified that she began working on Project Roxanne at the end of 2005, but she had not worked on Project Quantum; Voyzey agreed with this timing in his testimony. ((Kroll Dec., Exh. 17, [Docket No. 399], 20; Kroll Dec., Exh. 89, [Docket No. 471], 3-4). Fitzwater further testified that she had no role in preparing drawing 50019D, which was the sleeve design with pillow packs. (Kroll Dec., Exh. 89, [Docket No. 471], 10). However, Fitzwater's role in Project Roxanne "would have been to take concepts of others, including project leaders, and essentially put them to paper, create drawings." (Id. at 5). She testified that she did not create drawings or samples absent a specific request to do so. (Id.). Brower similarly testified that that he worked with Fitzwater and could not "recall any instances where [he] asked [Fitzwater] to come up with a new design without providing her some direction as to what [he] wanted in that design." (Kroll Dec., Exh. 83, [Docket No. 465], 7).

During her deposition, Fitzwater identified various drawings—Drawings 51616D, 51616E, and 51616F—and she noted the differences in the designs represented therein. (Kroll Dec., Exh. 89, [Docket No. 471], 11).

On September 30, 2005 ("the September 30, 2005, email"), Brower sent an email to Fitzwater—copied to Voyzey—that included suggestions on Drawings 51616D, 51616E, and 51616F. (Kroll Dec., Exh. 90, [Docket No. 472], 3). Brower testified that the September 30, 2005, email was "specifically advising [Fitzwater] that [Nestle] would like a new variation of the

sleeve with a single tear strip located approximately halfway down the sleeve." (Kroll Dec., Exh. 83, [Docket No. 465], 9). Both Voyzey and Biddle testified that the September 30, 2005, email contained suggestions and feedback on Drawings 51616D, 51616E, and 51616F. ((Kroll Dec., Exh. 33, [Docket No. 415], 15-16); Kroll Dec., Exh. 39, [Docket No. 399], 23). Fitzwater confirmed that as of September 30, 2005, Brower communicated to her that he wanted one tab on the sleeve. (Kroll Dec., Exh. 89, [Docket No. 471], 11).

Voyzey testified that he had once referred to a "fourth" design—in addition to the three drawings referenced above--because of Brower's desire for a tear away panel that exposed approximately half of the sandwich at once. (Kroll Dec., Exh. 17, [Docket No. 399], 25). Biddle similarly testified that he understood the "fourth design" to be based upon the suggestion that Brower had made. (Kroll Dec., Exh. 33, [Docket No. 415], 17). Voyzey further testified that prior to Brower's suggestion, there was no drawing of a sleeve with a single tear-away portion that removed approximately half of the sleeve. (Id. at 24).

On October 2, 2005, Voyzey sent an internal Graphic "sample request" (also referred to as a "CAD Request" and a "drawing request form") requesting a change to Drawing 51616C "removing the top horizontal zipper. One zipper that removes the top 2 [inches] with one zipper." (Kroll Dec., Exh. 91, [Docket No. 473], 3). Voyzey testified that this sample request was intended to reflect the changes suggested by Brower in the September 30, 2005, email, and Fitzwater agreed that it appeared that the sample request was made to produce a design with the features Brower requested in the September 30, 2005, email. (Kroll Dec., Exh. 17, [Docket No. 399], 27-28; Kroll Dec., Exh. 89, [Docket No. 471], 12). Voyzey also testified that Drawing 51616G was completed on October 3, 2005, and was consistent with his October 2, 2005, sample request. (Id. at 28). Biddle similarly testified that Fitzwater's Drawing 51616G was the drawing

that reflected Brower's suggestion in the September 30, 2005, email. (Kroll Dec., Exh. 33, [Docket No. 415], 18).

On October 2, 2005, Voyzey sent an email to Mark Sinclair (whose role at Graphic is not indicated in the record) and Biddle and copied it to Fitzwater, Best, Dan Keefe (whose role at Graphic is not known), Scott Middleton (whose role at Graphic is not known), and Terry Lafferty (whose role at Graphic is not known); that email referred to "3, soon to be 4, pillow pack designs we've shown to Nestle for project Roxanne." ((Kroll Dec., Exh. 33, [Docket No. 415], 14; Kroll Dec., Exh. 90, [Docket No. 472], 2). Voyzey further noted in the email that "Marketing was more excited about these than they have been about any concepts we've shown them to date. They seemed to forget that we had shown them pillow pack concepts 18 months ago." (Id.). Voyzey stated:  "[Fitzwater] has submitted these designs to see if they are patentable. We need to move quickly to see if these are patentable concepts and if so to get them protected as soon as possible." (Id.). Attached to Voyzey's October 2, 2005, email was Brower's September 30, 2005 email, which explicitly stated that "these designs fall under our Exclusivity Agreement." (Id. at 3-4).

Biddle testified that he could not produce any documentation to show that he had inquired into the assertion in Voyzey's October 2, 2005, email that Graphic showed Nestle pillow pack concepts 18 months prior. (Kroll Dec., Exh. Exh. 33, [Docket No. 415], 17; Exh. 90, [Docket No. 472], 2).

On October 7, 2005, Fitzwater signed a form entitled "Graphic Packaging Corporation Invention Disclosure." (Kroll Dec., Exh. 95, [Docket No. 476], 2). The Invention Disclosure Form ("IDF") states:  "This invention is a MW sleeve that contains a food product (a heat and serve sandwich, for example) which might be consumed by the user while 'on the go.'

Consequently, it features tear-off portions which the person can remove as the product is 'eaten down.'" (Id.). The IDF refers to "GPI drawings #51616D, 51616G," and states that the invention "was first disclosed to another person" on September 23, 2005, when "[s]amples and drawing were submitted to Corey Brower [at] Nestle." (Id.).[6] Fitzwater testified that if she had questions about an Invention Disclosure Form, she would "[p]robably" go to Graphic's patent attorneys, including Biddle. (Kroll Dec., Exh. 89, [Docket No. 471], 7). She further testified that her understanding was that an Invention Disclosure Form (IDF) would eventually go to Biddle or another individual involved with Graphic's patent attorneys. (Id. at 8, 13).

Graphic's Rule 30(b)(6) representative, Jeffrey Sloat, testified that once an IDF was completed, "[i]t goes through a witness process. Other people have to read through it, and then sign as witnesses, and then it gets sent to our internal Counsel, . . . Barry [Biddle] for approval. If he approves it, then it goes into [sic] our external Counsel for generation of an application." (Kroll Dec., Exh. 106, [Docket No. 487], at 3).

---

[6] Inline merely cites generally to Expert Kowalchyk's explanation and summary of the process by which "Graphic applied for multiple patents from 2005 to 2013 that incorporate and claim the three major categories of concepts and ideas Brower and others at Nestle provided under Projects Quantum and Roxanne and the JDA." (Mem. in Supp., [Docket No. 381], 33, citing generally to "Exh. 81, ¶¶ 37-99; Exh. 82, ¶¶ 27-61). Similarly, Inline cites only to its Expert Report and Rebuttal Report as the support for the following paragraph:

        Someone at Graphic . . . created invention disclosures on the Hot Pocket designs that incorporate the drawings made pursuant to Brower's instructions and claim Brower's contributions. Someone also revised the disclosures after Brower's September 30, 2005, email, so that one of the disclosures specifically referenced the new Drawing 51616G. But Fitzwater is the only person identified as the inventor in all of the disclosures. Fitzwater signed the disclosures and submitted them for patenting.

(Mem. in Supp., [Docket No. 381], 32-33). Inline also cites only to the Expert Report and Rebuttal Report for the following assertions:  (1) "Graphic applied for an entire family of patents (the "Invalid Patents") that were all premised on Nestlé's contributions"; (2) "Although the Invalid Patents claim concepts provided by Brower, on behalf of Nestle, none of the applications or patents list him or anyone else at Nestle as an inventor"; (3) "But because Brower and others came up with the patentable concepts, the law required that they receive attribution. Since the patents do not list them as at least co-inventors and instead incorrectly list Fitzwater as the sole inventor, the patents are invalid." (See, Mem. in Supp., [Docket No. 381], 33). Because it is improper to consider an expert's characterization of facts or conclusory statements as evidence relevant to a plaintiff's burden to show a prima facie case for punitive damages in order to succeed on a motion to amend a complaint to add punitive damages, the Court, as already explained above, does not consider this as evidence. In light of its ability to consider the record as a whole, however, the Court may consider as general background that Inline intends to argue that the patents which Graphic asserted in its conversations with Nestle and in its patent litigation against Inline are invalid because Fitzwater is allegedly listed as the only inventor when Inline asserts that this is untrue.

Biddle testified that his responsibilities at Graphic included managing Graphic's intellectual property portfolio and managing patent prosecution activities, including "sometimes" reviewing them, but he did not draft claims, applications, or responses to office actions. (Kroll Dec., Exh. 33, [Docket No. 415], 4).[7] Biddle was the primary contact person between Graphic and its outside patent counsel since at least 2005. (Id.). Biddle testified that he believed it was correct to say that "a sale of a purported invention . . . more than a year prior to the filing of application is a clear bar to patentability." (Id. at 22). He also testified that he was aware that the disclosure obligations required the disclosure of information on enablement, on possible prior public uses, sales, offers to sell, derived knowledge, prior invention by another, and inventorship conflicts. (Id. at 24).

Biddle further testified that he was "involved in pursuing patent [] protection on Kelly Fitzwater's inventions." (Kroll Dec., Exh. 33, [Docket No. 415], 11). He further testified that he is aware that Graphic "prepared and filed a patent application on . . . the sleeve invention that she developed," and that while Biddle may or may not have reviewed or approved it, he would have worked with outside patent counsel and ultimately instructed outside patent counsel whether they were permitted to file the provisional patent application. (Id. at 5, 12, 23). But later, Biddle testified that he reviewed all of the Invention Disclosure Forms (IDFs) which were sent to outside patent counsel. (Id. at 28). Biddle testified that he would have seen Fitzwater's drawings "if they were attached to an [IDF] that was sent to [him]," and he "believe[d]" he eventually saw

---

[7] On May 25, 2007, Biddle authored an email regarding a patent (unrelated to the patents currently at issue in this litigation) on which a third-party was claiming he should be listed as an inventor. (Kroll Dec., Exh. 108, [Docket No. 489], 2-3). In that email, Biddle states that he reviewed a patent application "as well as the development documents that were forwarded to me by the listed inventors and I have had several conversations with GPI [Graphic] personnel that were involved in the development of the product." (Id.). The email continues on to communicate Biddle's thoughts on the validity of the third-party's claim to inventorship. (Id.). Inline cites this singular example in support of its broad assertion that "Biddle historically investigated inventorship issues relating to collaborative work between Graphic and other partners that involved less substantive concepts." (See, Mem. in Supp., [Docket No. 381], 37).

drawings for Fitzwater's IDF. (Id. at 14, 19). Biddle testified that he ultimately instructed outside patent counsel to file the nonprovisional patent application on Fitzwater's design, listing Fitzwater as the sole inventor. (Id. at 25).

Biddle testified that he did not ever ask for or review Voyzey's Project Roxanne file or interview him with regards to the IDF, he did not recommend to outside patent counsel that they interview Voyzey, and he could not recall whether he performed any due diligence[8] by looking through documents or interviewing people. (Kroll Dec., Exh. 33, [Docket No. 415], 20, 27, 29). Biddle also testified that he did not remember specifically talking to Fitzwater about "what it means to be an original, first and sole inventor" or discussing with her "the Corey Brower concept . . . at or about the time the [nonprovisional] patent application was filed." (Id. at 26).

Voyzey testified that he was aware that Fitzwater had submitted Invention Disclosure Forms claiming to be an inventor of the sleeve designs, and he agreed with the statement that he was "involved in the decision to seek patent protection on [the] designs drawn by Ms. Fitzwater." (Kroll Dec., Exh. 17, [Docket No. 399], 26-27). Voyzey's testified that during his employment at Graphic, he was never "questioned with regard to what is in the[] invention disclosure forms," nor did he recall anyone in connection with the patent-seeking process asking him for information "relating to the work that had been done prior to September 2005 in connection with Project Roxanne and Project Quantum." (Kroll Dec., Exh. 17, [Docket No. 399], 22, 27). Voyzey also testified that he did not recall ever being "asked to collect drawings, memos, materials with regard to the work that had been done on Project Quantum and Project Roxanne as part of patent prosecution efforts." (Id.at 30). Voyzey also testified that he did not talk to anyone at Graphic about whether it was permissible to file a patent solely in Graphic's

---

[8] The deposition excerpt provided by Inline does not provide context as to what, exactly, Biddle or Inline were referring to that Biddle could have performed due diligence in regard to. (See, Kroll Dec., Exh. 33, [Docket No. 415], 21).

name despite the joint work with Nestle on the Project Roxanne sleeve. (Kroll Dec., Exh. 17, [Docket No. 399], 14, 18).

Voyzey further testified that he did not recall ever having a conversation with Brower "telling him that the concept of a sleeve with a single tear away feature that exposes about half the sandwich with one tear was being submitted for patent protection by Graphic, and he did not recall ever telling anyone at Nestle that Brower was originally the person who suggested the single tear strip modification. (Kroll Dec., Exh. 17, [Docket No. 399], 29, 35).

Similarly, Fitzwater testified that she understood what it means to be the "sole inventor" of something. (Kroll Dec., Exh. 89, [Docket No. 471], 15). She also testified that "[i]f someone took part in the designing of whatever specifically is being claimed [on an "Invention Disclosure Form"], then they would be added to that invention disclosure. (Id. at 8). She specifically described "the type of information [she understood she] had an obligation to disclose" as "if I was taking somebody else's design and stealing it, I would have to disclose that. That would be wrong. Disclosing anything that I believe is unpatentable, I guess. . . . disclosing everything I know, that I believe has anything to do with what I created." (Id. at 16). Fitzwater further testified that she had "no role in preparing drawing 50019[D], and she created drawings of an already-existing but modified sleeve with added tear strips and a closed bottom. (Id. at 6, 10). She also testified, as related above, that Brower suggested modifications to the design, including the suggestions in the September 30, 2005, email. (Id. at 12). Yet, she testified that she didn't recall whether she "ever advise[d] Mr. Brower that [she] submitted an invention disclosure on the drawing that [she] did pursuant to his suggestion." (Id. at 14).

For his part, Brower testified that he did not recall anyone at Graphic ever advising him that they were seeking patent protection on the designs that resulted from his suggestions, and he

did not recall ever being advised that Fitzwater had submitted invention disclosure forms claiming the resulting drawings as her own inventions. (Kroll Dec., Exh. 83, [Docket No. 465], 10-11).

On December 20, 2005, Voyzey submitted another sample request to Fitzwater, and included the following notation: "One more change for the Roxanne Sleeve. They'd like to add a locking tab to the bottom flaps. Something like a cereal box top." (Kroll Dec., Exh. 93, [Docket No. 383-2, 2). Brower used this sample request in his Declaration as "[a]nother particular example of Nestle providing instructions to Graphic." (Kroll Dec., Exh. 85, [Docket No. 467], 6). On December 20, 2005, Fitzwater completed Drawing 51616M. (Kroll Dec., Exh. 94, [Docket No. 475], 2).

Voyzey testified that the Project Roxanne Hot Pocket sleeves were commercialized in or around 2007, and Nestle was required to purchase 100 percent of the Roxanne Hot Pocket sleeves from Graphic from 2007 to 2014. (Kroll Dec., Exh. 17, [Docket No. 399], 16). Biddle testified that he "believe[d it] is correct" to say that "the Roxanne sleeve ultimately procured by Nestle was developed pursuant to" the Joint Development Agreement. (Kroll Dec., Exh. 33, [Docket No. 415], 10). Similarly, Best agreed "that the Roxanne sleeve ultimately procured by Nestle was developed pursuant to" the Joint Development Agreement. (Kroll Dec., Exh. 3, [Docket No. 387], 9).

In addition to the evidence detailed above, Inline also submitted to the Court excerpts from Graphic's "Code of Business Conduct and Ethics." Best and Jim Seefeldt, Graphic's vice president of sales, both testified that they were aware of the Code of Business Ethics and Conduct and that they signed and acknowledged it annually. (Kroll Dec., Exh. 3, [Docket No. 387], 17; Kroll Dec., Exh. 9, [Docket No. 391], 5). Best further testified that he had never self-

reported that he had violated that ethical code, and although he had contacted Graphic's legal department "on occasion" about his concerns, none of those contacts "in any way, directly or indirectly, involve[d] the allegations" asserted by Inline in this litigation. (Kroll Dec., Exh. 3, [Docket No. 387], 20).

Inline states that "Graphic's code of ethics prohibited employees from engaging in the kind of deceit continuously exhibited by Graphic's leadership." (Mem. in Supp., [Docket No. 381], 37). The Court first notes that the page cited to support this assertion is the introduction to the Code of Business Conduct and Ethics and states only the "Purpose of Our Code" and that it "applies to us all." (See, Kroll Dec., Exh. 25, [Docket No. 407], 6). Inline also directs the Court to excerpts from Graphic's Code of Business Conduct and Ethics that state that (1) managers must "uphold[] the highest standards of professional conduct"; (2) employees should "Never get involved in any discussion that may be interpreted as interfering with free and fair competition"; (3) employees should "not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing practice"; and (4) employees should "speak up" even if they "only suspect unethical behavior." (Kroll Dec., Exh. 25, [Docket No. 407], 9, 11, 30-31).

Inline now contends that the evidence detailed above establishes by clear and convincing evidence that "Graphic leadership knew that the patented concepts were not invented by Fitzwater because the Concepts were developed under the JDA and Projects Quantum and Roxanne." (Mem. in Supp., [Docket No. 381], 35). Inline also argues that "Graphic leadership on Project Roxanne, Biddle in particular . . . knew facts creating a high probability that Fitzwater was not the sole inventor of the Invalid Patents, but willfully turned a blind eye." (Id. at 37).[9]

---

[9] In their respective Memoranda in support of and in opposition to the present Motion to Amend to Plead Punitive Damages, both Inline and Graphic argue the ultimate merits of the underlying claims in this suit. Graphic does so

The Court observes, however, that some of Inline's assertions in its argument on this point are entirely conclusory and are not supported by its citations to the evidence in the record now before the Court. For example, while asserting Graphic had knowledge that the patents were invalid, Inline states that "Graphic leadership even acknowledged that there were 'valid concerns from past history regarding IP ownership.'" (Mem. in Supp., [Docket No. 381], 38). However, the email to which Inline cites in support of this specific contention is a February 11, 2016, email from Katie Kloth (whose role at Graphic is not known) to Seefeldt discussing a potential future project with Nestle that in fact has nothing to do with the issues in the present litigation. (See, Kroll Exh. 100, [Docket No. 481], 20.

Similarly, Inline states that "after the 2016 Nestle RFP process, Seefeldt noted that the Invalid Patents resulted from Nestlé's 'insight' and 'improvements' and acknowledged that it was Nestlé's design." (Mem. in Supp., [Docket No. 381], 38). The citation in support of this assertion, however, is actually to an October 28, 2015, email string with the subject line "Nestle Hot Pocket sleeve history" in which Kloth wrote to Seefeldt:

> We started the sleeve back in 1984 with a simply square sleeve designed for Nestle. Around 2005, they came back to us with some additional consumer insight wanting to make improvements. At that time we created 12+ designs for them, which were tweaked a few times before they agreed to a final sleeve they are still using today. At that time, we patented the design, but had no exclusivity to Nestle – only an agreement and understanding that it was their "Nestle design". [*sic*]

---

extensively, as it argues that Inline "fails to establish a prima facie case of tortious interference with contractual relationship," that "Inline has failed to present a prima facie case . . . that Graphic's assertion of its patent rights was wrongful or unlawful," and that "Inline does not offer evidence of any specific intent to deceive the [United States Patent and Trademark Office." (Mem. in Opp., [Docket No. 506], 14, 22, 39). None of this is relevant to the present Motion to Amend to Plead Punitive Damages. See, Coy v. No Limits Education, No. 15-cv-93 (BRT), 2016 WL 7888047, *2 (D. Minn. April 1, 2016) ("[W]hen deciding whether punitive damages are available, courts do not need to examine the merits of the underlying claims or determine whether they were properly pleaded. Those questions are best considered in the context of dispositive motions."). Therefore, the arguments of both parties which go to the merits of the underlying claims are not addressed in this Order.

(Kroll Dec., Exh. 112, [Docket No. 494], 2). In response, Seefeldt wrote only: "Thanks Katie[.]"

(Id.).

In addition, some of Inline's other characterizations of the evidence in the record now before the Court are imprecise at best. For example, Inline asserts that "Best told the Graphic team to 'stay focused on . . . Inline' and to push for Nestle to license Graphic's patents via an 'economic move to incent this offer' and make 'the legal stuff go[] away." (Mem. in Supp., [Docket No. 381], 38). Inline cites here to Exhibit 113 to the Kroll Declaration, which includes an email from Best to various Graphic employees dated December 11, 2015, which stated, in relevant part:

> We are advancing a thought on how to get an extension on the Nestle Sleeve-Microwave business[.]
> He needs the following recap on all the Nestle Sleeve-Microwave business. Essentially, we are looking for you to go through the Nestle business and provide the following input.
> Lets [sic] stay focused on the Inline and GPI microwave business. I know that Westrock runs some patch items but believe this is a bit out of scope for this exercise.
> Item        Supplier        Sales   Margin        Is it Patented  (y/N)  [sic]
>     If Yes, when expires            How easy to get around the patent?
> Make sense?
> This is pretty hot…Bill, Jeff…we have the opportunity to talk with Mike U next week. Part of our conversation needs to checking [sic] his willingness to license Nestle on the Roxanne sleeve (provided we hold our volume-4 year deal) and all the legal stuff goes away. We would make an economic move to incent [sic] this offer and deliver some Stouffer [sic] carton growth.

(Kroll Dec., Exh. 113, [Docket No. 495], 2-3) (ellipses in original). When put into full context within the email, Best's language is not at all as Inline characterizes it.

### Evidence Which Inline Asserts Shows that Graphic Asserted the Patents Despite Knowing that doing so had a High Probability of Injuring Inline's Right to Interference-Free Business Relations

Inline next argues that despite knowing or disregarding facts which showed that the implicated patents were invalid, Graphic nevertheless applied for the patents at issue because it

sought "multi-year protection in the market" for Hot Pocket Sleeves, it was concerned about upcoming expirations of previously issued patents, increased competition from Inline motivated Graphic to seek the patents, and seeking patents based on others' ideas is common strategy for Graphic. (See, Mem. in Supp., [Docket No. 381], 34). Therefore, Inline claims, Graphic deliberately took actions which interfered with Inline's prospective and existing business relations despite knowing of a high probability that such actions would injure Inline's right to interference-free business relations. See, Minn. Stat. § 549.20, Subd. 1(b).

The following is the evidence upon which Inline relies for this portion of its argument.

An unknown Graphic employee created an unsigned "update" regarding events in October 2008, stating:

> Inline Packaging is showing up within all groups within Nestle. They've made presentations to R&D, Stouffer's, HHFG in Denver and with Lou Judge [at Nestle] in St. Louis in the last 60 days. They have provided sample for 3 of the projects we are working on today . . . Project leaders report Inline being very aggressive and very innovative.

(Kroll Dec., Exh. 41, [Docket No. 423], 2; see, also, Kroll Dec., Exh. 52, [Docket No. 434], 1).

On May 13, 2009, Best issued Graphic's Monthly Report for April 2009, which reported: "Competitive activity from In Line [sic] packaging has risen to a troubling level. They have attacked in a number of our high profit, low end, and non protective structures at Nestle, Heinz, and Schwan's. It is obvious that our customers are using them to apply pressure to GPI." (Kroll Dec., Exh. 12, [Docket No. 394], 4).

In June 2009, a series of internal Graphic emails and an email to Lou Judge, Group Manager of Strategic Procurement at Nestle, from Tim Klisares, Sales Manager for Graphic, regarding Graphic's offer to reduce product pricing for Nestle in exchange for Graphic receiving

100% of Nestlé's business and Nestlé's rejection of that offer. (Kroll Dec., Exhs. 22-24, [Docket Nos. 404, 405, and 406).

In an internal Graphic email dated October 5, 2009, Larry Seaborg (whose role at Graphic is not known) informed Seefeldt, among others, that a third-party had "state[d] he would not give ideas to [Graphic] because they run out and get patents on his ideas." (Kroll Dec., Exh. 99, [Docket No. 480], 2).

Jeffrey Watkins, President of Inline, testified that Inline became a fully qualified Nestle supplier in 2011. (Kroll Dec., Exh. 5, [Docket No. 386], 4). (Kroll Dec., Exhs. 22-24, [Docket Nos. 404, 405, and 406; Kroll Dec., Exh. 52, [Docket No. 434], 1).

In November 2011, Voyzey prepared and issued an internal Graphic "project summary" that noted that Nestle had confirmed its intent to move the Kahiki sleeve business to Inline effective January 2012. (Kroll Dec., Exh. 9, [Docket No. 391], 22; Kroll Dec., Exh. 45, [Docket No. 427], 2). Voyzey testified that susceptor products that Graphic manufactured and sold generally have a higher margin when compared to folding carton products. (Kroll Dec., Exh. 17, [Docket No. 399], 33).

On November 30, 2011, Mike Vance (whose role at Graphic is not known) emailed Pete Lokar (whose role at Graphic is not known), Klisares, and Seefeldt, and he stated that in an open bid situation, Graphic could be forced to reduce its profitability margin on microwave sleeves by up to 20%. (Kroll Dec., Exh. 44, [Docket No. 426], 4). In the email, Vance also stated: "As you are aware the microwave business is under competitive pressure and will likely take a hit when our contract is up." (Id.).

William Sedlacek, former Vice President and General Manager of the Graphic's Microwave Division until 2011, when he became Vice-President of Innovation and Business

Development for Graphic, testified that he had also received Vance's November 30, 2011, email. (Kroll Dec., Exh. 28, [Docket No. 410], 6; Id. at Exh. 44, [Docket No. 426], 4). Sedlacek further testified that at the time, he was willing to reduce the profitability margin on microwave sleeves provided that Graphic retained 100% of the paperboard production. (Id. at 7; see, also, Kroll Dec, Exh. 9, [Docket No. 391], 24).

In a related email on December 5, 2011, Seefeldt stated:

> I believe Nestle is committed to get a back[-]up source of supply on susceptor for leverage. Nestle believes – and has believed for some time that our prices on susceptor are very high because we are 'unchecked' in the market. . . . I think this is mostly about leverage and back up and the fact that Lou [Judge] has probably seen significant double digit saving opportunities via [I]nline.

(Kroll Dec., Exh 44, [Docket No. 426], 2). Seefeldt later testified that he learned in late 2011 that Nestle was awarding Inline—instead of Graphic—its Kahiki spring roll susceptor sleeve business. (Kroll Dec., Exh. 9, [Docket No. 391], 22).

Inline argues that "[i]ncreased competition from Inline put pressure on Graphic to obtain patents. (Mem. in Supp., [Docket No. 381], 34). However, the evidence Inline cites to support this extremely broad assertion is only Best's testimony that Graphic did "[n]ot necessarily" want a protectable design; "We wanted to solve the customer's issue." (See, Id.; see, also, Kroll Dec., Exh. 3, [Docket No. 387], 7). The deposition excerpt cited by Inline does not support its assertion that pressure from Inline motivated Graphic to obtain patents.

Similarly, at his deposition, Seefeldt was asked: "You would agree with me that patents on microwave susceptor technology are a party of Graphic's strategy for keeping its microwave susceptor business? Yes?" (Kroll Dec., Exh. 9, [Docket No. 391], 11). Seefeldt replied:

> I think that where we have worked and invested for patents and technology, that we want to use that to our advantage and the customer's advantage, and so does it ever tie into the strategy? It does. But again we've earned the patent and the customers found value in it. So . . . ."

(Id. (ellipses in original transcript)). Inline cites to this portion of Seefeldt's testimony to support its equally broad assertion that "patents are a part of Graphic's usual 'strategy' for keeping susceptor business." (See, Mem. in Supp., [Docket No. 381], 34). When considered in proper context, however, Inline's characterization of the cited deposition testimony is plainly imprecise.

In any event, on December 5, 2011, Klisares sent Judge (at Nestle) an emailed proposal offering a reduction in product price if Nestle would extend Graphic's Kahiki sleeve contract, extend other susceptor agreements with Graphic, and award additional business to Graphic. (Kroll Dec., Exh. 46, [Docket No. 428], 2-3). Sedlacek testified after becoming aware of the award of the Kahiki sleeve business to Inline, Graphic nevertheless sought to extend its right to sell Kahiki sleeves for another year, despite potential interference with the award to Inline. (Kroll Dec., Exh. 28, [Docket No. 410], 9).

In an April 4, 2012, email to Seefeldt, Klisares referred to an "applied-for patent" on the microwave sleeve and stated that the patent might not be issued "for months." (Kroll Dec., Exh. 9, [Docket No. 391], 25-26; Id. at Exh. 53, [Docket No. 435], 2). Yet in an April 13, 2012, email Klisares sent to Judge (at Nestle), Klisares purported to remind Judge of a conversation in November 2011, during which Klisares had informed Judge that the microwave sleeve in question was "a GPI patented structure" and so a licensing agreement might be necessary if Nestle awarded the sleeve production to another company. (Kroll Dec., Exh. 47, [Docket No. 429], 2-4). Judge stated in his Declaration:  "Nestle takes allegations and threats relating to intellectual property infringement very seriously." (Kroll Dec., Exh. 52, [Docket No. 434], 3). Sedlacek testified that it was "likely" that Klisares made the statements to Judge regarding the GPI (Graphic) patent to create uncertainty about whether Inline could produce the sleeve without infringing on GPI's patent. (Kroll Dec., Exh. 28], 10).

In an email dated April 13, 2012, Klisares reported to Seefeldt that he had emailed Judge, and Seefeldt replied, "Well done." (Kroll Dec., Exh. 47, [Docket No. 429], 2). When Seefeldt was later asked if, at the time of those emails, he "understood that there had been no patent issued on the Kahiki sleeve," Seefeldt testified:

> I think that maybe the difference is if we applied for it, that that was, made it a valid. So if it's applied for, you know, it's almost like it's patented, you know, to laymen folks, maybe not in the legal sense of it. But if we have applied for it, we are protected for it and it's a protected structure from what I understand about patents, and I don't understand a lot, but that's what I thought to understand.

(Kroll Dec., Exh. 9, [Docket No. 391], 27).

Biddle testified that he "believe[d]" he had told Klisares—prior to Klisares' April 13, 2012, email to Judge—that they could not sue for patent infringement on a patent which is currently pending. (Kroll Dec., Exh. 33, [Docket No. 415], 30). What Inline doesn't acknowledge is that immediately following the deposition excerpt to which Inline cites, Biddle further testified that he felt that Klisares "had in particular at the time a poor understanding as to the difference between a patent and . . . a pending patent application", and Klisares "was ignorant" in "what you can and cannot do" with respect to each. (Kroll Dec., Exh. 33, [Docket No. 415], 30). In addition, although Biddle testified that he told Klisares that there was no patent at the time, Biddle further testified that he felt Klisares' statements to Judge were a mistake, rather than a lie. (Id. at 31).

On August 28, 2012, Judge (at Nestle) emailed Watkins (at Inline) an indemnification agreement Nestle planned to ask Inline to sign "concerning the sleeve currently packed at Kahiki Foods." (Kroll Dec., Exh. 48, [Docket No. 430], 2-3).

In a series of internal Graphic emails dated June 20 through June 22, 2012, Graphic employees discussed topics for an upcoming meeting between Graphic and Nestle regarding

packaging safety and certificates of compliance. (Kroll Dec., Exh. 43, [Docket No. 436], 2-5). In one of the emails, Klisares stated that Sedlacek had:

> suggested we use this forum with [Nestlé's incoming Global Manager of Packaging Safety] to plant the seed of doubt with regards to the Microwave topic – that while GPI [Graphic] is a market leader in the field and can speak to our level of compliance, we can not [*sic*] vouch for lesser companies out there (Inline) that may not be as sophisticated or well resourced. Further – since he may not be aware that Nestle has recently moved some business to Inline – that he probe them in terms of [certificates of compliance] to make sure that they can, and will comply with the same level of scrutiny that GPI and other large suppliers are being asked to meet.

(Id. at 2). Pete Lokar (whose position at Graphic is not known) replied that he "like[d the] strategy of using this process as a way to highlight our resources . . . and also plant the seed of doubt in any upstart in this space (like InLine [*sic*]). We need to make sure that is an objective of this meeting." (Id.). Klisares agreed:  "[I]t will be an objective of the meeting." (Id.).

Sedlacek himself testified that he "wanted to plant a seed of doubt" with Nestlé's incoming Global Manager of Packaging Safety, and that he did not have any evidence that Inline was not in compliance with safety requirements. (Kroll Dec., Exh. 28, [Docket No. 410], 11). Here again, what Inline does not acknowledge about the cited deposition testimony is that Sedlacek testified immediately thereafter that during the meeting he did not actually assert that Inline was not in safety compliance. (Id.).

In a May 30, 2013, internal Graphic email exchange, Warren Burn (whose role at Graphic is not known) asked, "Would In-Line [*sic*] make a good tuck under?" and Lokar responded, "Yes – just to get In-Line [*sic*] out of our way and from screwing up the market here." (Kroll Dec., Exh. 69, [Docket No. 451], 2).

On September 3 and 4, 2013, there were a series of internal Graphic emails including Sedlacek, Lokar, Klisares, and Seefeldt that identified two potential competitors—one of which

was Inline—for microwave sleeve business which expired in June 2014, and later stated there was no data to suggest the other competitor was active in the microwave sleeve business. (Kroll Dec., Exh. 55, [Docket No. 437], 2-5).

On December 7, 2013, Jeff Martinez of Graphic (whose role there is not known) emailed Gregory Scharine of Nestle (whose role there is not known) and informed him that two sleeves they had been discussing were covered "at least" by two patents. (Kroll Dec., Exh. 58, [Docket No. 440], 2). Seefeldt later testified that he "believed" that Martinez had informed Nestle that there were Graphic patents which would be infringed if Nestle awarded Inline the sleeve business involved in anticipated January 2014, bidding for Nestle business. (Kroll Dec., Exh. 9, [Docket No. 391], 29). Voyzey also testified that "well in advance" of January 31, 2014, multiple people at Graphic—including Voyzey, Klisares, and possibly Martinez and/or Seefeldt—had informed Nestle that the Hot Pocket sleeves were patent-protected, and Voyzey believed that he himself had discussed the issue with Judge (at Nestle) in 2011 or 2012. (Kroll Dec., Exh. 51, [Docket No. 433], 9-10).

On January 8, 2014, Nestle accepted bids on multiple lots of business ("the ARIBA auction") that included provision of microwave susceptor sleeves. Watkins (at Inline) testified that even prior to the ARIBA auction, Inline and Nestle had communicated about possible Hot Pockets patent issues. (Kroll Dec., Exh. 5, [Docket No. 386], 9-10). Inline has provided screenshots from ARIBA Sourcing which it asserts shows that Inline's January 8, 2014, bids were the lowest bids for Nestlé's "Lot 1 – MEDFORD," Kahiki Spring Roll Wrappers, Hot Pocket, Croissant Pocket lots. (Kroll Dec., Exh. 59, [Docket No. 441], 2-4; Exh. 60, [Docket No. 442], 2-4). Inline has also provided screenshots from ARIBA Sourcing which Watkins later

testified showed that bidding was completed and Inline had been awarded the Nestle lots. (Kroll Dec., Exh. 5, [Docket No. 386], 5-7); Kroll Dec., Exh. 62, [Docket No. 444], 2-9).

In a January 29, 2014, internal Graphic email string including Sedlacek, Seefeldt, Lokar, and various other Graphic employees, Sedlacek stated that Nestle had informed another Graphic employee that "they intend to move the entire sleeve business," that Graphic's bid was not the lowest, and that Graphic "might be able to salvage something (maybe up to 40$) with a bold move." (Kroll Dec., Exh. 61, [Docket No. 443], 2-3). Similarly, Voyzey testified that the feedback from Nestle after and regarding the ARIBA bids was that Nestle was "in a position to move 100 percent of the microwave susceptor sleeve business." (Kroll Dec., Exh. 51, [Docket No. 433], 7).

In an email dated February 7, 2014, Shannon Gavie (who appears to be a Nestle employee) informs Judge and Kathryn Carlson (who appears to be another Nestle employee) of an error that was discovered in one of the lots and an email dated February 9, 2014, in which Judge replies, in relevant part, "I do not think a rebid is in order as GPI [Graphic] will get all the business in a blocking strategy to keep Inline out." (Kroll Dec., Exh. 64, [Docket No. 446], 2).

In an internal Graphic email string dated February 16 and 17, 2014, Voyzey opined that it would be "[w]orth pointing out at this point that the croissant sleeve (drawing 51843) is covered by at least 2 patents (7,414,230 & 7,893,389) and 1 pending application. . . . We could remind [Nestle] of these patents now or let it slide for a while." (Kroll Dec., Exh. 65, [Docket No. 447], 2-3). In response, Sedlacek stated:

> Let's focus on getting the current proposal done and not overly complicate finalization of the negotiations. We can probably have greater impact later, rather than creating the turmoil now. While Nestle clearly is involved on the patent question, the legal issue ultimately would be with In Line [*sic*] as they would be the infringer on patents as the manufacturer. . . . My assessment is the patent issue will not force Nestle to give us any more share or prevent

them from bringing In Line [*sic*] in with a simple die change. Let's use it with In Line [*sic*] where the legal issue would be anyway. The timing needs to be finalized, but one option would be to monitor In Line's [*sic*] qualifying activity with their limited award, presumptively on the current die cut. As the current contract end nears, play the patent card which should dictate that In Line [*sic*] is prevented from producing the current die cut. They presumably will then have to requalify a revised die cut, essentially starting over again, having wasted time and expense while they pursue the current die cut.

(<u>Id.</u> at 2).

On February 13, 2014, Kathryn Carlson at Nestle (whose role is not known) emailed Judge and Seefeldt, among others, confirming that Nestle was offering Graphic a 2-year extension for lots 3 and 4, which were the Hot Pocket lots. (Kroll Dec., Exh. 65, [Docket No. 447], 4-5).

On February 20, 2014, Watkins signed an indemnification agreement on behalf of Inline for Nestle. (Kroll Dec., Exh. 51, [Docket No. 432], 2). Watkins testified that Judge had informed him that Graphic had said that Inline supplying Hot Pockets would infringe upon Graphic patents. (Kroll Dec., Exh. 5, [Docket No. 386], 9).

In a March 12, 2014, email exchange with Lokar and Vance, Seefeldt noted that Inline had expanded an existing plant and hired additional employees. Seefeldt opined that this expansion was "[o]bviously part of Nestle strategy and probably others," and Lokar replied, "How did we not know this before? Did you share with Voyzey/Sedlacek?" (Kroll Dec., Exh. 66, [Docket No. 448], 2).

In an internal Graphic email dated March 26, 2014, Seefeldt identified topics to discuss during an upcoming internal Graphic phone conference. (Kroll Dec., Exh. 67, [Docket No. 449], 2). One of the 9 topics was: "with inline [*sic*] building new plant – it won't be long before they attack our susceptor margins. If more dollars are needed I suggest we consider reducing margins

on susceptor piece to not further erode carton margins and to put us in a better position when inline [*sic*] comes after susceptor[.]" (Id.).

A June 30, 2014, internal Graphic email from Lokar to Best, Seefeldt, and Sedlacek, among other Graphic employees, stated:

> Guys, For preparation for Steve's CPD leadership meeting next Monday-Tuesday, please refer to the attached. Given recent events in the marketplace, we are going to be seriously challenged to find growth. Refer to Steve's email to me on Sunday as a reference. The spreadsheet that he has attached was a condensed version of the countermeasures lists we put together last month. It will serve as a starting point for building this target list. As per my team call last Friday, "gloves are off" gentlemen – what we didn't want to do/weren't willing to do are on the table. We need creative and aggressive ideas. [W]hat I will put together with your input is a starting point – and we will certainly discuss more at the staff meeting next week. See attached – we will discuss live this afternoon.

(Kroll Dec., Exh. 68, [Docket No. 450], 2). This email does not mention Inline in any way. (Id.).

Sedlacek later testified that in 2014, Graphic expressed interest in acquiring Inline. (Kroll Dec., Exh. 28, [Docket No. 410], 13-14). During a meeting with an Inline representative to discuss the acquisition, Sedlacek "didn't talk about the patents at all." (Id. at 13). When asked, "And the reason that you didn't raise those issues is if they weren't receptive to an acquisition, you wanted to be as disruptive to their business as possible. Isn't that correct?" Sedlacek answered, "Potentially, yes." (Id. at 14). Sedlacek further testified that Graphic sued Inline for patent infringement in 2015, and agreed with Inline's deposing counsel that thereby, "[t]he patent card [referred to in the February 2014, internal Graphic emails] was played." (Id.).

On May 5, 2015, Graphic sent Inline a cease-and-desist letter, informing Watkins that Graphic had filed a lawsuit for the alleged infringement by Inline of four patents. (Kroll Dec., Exh. 71, [Docket No. 453], 4). Biddle testified that he was involved in the decision to sue Inline. (Kroll Dec., Exh. 33, [Docket No. 415], 35-36). Inline also argues that "other Graphic leadership,

such as Seefeldt" were also involved in the decision to sue Inline, but neither the portion of Biddle's deposition testimony nor the additional citation by Inline in support of this assertion demonstrate this to be the case. Seefeldt's only involvement—as supported by Inline through its citations to the present record—was that Biddle sent Seefeldt a copy of the complaint and cease-and-desist letter and stated:  "Please let me know if you have any questions." (See, Id. at 35-36; Kroll Dec., Exh. 71, [Docket No. 453], 2-5). However, in a May 5, 2015, email from Biddle to Seefeldt identifying "talking points" for an anticipated conversation with Nestle, Biddle asked Seefeldt not to "answer any questions regarding strategy, intent, etc." (Kroll Dec., Exh. 72, [Docket No. 454], 2-3).

On May 6, 2015, Seefeldt sent an email to Judge (at Nestle) to which he attached a copy of the cease-and-desist letter meant for Inline. (Kroll Dec., Exh. 9, [Docket No. 391], 30; Kroll Dec., Exh. 70, [Docket No. 452]).

In November 2015,[10] a representative of another food supplier reached out to a Graphic employee seeking information on obtaining susceptor sleeves because it was "having issues with the current supplier on a couple issues." (Kroll Dec., Exh. 29, [Docket No. 411], 3). On November 6, 2015, Voyzey forwarded the email to Best and Sedlacek, among others, referring to it as "some background on Inline and issues they're having in the market." (Id.). Best replied, asking, "Do we know where Inline has business besides Nestle?" (Id. at 2). Voyzey responded, "I know a handful but let me poll the group and put together a comprehensive list of accounts, status, and $ value." (Id.). Best replied, "Then put on your pirate hat and attack…Put your foot on their throat…no air[.]"(Id.). Voyzey responded:  "Aye, Aye Captain!" (Id.)

On March 11, 2016, Seefeldt emailed Kathryn Carlson at Nestle (whose role is not known) and outlined a proposed agreement under which Nestle would award at least 90% of its

---

[10] The present case was filed in this Court on July 31, 2015.

microwaveable packaging products to Graphic and, in exchange, Graphic would provide a royalty-free license to Nestle, which it could then sublicense. (Kroll Dec., Exh. 74, [Docket No. 456], 3). The offer was also contingent on Inline dismissing its antitrust lawsuit; Inline's agreeing not to contest the validity of any patents licensed to Nestle; and Inline's agreement to cease any involvement in the inter partes review, other than efforts to assist Graphic in having the inter partes review dismissed. (Id.). In exchange, Graphic agreed to dismiss its infringement suit against Inline. (Id.). Seefeldt testified that Biddle had approved his reaching out to Nestle to discuss a patent license for Inline. (Kroll Dec., Exh. 9, [Docket No. 391], 31-32). Seefeldt further testified that he knew "that [Nestle] preferred [that the patent dispute between Graphic and Inline] wasn't there." (Kroll Dec., Exh. 9, [Docket No. 391], 33).

In an internal Inline email dated January 19, 2016, Jon Wolfe (whose role at Inline is not known) detailed for Watkins a draft of Inline's proposal for the Roxanne (Hot Pocket) susceptor sleeve business with Nestle. (Kroll Dec., Exh. 76, [Docket No. 458], 2-3).

An email dated February 11, 2016, from Kloth (at Graphic) to Seefeldt stated in part, "[E]veryone [at Nestle] really wants to work with Graphic on this [Lean Cuisine and Stouffer's] initiative and partner with us. They do have some valid concerns from past history regarding IP ownership and the recent issues with Inline." (Kroll Dec., Exh. 100, [Docket No. 481], 2). The email further detailed Nestlé's requests on the upcoming project:  "[A]ny IP we already own, we keep and anything Nestle owns, they keep. Anything we work on together and create uniquely for Nestle during the session – Nestle would own the IP." (Emphasis in original). (Id.).

As part of an internal Nestle email string dated June 28, 2016, Andrew Leach (whose role at Nestle is not known) recommends keeping the Croissant Pocket business with Inline and keeping the Roxanne (Hot Pocket) sleeves with Graphic. (Kroll Dec., Exh. 77, [Docket No. 459],

2). Leach further noted: "Inline offered slightly higher savings although moving more volume away from GPI [Graphic] would increase the likelihood of GPI taking legal action on the perceived patent infringement." (Id.). The email string shows that ultimately Graphic and Nestle agreed to a 3-year contract extension—through June 30, 2019—with a minimum 85% share maintained by Graphic. (Id. at 2-3).

Based upon the evidence set forth above, Inline contends the record clearly establishes that Graphic perceived Inline to be a competitive threat at major food companies including Nestle. (Mem. in Supp., [Docket No. 381], 21). Inline further argues that after Graphic learned that Nestle had awarded Inline the Kahiki sleeve business in 2011, Graphic nevertheless attempted to extend its Kahiki sleeve business by offering price reductions in exchange for 100% of the business volume from Nestle. (Id.). When Nestle rejected this offer, Inline contends that Graphic asserted that it held patents which covered the Kahiki sleeves despite knowing that those patents had not yet been issued, were only applied-for, and therefore could not be sued upon. (Id. at 22). Inline also asserts that Graphic "attempted to convince Nestle in Summer 2012 that Inline did not comply with food packaging safety requirements" despite having no evidence of non-compliance by Inline. (Id. at 22-23).

Inline contends the record also clearly establishes that Graphic deliberately interfered with Inline's award of business from Nestle in the ARIBA Auction by deliberately asserting rights under patents it knew were invalid due to misrepresented inventorship both in communications to Nestle and in what Inline characterizes as "sham" patent litigation. (Id. at 23). Inline maintains that Graphic told Nestle that it held patents on the Hot Pocket and Croissant Pocket sleeves involved in the 2014, bidding process and there would be patent infringement if the business was awarded to Inline. (Id.). Inline only generally asserts that this communication

occurred "[a]round the time of the [ARIBA] auction." (Id. at 24). Inline further argues that the assertion of the patent rights was done with intentional and deliberate disregard of Graphic's knowledge that the patents were invalid and that Graphic's assertion of patent rights "showed deliberate disregard for Inline's rights." (Id. at 37-38).

Inline asserts that although it had been awarded the business in the ARIBA auction because it had the lowest bid, Nestle took the patent threats by Graphic seriously such that it later transferred the Hot Pocket portion of the business back to Graphic, leaving Inline with the "much smaller Croissant Pocket and Kahiki sleeve business." (Id.). After a failed attempt to acquire Inline, Graphic then—according to Inline—decided to "play the patent card" and filed suit alleging infringement by Inline of four patents which Inline has responded to by maintaining Graphic knew the patents to be invalid. (Id. at 25). Inline conclusorily contends that Graphic sued only to "cause 'turmoil.'" (Id.). Inline also asserts that in the context of the business Nestle awarded in early 2016,[11] it awarded Graphic a contract extension in part because Nestle felt "moving more volume away from GPI would increase the likelihood of GPI taking legal action on the perceived patent infringement." (Id. at 26). Thus, Inline contends that "Graphic's intentional assertions of patent rights interfered with Inline's business relations with Nestle, causing Inline to lose the award of Hot Pockets susceptor sleeve business." (Id. at 26-27).

Inline argues that its submitted evidence shows "Graphic's explicit pattern and practice of attempting to interfere with Inline's contractual and prospective relations, Graphic's knowledge of Inline's inroads at Nestle[,] . . . of the invalidity of certain patents due to incorrect inventorship, Graphic's intentions in asserting its sham patents, and Graphic's eventual success in interfering with Inline's relations . . . [thus] demonstrate[ing] Graphic's deliberate disregard

---

[11] See, fn. 10, supra.

for Inline's right to business relations without interference." (Mem. in Supp., [Docket No. 381], 41-42).

The Court, on the basis of the present record, cannot agree.

A "deliberate disregard for [the] right to business relations without interference" is not the showing Inline must make in order to succeed on its Motion to Amend the Complaint to Add Punitive Damages, [Docket No. 504], presently before the Court. Rather, as already stated above, Inline must provide evidence which, if unrebutted, clearly and convincingly allows a conclusion that Graphic (1) was aware of or intentionally disregarded facts that created a high probability of injury to Inline's rights, and (2) deliberately proceeded to act in conscious disregard, intentional disregard, or with indifference to that high probability of injury to Inline's rights. See, Minn. Stat. § 549.20, Subd. 1(a)-(b).

After a thorough review of the multitude of Exhibits now before the Court, both individually and as a whole, the Court concludes that the evidence submitted by Inline, even unrebutted, does not establish a prima facie case to allow Claims I and II to be amended to asserts a claim for punitive damages. Although the proffered evidence, unrebutted as it currently is, might arguably convince a jury that Graphic tortuously interfered with Inline's existing and prospective business relations with Nestle by asserting patent rights under patents Graphic knew or should have known to be invalid, Inline has presented <u>no</u> evidence that Graphic policy makers intentionally disregarded or were aware of the invalidity of its patents, and Inline has presented <u>no</u> evidence that Graphic had "deliberate disregard for the rights" of Inline to interference-free business relations.

Inline attempts to closely parse certain internal emails and other documents in order to characterize them as showing this deliberate disregard, but often those characterizations are not

supported by the actual evidence to which Inline cites in support. In addition, although Inline has proffered evidence that Graphic asserted patent rights in its communications with Nestle, a mere assertion of patent rights by Graphic alone does not entitle Inline to seek punitive damages. See, Virtue v. Creamery Package Mfg. Co., 142 N.W. 930, 936 (Minn. 1913) ("It is true that the owner of a patent may lawfully warn others against infringement, and give notice of his intention to enforce his rights, if done in good faith."). Inline must also make a prima facie showing that Graphic asserted those patent rights while either being plainly aware that the implicated patents were invalid or being likewise aware of a high probability that the implicated patents were invalid and that Graphic's assertion of rights on those patents had a high probability of injuring Inline's rights to conduct its business without undue interference.

Inline contends that it has done so. (Mem. in Supp., [Docket No. 381], 42). In support, Inline cites to two cases, both of which factually are materially distinguishable from the present case. First, Inline cites to Sorin Group USA, Inc., a case in which Magistrate Judge Jeffrey J. Keyes granted the plaintiff's motion to amend to add punitive damages under Minnesota Statue § 549.191. (Mem. in Supp., [Docket No. 381], 42); see, also, Sorin Group USA, Inc., 2015 WL 12803583, *1. Similar to the present case, the plaintiff in Sorin Group USA, Inc. sought to plead punitive damages in relation to a Minnesota state law claim of tortious interference with contractual rights. Id. The asserted interference in Sorin Group USA, Inc. occurred when the defendant engaged in certain conduct regarding plaintiff's employees and eventually hired away two of plaintiff's employees. Id. In its motion to amend its complaint to plead punitive damages, the plaintiff in Sorin asserted that it had entered into employment agreements with both of its former employees, that the defendant knew of those employment agreements, and despite that knowledge, the defendant induced the plaintiff's former employees to violate their obligations

under those employment agreements, and that this was conduct that had a high probability of injuring the defendant's contractual rights under those employment agreements. Id. at *1-2.

In support of its motion, the plaintiff in Sorin Group USA, Inc. provided evidence—by way of testimony from the defendant's in-house counsel—showing that the defendant's in-house counsel had received a copy of the employment agreement, had discussed it with the plaintiff's former employee and with the defendant's senior management, and had specifically warned both the plaintiff's former employee and the defendant's management not to violate its terms. Id. at *2. The plaintiff also provided direct email evidence that, despite knowledge of a non-compete clause in the employment agreement, high-ranking managerial employees of the defendant had email communication with one of the plaintiff's employees regarding how much business he could "'bring over'" when he left the plaintiff's employment and began working for the defendant. Id. at *3.

Inline also cites to Northwest Airlines, Inc. v. American Airlines, Inc., 870 F. Supp. 1499 (D. Minn. 1994). (Mem. in Supp., [Docket No. 381], 42). In Northwest Airlines, Inc., the evidence submitted in support of the motion to plead punitive damages included evidence showing that the managing director at Northwest Airlines, who was formerly the manager of American Airlines' yield management operations, telephoned an American Airlines employee and obtained certain information that, as a former manager of American Airlines, he knew or should have known that the information was proprietary, would violate American Airlines' right to employee confidentiality, as well as, violate its right to be free from misappropriation of its proprietary information. Id. at 1503

Both of the cases relied on by Inline are materially distinguishable from the case presently before the Court.

Unlike the plaintiff in <u>Sorin Group USA, Inc.</u> and the defendant in <u>Northwest Airlines, Inc.</u>, Inline has not provided sufficient prima facie evidence that Graphic's senior management employees knew or should have known that their actions on behalf of Graphic had a high probability of injuring Inline's rights and nevertheless took those actions. In short, the materials Inline has provided from various lower level employees do not show by clear and convincing evidence that Graphic senior managers knew or disregarded facts showing that the patents it asserted were invalid and that Graphic asserted those patents anyway, despite a high probability that doing so would injure Inline's rights vis-à-vis Nestle.

The case presently before the Court is much more similar to <u>Select Comfort Corp. v. Tempur Sealy International, Inc.</u>, No. 13-cv-2451 (DWF/SER), 2015 WL 12803582 (D. Minn. Nov. 6, 2015). In that case, the party moving to seek punitive damages submitted evidence that "[did] not demonstrate that the employees knew the statements [at issue] were false, and deliberately made the statements regardless of their falsity." <u>Id.</u> at *6. "At best, [the] evidence [submitted in support of the motion for punitive damages] may show that [the defendant] was negligent . . ., but this is insufficient to establish a claim for punitive damages." <u>Id.</u> at *4. Similarly, in the present case, the evidence Inline has submitted may show that Graphic negligently or carelessly committed the torts pled by Inline in this lawsuit, and it may show that Graphic's employees did not have a deep understanding of patent law, but it does not show the deliberate nature required to establish a claim for punitive damages.

Inline points out that the Eighth Circuit has allowed evidence of anticompetitive intent in antitrust cases to be inferred; it does not need to be proven by direct evidence. (Mem. in Supp., [Docket No. 381], 18); <u>see</u>, <u>Gen. Indus. Corp. v. Hartz Mountain Corp.</u>, 810 F.2d 795, 802 (8th Cir. 1987) ("Specific intent [in the context of an attempted monopoly claim] need not be proven

by direct evidence, but can be inferred from the defendant's anticompetitive practices or other proof of unlawful conduct."). While that precept applies to Inline's burden of proof regarding ultimate liability on the underlying state law antitrust claim (or possibly even its state law tortious interference claims) in this case as presented to a jury or other fact-finder, it has long been held in this District that "circumstantial evidence suggesting that defendants acted in deliberate disregard" is insufficient to plead a claim for punitive damages. Best Buy Stores, L.P. v. Developers Diversified Realty Corp., No. 5-cv-2310 (DSD/JJG), 2008 WL 227689, *2 (D. Minn. Jan. 25, 2008).

Even considering the evidence proffered by Inline as unrebutted, as the Court must for purposes of the present Motion to Amend to Plead Punitive Damages, [Docket No. 504], Inline has not satisfied its burden to establish a prima facie case that Graphic had knowledge or intentionally disregarded facts that created a high probability of injury to Inline's rights to conduct its business without interference and that Graphic deliberately proceeded to act in conscious disregard, with intentional disregard, or with indifference to the high probability of injury to those rights. See, Minn. Stat. § 549.20, subd. 1(b).

Accordingly, Inline's Motion to Amend to Plead Punitive Damages, [Docket No. 504], is **DENIED.**

**III.**     **CONCLUSION**

For the reasons set forth above, **IT IS ORDERED:**

1.  That Plaintiff's Motion to Amend to Plead Punitive Damages, [Docket No. 504], is **DENIED**.


Dated: March 8, 2018                                                    s/Leo I. Brisbois
                                                                        Leo I. Brisbois
                                                                        U.S. MAGISTRATE JUDGE