# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Inline Packaging, LLC,

        Plaintiff,

v.

Graphic Packaging International, LLC,

        Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 15-3183 ADM/LIB

---

Robert R. Weinstine, Esq., Justice Ericson Lindell, Esq., Brent A. Lorentz, Esq., and Kyle Kroll, Esq., Winthrop & Weinstine, PA, Minneapolis, MN, on behalf of Plaintiff.

Felicia Boyd, Esq., Barnes & Thornburg LLP, Minneapolis, MN; David B. Hamilton, Esq., and Barry J. Herman, Esq., Womble Bond Dickinson (US) LLP, Baltimore, MD; Jason Hicks, Esq., and Amanda Norris Ames, Esq., Womble Bond Dickinson (US) LLP, Charlottesville, VA; and Christine H. Dupriest, Esq., Womble Bond Dickinson (US) LLP, Washington, D.C., on behalf of Defendant.

---

# I.  INTRODUCTION

On June 6, 2018, the undersigned United States District Judge heard oral argument on Plaintiff Inline Packaging, LLC's ("Inline") Motion for Partial Summary Judgment [Docket No. 540] and Motion to Exclude Expert Testimony [Docket No. 610].  Defendant Graphic Packaging International, LLC's ("Graphic") Motion for Summary Judgment [Docket No. 635], Motion to Exclude Expert Testimony [Docket No. 773], and Motion to Strike Pleading [Docket No. 788] were also heard on the same date.

Additionally before the Court is Inline's Objection [Docket No. 538] to Magistrate Judge Leo I. Brisbois' March 8, 2018 Order [Docket No. 534] denying Inline's Motion to Amend to Plead Punitive Damages [Docket No. 504].  For the reasons set forth below, Graphic Packaging's motion for summary judgment is granted, Inline's motion for partial summary

judgment is denied, all other motions are denied as moot, and Inline's Objection is denied as moot.

## II. BACKGROUND

### A. Parties

Inline and Graphic compete in the susceptor food packaging industry.  Compl. [Docket No. 1] ¶ 2.  Inline alleges Graphic is a monopolist in the United States susceptor food packaging market who has maintained its dominant position through a combination of anticompetitive tactics including unlawful discount bundling and sham intellectual property assertions.  See generally, id.  Inline contends that these tactics were employed in response to Inline's inroads at major food companies, and that Graphic's conduct has foreclosed Inline from selling to the market's largest purchasers of susceptor food packaging.

### B. Susceptor Market

Susceptor food packaging is active food packaging that converts microwave energy to high surface temperatures which crisp and brown foods.  Compl. ¶ 60.  Of the handful of companies that supply susceptor products in the U.S., Graphic holds by far the largest market share at approximately 95% of the market, and Inline is second with approximately 4.6%.  Hicks Decl. [Docket No. 638] Ex. 2 [Docket No. 640] ("Levinsohn Report") Ex. 4.

Inline and Graphic compete for supply contracts with consumer packaged goods food companies ("CPGs").  Compl. ¶¶ 20–21.  The five largest purchasers of susceptor products in the U.S. are Nestlé, Conagra, Heinz, Schwan's, and Pinnacle.  Levinsohn Report ¶ 187, Ex. 5.  These five CPGs accounted for nearly 93% of U.S. susceptor sales in 2016.  Id. Ex. 5.

### C.  Paperboard Market

Although Inline manufactures and sells only susceptor products, Graphic manufactures and sells paperboard/folding carton food packaging as well as susceptor products.  Lindell Decl. [Docket No. 614] Ex. E [Docket No. 619] ("Saravia Report") ¶¶ 46–51.  Graphic operates seven North American mills that produce paperboard to be used for manufacturing folding cartons.  Id. ¶ 48.  Graphic's paperboard customers include the five large CPGs listed above.  Id. ¶ 52. Graphic's revenue and profits from sales of paperboard to these five customers far exceed its revenue and profits from sales of susceptor products to these same CPGs.  Id.  From 2010 to 2016, Graphic's revenue from paperboard sales to these CPGs was $1.9 billion, whereas its revenue from susceptor sales was $0.4 billion.  Id.  Graphic's gross profits from paperboard sales to these customers was $0.8 billion over this time period, while its gross profits from sales of susceptors was $0.2 billion.  Id.

Graphic faces intense competition in the paperboard market from WestRock (formerly RockTenn), International Paper, Burd & Fletcher, and other regional and private label competitors.  Id. ¶¶ 48, 53.  In 2015, WestRock's reported revenue was $15.5 billion, which more than tripled Graphic's revenue of $4.3 billion for that year.  Id. ¶ 53.  Competition between Graphic, WestRock, and International Paper is intensified because these three firms are vertically integrated with paper mills.  Id. ¶ 54.  To cover the large fixed costs of running the mills while also offering competitive prices, the firms must operate the mills at full or close to full capacity. Id.  Thus, these firms are dependent on and must compete for large paperboard orders that will enable them to operate more efficiently and offer lower prices.  Id.

Companies purchasing paperboard products employ strategies to encourage direct

competition between paperboard suppliers to drive down prices.  Id. ¶ 56.  Business is sometimes

awarded through reverse auctions and by seeking multiple bids for new lines of products or

before re-signing contracts for an existing line of products.  Id.  For example, in early 2014,

Heinz conducted an open market bid and reverse product auction on its folding carton volume,

even though Graphic had an existing contract for that volume of products through April 2015.

Id.  Although Graphic was successful in retaining the business, Heinz extracted a 5.8% price

reduction on some products, with the reductions starting before the end of the original contract

term.  Id.  Customers also seek discounts and incentives that suppliers agree to in order to retain

business.  Id. ¶ 58.  This competition suggests that customers wield significant power in dictating

contract terms and is likely one reason why Graphic's profit margins on paperboard products are

lower than susceptor products, 9% to 23% for paperboard versus 32% to 46% for susceptors.

Levinsohn Report ¶ 101.

**D.  Graphic's Supply Agreements**

Graphic holds multi-year supply agreements with four of the five major CPGs for the

supply of susceptor and paperboard products.  See id. ¶¶ 132–185; Hicks Decl. ¶ 30.  These

contracts govern their purchases of susceptor and paperboard products from Graphic.  Levinsohn

Report ¶¶ 133, 144, 151, 158, 164, 168, 175, 179.  The contracts, which extend from one to four

years, are common in the industry.  See, e.g. Hicks Decl. Ex. 12 [Docket No. 650] ("Jones

Dep.") 124:7–11; Hicks Decl. Ex. 14 [Docket No. 652] ("Ferrara Dep.") 95:12–12; Hicks Decl.

Ex. 15 [Docket No. 653] ("Dorman Dep.") 142:17–144:1; 145:6–23.

These supply contracts also include an array of financial incentives.  For example,

Graphic's supply agreement negotiated in 2010 with Heinz included price caps, price reductions,

and improved payment terms for both paperboard and susceptor products.  Levinsohn Report

¶ 139.  Graphic's 2012 contract with Schwan's included year-over-year price reductions and an

annual rebate program that provided discounts for both paperboard and susceptor products if

Schwan's purchased a target incremental amount of susceptor products.  Id. ¶ 156.  Graphic's

2014 contract with Conagra included fixed pricing, caps on paperboard price fluctuations, annual

price reductions, and required Graphic to pay all tooling and die and equipment costs.  Id. ¶ 168.

Graphic's 2014 amendment to its supply agreement with Pinnacle included a cap on paperboard

prices, a $1.25 million signing bonus that Pinnacle would have to repay if it stopped purchasing

from Graphic, and a commitment to pursue productivity improvements to reduce Pinnacle's

costs by at least 4% each year.  Id. ¶ 180.  Similar contractual terms are common in the

paperboard and susceptor industries.  See, e.g. Jones Dep. 124:7–11; Ferrara Dep. 95:3–12;

Dorman Dep. 145:13–23.

Graphic's 2010 contract with Heinz was contingent upon Graphic receiving Heinz's

Smart Ones Artisan Pizza business, which was under contract with Inline at the time.  Levinsohn

Report ¶ 136.  During the negotiation period leading up to the 2010 Heinz contract, Graphic

viewed Inline as a "competitive threat."  Id. ¶ 141.  Graphic's internal emails from May 2009

reflect concern that Inline is "pushing to get business at a major CPG[s] like Heinz, Nestlé, or

Schwan [sic].  We want to keep them out of these locations to limit their credibility and growth."

Id. ¶ 154.

**E.  Nestlé's Susceptor Sleeve Business**

Since at least 2005, Nestlé has been one of Graphic's major customers.  First Lorentz

Decl. [Docket No. 543] Ex. 65 ("Best Dep.") 60:25–61:6.  Unlike the other four large CPGs,

however, Nestlé's purchases from Graphic are not covered by a supply agreement.

In 2009, Graphic viewed Inline's competitive efforts to secure business from Nestlé as having risen to a "troubling level."  First Lorentz Decl. Ex. 67 [Docket No 557].  Graphic understood that Nestlé perceived Graphic's susceptor prices as "very high" because Graphic was "'unchecked' in the market."  Id. Ex. 68 [Docket No. 558].  In late 2011, Inline was successful in securing Nestlé's Kahiki susceptor sleeve[1] business for supply in 2012.  Id. Ex. 69 ("Seefeldt Dep.") 179:10–20.

All of Nestlé's susceptor sleeve business—including the Kahiki line that Inline secured in 2012—was scheduled for renewal at the end of June 2014.  Graphic was aware that Inline was a serious competitor for this business.  First Lorentz Decl. Ex. 72 [Docket No. 561]; id. Ex. 73 [Docket No. 562] at GPI 00104156.  In the summer of 2013, Nestlé sent requests for proposals ("RFP") to Graphic, Inline, and other suppliers that covered three Nestlé product lines:  Kahiki, Croissant Pocket, and Hot Pocket sleeves.  Id. Ex. 87 [Docket No. 575]; First Watkins Decl. [Docket No. 590] ¶ 3.  Nestlé explained that the product specifications would be distributed through an online system called "Ariba."  First Watkins Decl. ¶ 3.  Suppliers would submit proposals through the Ariba system for Nestlé's review.  Id.  If Nestlé elected to award business on the basis of a RFP proposal, that decision would be communicated to the supplier.  Id. Ex. A [Docket No. 591].

Inline submitted RFP proposals for Nestlé's Kahiki, Croissant Pocket, and Hot Pocket

---

[1] Nestlé uses susceptor sleeves to package certain food products.  Hot Pockets, for example, are packaged in a foldable and tearable susceptor sleeve that serves the dual function of browning and crisping as well as providing a holder for carrying the Hot Pocket.  First Lorentz Decl. Ex. 55 [Docket No. 553].

susceptor sleeve business.  Wolfe Decl. [Docket No. 600] ¶ 4.  Nestlé, however, elected not to award any business through the RFP process, but decided to conduct a one-day, best and final auction event on January 7, 2014 using the Ariba system.  Id. Ex. B [Docket No. 602].

Shortly before the auction, Inline received an email from Nestlé stating that "the Susceptors that you bid on in the previous RFP Susceptor Part I are going to be taken to a best and final auction."  First Watkins Decl. ¶ 6.  The terms and conditions governing the auction provided that a two or three year contract would be awarded, that the lowest bid price does not guarantee a business award, and that a formal contract would be drafted after the auction that would take precedent over anything specified in the RFP.  Id. Ex. B [Docket No. 592].

Inline bid on five susceptor sleeve lots.  First Watkins Decl. ¶ 9.  As bidding on each lot progressed on the Ariba system, participants were able to see if another supplier had submitted a lower bid.  Id. ¶ 10.  If a lower bid had been received, there was an opportunity for suppliers to respond with another, lower bid of their own.  Id.  This bidding activity occurred on lot 2, which was the Kahiki business.  Id.  The back-and-forth competition resulted in a 20% reduction from the starting bid.  Id.

For each the five susceptor sleeve lots on which Inline submitted bids, Inline's bid price was the lowest.  Id. ¶ 12.  Nestlé communicated to Inline through the Ariba system that Inline had been awarded each of the five susceptor sleeve lots.  Id. ¶ 12, Ex. F [Docket No. 596].

After the auction closed, Nestlé informed Graphic that it intended to move its entire susceptor sleeve business to the lowest bidder.  Seefeldt Dep. 230:13–23; First Lorentz Decl. Ex. 96 [Docket No. 583].  Nestlé "[e]xpressed disappointment in [Graphic's] lack of an aggressive move and the fact [Graphic] did not get aggressive in the auction."  First Lorentz Decl. Ex. 96.

Graphic viewed Nestlé's statement as an attempt to elicit a reaction from Graphic.  Id.  Graphic

intended to respond by "send[ing] a very strong message to Nestlé on how [Graphic] perceive[d]

this underhanded move."  Id.

Graphic suspected Inline was the lowest bidder in the Ariba auction.  First Lorentz Decl.

Ex. 9 [Docket No. 546] ("Voyzey Dep.") 192:23–193:9.  Graphic communicated to Nestlé that it

had patents on susceptor sleeves, and that a new supplier would likely be infringing those patents

if Nestlé elected to steer its susceptor business away from Graphic.  Seefeldt Dep.

221:19–222:18.

On February 24, 2014, Nestlé informed Inline that it was going to purchase only lots 2, 5

and 6, the Kahiki and Croissant Pocket sleeves, from Inline, representing about 10% of Nestlé's

total susceptor sleeve business.  First Lorentz Decl. Ex. 76 at 246:15–23; Ex. 99 [Docket No.

586] 68:6–8.  Nestlé awarded Graphic lots 3 and 4, the Hot Pocket product line, which were

overwhelmingly Nestlé's largest susceptor sleeve lines.  Voyzey Dep. 207:7–10.

## F.  Graphic's Patent Assertions

In December 2013, before the Ariba auction, Jeff Martinez ("Martinez"), Graphic's

representative for the Nestlé account, emailed Nestlé and stated that at least two Graphic patents

covered Nestlé susceptor sleeves.  Second Lorentz Decl. [Docket No. 824] Ex. 177 [Docket No.

888].[2]  After the auction ended, Graphic communicated to Nestlé that Graphic's patents would

---

[2] The issue of patent infringement had been a component of Graphic and Nestlé's relationship.  In a 2012 email discussing moving sleeve business from Graphic to Inline, Nestlé employee Shannon Gavie ("Gavie") told Nestlé's head of packaging procurement, Lou Judge ("Judge"), to "be careful given [Graphic's] likelihood to want to sue us."  Second Lorentz Decl. Ex. 173 [Docket No. 884].  Judge and Gavie respectively characterized Graphic as "litigation happy" and "Patent happy and like to threaten to sue."  Id. Exs. 174 [Docket No. 885]; 175 [Docket No. 886].

likely be infringed if Nestlé awarded any its susceptor sleeve business to Inline.  Seefeldt Dep.

222:10–18; Voyzey Dep. 199:13–18.  Because infringement threats can create concerns about

the viability of a supplier and the impairment of Nestlé's supply chain, Nestlé takes threats

relating to intellectual property infringement "very seriously."  First Lorentz Decl. Ex. 101

[Docket No. 588] ¶ 6.  Graphic eventually did retain the Hot Pocket sleeve business.  Id. Ex. 97

[Docket No. 584].  After Inline lost the Hot Pocket business to Graphic, Nestlé employee Judge

stated to Inline's president, Jeffrey Watkins ("Watkins"), that Graphic had told Nestlé that Inline

would be infringing Graphic's patents if Inline were to become the supplier of the Hot Pocket

packaging.  Second Lorentz Decl. Ex. 167 [Docket No. 879] 256:21–257:8.

Shortly after Nestlé awarded its 2014 business to Graphic and Inline, Graphic considered

reminding Nestlé of Graphic's patents on the susceptor sleeves, but decided that "the patent issue

will not force Nestlé to give us any more share or prevent them from bringing In Line [sic] in

with a simple die change."  Id. Ex. 184 [Docket No. 892].  Graphic decided instead to use the

patent issue "with In Line [sic] where the legal issue would be anyway."  Id.  William Sedlacek

("Sedlacek") of Graphic suggested waiting until the current contract had nearly ended and then

"play the patent card."  Id.  Doing so would force Inline to "requalify a revised die cut,

essentially starting over again, having wasted time and expense while they pursue the current die

cut."  Id.  In his deposition, Sedlacek defended this practice, describing waiting to "play the

patent card until it has the most impact and turmoil" on Inline as "competitive strategy."  Id. Ex.

185 [Docket No. 893] ("Sedlacek Dep.") 137:16–20.

On May 5, 2015, Graphic sent Inline a cease and desist letter asserting that Inline was

infringing Graphic's intellectual property, specifically U.S. Patent Nos. 8,872,078 (the "'078

Patent"); D694,106; D694,124; and D727,145 (collectively, the "Asserted Patents"), which related to Nestlé's susceptor sleeves. Second Lorentz Decl. Ex. 187 [Docket No. 895]. The letter stated that Graphic intended to serve Inline with a patent infringement lawsuit unless Inline cease all infringing activities. Id. The following day, Graphic notified Nestlé about the cease and desist letter sent to Inline. Id. Ex. 186 [Docket No. 894].

When considering Nestlé's 2016 business award, Nestlé's Andrew Leach ("Leach") recognized that "Inline offered slightly higher savings although moving more volume away from [Graphic] would increase the likelihood of [Graphic] taking legal action on the perceived patent infringement." Id. Ex. 191 [Docket No. 898]. Nestlé eventually agreed to a three year extension with Graphic, which obligated Nestlé to purchase at least 85% of its susceptor sleeve business from Graphic. Id. Ex. 192 [Docket No. 899].

## G.  Origin of Asserted Patents

In 2005, Graphic obtained the Asserted Patents relating to susceptor sleeves. These are the same patents that Graphic asserted to Nestlé before the Ariba auction and to Inline in 2015. Kelly Fitzwater ("Fitzwater"), a Graphic designer, is identified as the first and sole inventor of the Asserted Patents and their underlying applications. Because Inline challenges the validity of the Asserted Patents on inventorship grounds, their origin is reviewed here.

The Asserted Patents represent the end result of susceptor sleeve redesigns. In the early 2000s, Corey Brower ("Brower"), a Nestlé packaging engineer, was involved in Projects Quantum and Roxanne.[3]  First Lorentz Decl. Ex. 11 ("Brower Dep.") 15:11–16; 17:8–13.

---

[3] Prior to Nestlé's acquisition of Chef America, Incorporated ("Chef America"), Brower was a Chef America employee. Brower Dep. 14:12–17. When Nestlé acquired Chef America, Brower became a Nestlé employee. Id. 15:11–16. For ease of clarity, hereinafter, Chef America

Project Quantum addressed increasing the filling within the Hot Pocket, and Project Roxanne was directed to increasing the portability of the Hot Pocket. Id. 17:16–19:18.

Brower communicated with Graphic regarding particular sleeve design features that Nestlé wanted. Id. 33:9–12. After receiving instructions from Brower, Graphic would supply susceptor sleeve design samples to Nestlé, which Brower and others at Nestlé would test and rate. Brower would then typically relay the suggested revisions or changes back to Jeff Voyzey ("Voyzey") at Graphic. Id. 33:14–36:3.

In a June 12, 2001 memo, Brower described Nestlé's interest in particular design concepts with tear strips, pillow packs, and gussets. Id. 25:13–26:13; First Lorentz Decl. Ex. 14. Shortly after the June 2001 memo, Deb Pair ("Pair"), then a designer at Graphic, created drawings 50019D and 50019F that included the requested features. First Lorentz Decl. Exs. 18, 19. Graphic made 500 sample sleeves from each drawing and sold them to Nestlé for a total of $3,632. Id. Exs. 15–16.

After July 2001 and prior to 2005, Nestlé explored sleeve options without pillow packs and tear strips. Id. 39:9–13. Nestlé briefly explored a flexible sleeve, but decided to move back to the pillow pack and tear strip because it was unable to achieve product quality out of a flexible susceptor. Id. 39:14–40:23.

On March 30, 2005, Graphic and Nestlé entered into a Joint Development Agreement ("JDA") to "cooperate in the development of certain thermal insulating, hand held microwave sleeve packaging for hand held food products . . . and/or new cost reducing processes for

---

will be referred to as Nestlé when discussing events that occurred prior to Nestlé's acquisition of Chef America.

producing Nestlé's existing microwave sleeve for hand held products."  First Lorentz Decl. Ex. 22.  Nestlé agreed to furnish Graphic with packaging criteria and concepts, assist Graphic as requested, and to test concepts developed by Graphic.  Id. ¶ 4.  The JDA provided for seven years of mutual exclusivity—Nestlé would purchase 100% of its requirements from Graphic and Graphic would not provide the same packaging to Nestlé's competitors—for any designs that Nestlé ultimately selected.  Id. ¶ 5.1.  The JDA also contemplated patents.  Inventions that were solely invented by one party were to remain the property of the originating party.  Id. ¶ 5.2 Inventions that were jointly invented were to be owned jointly "in accordance with the law governing such jointly owned patents."  Id.

Fitzwater, who became a designer for Graphic in 2003, began working on Project Roxanne near the end of 2005.  First Lorentz Decl. Ex. 5 ("Fitzwater Dep.") 19:16–22, 27:11–18.  Between September 6 through September 23, 2005, Fitzwater drafted five drawings in response to instructions from Voyzey.  Id. 144:13–20; First Lorentz Decl. Exs. 26, 28–34. Fitzwater began by modifying drawing 50019D, which had been created by Graphic designer Pair in 2001.  First Lorentz Decl. Ex. 25, 26.  Fitzwater testified in her deposition that each of her later drawings was "very different" from Pair's original design, and that she ultimately "changed the whole package."  Hicks Decl. Ex. 17 [Docket No. 655] 145:18–25, 197:10–21.

Shortly after Fitzwater drafted the drawings, draft invention disclosures were prepared for Fitzwater's signature.  First Lorentz Decl. Exs. 35–37.  These partially completed, unsigned disclosure forms briefly describe the different opening features of each drawing.  Id. Exs. 35–37. Each of the three forms list September 13, 2005 as the conception date of the invention, and September 23, 2005 as the date the first drawing was made.  Id.

On September 30, 2005, Brower emailed Fitzwater and expressed his excitement for the concepts that Fitzwater had drafted.  Id. Ex. 38.  Brower requested a variation on the design that would "reduc[e] the number of tear down panels from two to one.  The tear would be located approximately half way down the sleeve, exposing more of the sandwich with the first tear."  Id. Fitzwater then created a new drawing that incorporated Brower's requests.  Id. Ex. 40.

In an October 2, 2005 email, Voyzey relayed Brower's excitement for the pillow pack designs to Mark Sinclair, a Graphic employee.  Id. Ex. 38.  In the email, Voyzey stated that Fitzwater "has submitted these designs to see if they are patentable.  We need to move quickly to see if these are patentable concepts and if so to get them protected as soon as possible."  Id.

Three new invention disclosures were drafted.  Id. Exs. 41–43.  Unlike the invention disclosure forms prepared the month before, these new forms were fully completed and bear Fitzwater's signature, dated October 7, 2005.  Id.  The September 13, 2005 conception date and September 23, 2005 date of first drawing remain, but one of the signed disclosure forms also identifies drawing 51616G as first being drawn on September 23, 2005.  Id.  Inline claims this date is incorrect, because drawing 51616G was created on October 3, 2005 in response to Brower's September 30, 2005 request.  Compare id. Ex. 35, with id. Ex. 43.

On December 8, 2005, Graphic filed a Provisional Application with the U.S. Patent and Trademark Office ("USPTO") for "Package with Removable Panel."  Id. Ex. 54.  The Provisional Application lists Fitzwater as the inventor and includes many of the drawings Fitzwater drafted in September 2005.  Id.

Brower does not recall Graphic advising him that it was seeking patent protection on these designs.  Brower Dep. 66:15–19.  Voyzey also does not recall telling anyone at Nestlé that

the patent would be filed showing Fitzwater as the sole inventor.  Second Lorentz Decl. Ex. 141

[Docket No. 859] 112:5–21.

During the week of December 12, 2005, Nestlé conducted consumer testing on three

sleeve designs.  First Lorentz Decl. Ex. 55.  Although the consumer testing was generally

positive, some customers complained the bottom did not stay closed.  Id.  An alternative design

with a locking tab was developed for a second testing group, which was well received.  Id.  After

testing, Brower directed Fitzwater to add a locking tab to the design preferred by the customers.

Id. Ex. 57.  Fitzwater drafted the new design on December 20, 2005.  Id. Ex. 58 [Docket No.

555].

On December 5, 2006, Graphic added the locking tab to a Non-Provisional Application,

which also listed Fitzwater as the inventor.  Id. Ex. 59.  In addition to making other claims and

acknowledgments, Fitzwater stated in a Declaration for Patent Application that she believes she

is "an original, first and sole inventor" of the "Package with Removable Panel" design submitted

on December 8, 2005.  Id. Ex. 60.  In her deposition, however, Fitzwater agreed that once she

submitted the designs the patent application "was out of her hands," and that she was never

involved in the "actual process, sitting with the lawyers."  Fitzwater Dep. 174:25–175:4;

178:1–4.

## H.  Graphic's Manufacture of Smart Ones Design

Another issue in contention is Graphic's alleged misappropriation of a susceptor design

that Inline had shared with Heinz.  On September 3, 2008, Jeffrey Watkins, the president of

Inline, met with Richard Parysek ("Parysek") of Heinz.  Second Watkins Decl. [Docket No. 817]

¶ 2.  During this meeting, Watkins provided a prototype of the "Micro-Bake II" design, which

was an improvement on Inline's original Micro-Bake susceptor disk that Inline produced and sold to Heinz.  Id. ¶¶ 3–4.  Watkins provided the prototype to Heinz under express terms that it be treated as confidential.  Id. ¶ 3.

In early 2011, Heinz agreed to move its susceptor disk business to Graphic.  Second Lorentz Decl. Ex. 178 [Docket No. 889] at 5–6.  However, Graphic was unable to provide a susceptor disk that matched the performance of the disk Inline supplied.  Id. at 6.  Heinz directed Graphic to "review current Microbake susceptor" and provided recommended designs.  Id.  Graphic later began supplying Heinz with a new dual susceptor disk that included similar specifications and materials to Inline's confidential "Micro-Bake II" design.  Id.

## I. Graphic's Patent Suit Against Inline

On June 5, 2015, Graphic filed a patent infringement suit against Inline.  See Graphic Packaging Int'l, Inc. v. Inline Packaging, LLC, No. 15–3476 (JNE/LIB) (the "Patent Suit").  In the Patent Suit, which remains pending, Graphic alleges that Inline infringed its Asserted Patents.  See generally Patent Suit Compl. [Patent Suit Docket No. 1].

On January 12, 2016, the Patent Office's Patent Trial and Appeal Board ("PTAB") granted a petition by Inline seeking inter partes review ("IPR") of the claims in the '078 Patent. See Inline's Mem. Supp. Mot. Stay [Patent Suit Docket No. 52] at 2.  The Patent Case was stayed pending the PTAB's decision in the IPR proceedings.  See Order, Apr. 6, 2016 [Patent Suit Docket No. 66].  On January 10, 2017, the PTAB issued a Final Written Decision invalidating the '078 Patent.  The Federal Circuit affirmed the judgment and denied Graphic's request for a panel rehearing and rehearing en banc.  The mandate issued on April 17, 2018, and the stay in the Patent Case was lifted on July 20, 2018.  See Order, July 20, 2018 [Patent Suit

Docket No. 82].

## J. Inline's Antitrust Suit Against Graphic

On July 31, 2015, Inline filed this lawsuit (the "Antitrust Suit") against Graphic. Inline alleges that Graphic, in response to price competition from Inline and others, engages in anticompetitive conduct to maintain a monopoly in the crisping and browning susceptor packaging market. Compl. ¶¶ 23–58, 81–110. According to Inline, Graphic's conduct has caused Inline to lose existing and potential customers. Id. ¶¶ 111, 114.

Inline asserts five claims against Graphic: Count I—Tortious Interference with Prospective Business Relations; Count II—Tortious Interference with Existing Contractual Relations; Count III—Misappropriation of Trade Secrets; Count IV—Violation of Minn. Stat. § 325D.52 for Maintenance or Use of a Monopoly Power; and Count V—Violation of the Sherman Antitrust Act, 15 U.S.C. § 2. Id. ¶¶ 121–48.

The tortious interference claims relate to Graphic's assertions to Nestlé that the Hot Pockets sleeve design was protected by the Asserted Patents. The misappropriation of trade secrets claim is based on Graphic's alleged copying of the susceptor packaging design that Inline had created for Heinz's Weight Watcher's Smart Ones pizza. The antitrust claims are premised on two theories of anticompetitive behavior: baseless threats of sham litigation (relating to the Asserted Patents) and predatory discount bundling (relating to Graphic's supply agreements with four of the five major susceptor purchasers).[4]

---

[4] Inline also alleged that Graphic engaged in the anti-competitive practice of "baiting/submarine patent activities." Compl. ¶¶ 55–58; 106–10. Claims based on this theory of antitrust liability were dismissed by the Court in February 2016. See Mem. Op. Order, Feb. 23, 2016 [Docket No. 36] at 22–23, 32.

# III.  DISCUSSION

## A.  Summary Judgment Motions

### 1.  Standard of Review

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, the nonmoving party "may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  Davenport v. Univ. of Ark. Bd. of Trs., 553 F.3d 1110, 1113 (8th Cir. 2009) (citing Anderson, 477 U.S. at 247–49).

### 2.  Graphic's Summary Judgment Motion

Graphic moves for summary judgment on all of Inline's claims.

#### a.  Antitrust Claims (Counts IV and V)

Inline asserts antitrust claims against Graphic under both Minn. Stat. § 325D.52 (Count IV) and the Sherman Antitrust Act, 15 U.S.C. § 2 (Count V).  Section 2 of the Sherman Act imposes liability on "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."  15 U.S.C. § 2.  To establish a § 2 violation, Inline must

show that Graphic (1) "possessed monopoly power in the relevant market," and (2) "willfully acquired or maintained this monopoly power by anticompetitive conduct as opposed to gaining that power as a result of a superior product, business acumen, or historical accident."  Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1060 (8th Cir. 2000) (internal quotations omitted).  "Minnesota anti-trust law is interpreted consistent with the federal court's construction of the Sherman Act."  Lamminen v. City of Cloquet, 987 F. Supp. 723, 734 (D. Minn. 1997) (citing State by Humphrey v. Road Constructors, Inc., 474 N.W.2d 224, 225 n.1 (Minn. Ct. App. 1991)); see also Lorix v. Crompton Corp., 736 N.W.2d 619, 626 (Minn. 2007) ("As the purposes of Minnesota and federal antitrust law are the same, it is sensible to interpret them consistently.").

Inline alleges that Graphic is a monopolist in the United States susceptor food packaging market who has maintained its dominant position through a combination of anticompetitive tactics.  Compl. ¶¶ 20–120.  Inline identifies these tactics to include sham intellectual property assertions and unlawful discount bundling.  Id. ¶¶ 23–38, 81–97.  Inline claims that this conduct foreclosed Inline from selling to the market's largest susceptor purchasers.

### i. Sham Patent Threats and Litigation

Inline argues that Graphic engaged in sham patent threats and litigation by obtaining the Asserted Patents through fraud on the PTO (commonly referred to as Walker Process fraud), and maintaining and enforcing the Asserted Patents with knowledge of the fraud.  Compl. ¶ 4, 29–38, 89–97; Hicks Decl. Ex. 98 [Docket No. 736] ("Pl.'s Resp. Interrog.") at Resp. Nos. 28, 29. Inline explains that Graphic procured the Asserted Patents through fraud by not disclosing that: (1) persons at Nestlé were joint inventors of the Asserted Patents; and (2) sales of the 50019D

and 50019F designs were made to Nestlé in 2001.

"[E]nforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present." Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 174 (1965). To succeed on a Walker Process sham litigation claim, a plaintiff must prove: (1) the defendant fraudulently obtained patents through knowing and willful misconduct before the PTO, and maintained and enforced the patents with knowledge of the fraudulent procurement; and (2) all other elements to establish a Sherman Act monopolization claim are present. TransWeb, LLC v. 3M Innovative Props. Co., 812 F.3d 1295, 1306 (Fed. Cir. 2016).

The evidentiary showing required to satisfy the first Walker Process element is "nearly identical" to that required to prove inequitable conduct. Id. at 1307. The inequitable conduct standard requires proof by clear and convincing evidence that "the patentee acted with the specific intent to deceive the PTO." Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1290 (Fed. Cir. 2011). A finding of gross negligence or negligence under a "should have known standard" does not satisfy this intent requirement. Id. Rather, clear and convincing evidence must establish that an individual owing a duty of candor to the PTO (1) had actual knowledge of omitted information; (2) knew that the omitted information was material to the PTO's decision to award the patent; and (3) made a deliberate decision to withhold it. Id.; 37 C.F.R § 1.56(c).

Because direct evidence of deceptive intent is rarely present, the intent to deceive may be inferred from indirect and circumstantial evidence. Therasense, 649 F.3d at 1290. "However, to meet the clear and convincing evidence standard, the specific intent to deceive must be the single

most reasonable inference able to be drawn from the evidence.  Indeed, the evidence must be

sufficient to <u>require</u> a finding of deceitful intent in the light of all the circumstances."  <u>Id.</u>

(internal quotations and citations omitted) (emphasis in original).  Thus, where multiple

reasonable inferences may be drawn, intent to deceive cannot be found.  <u>Id.</u> at 1290–91.

### a.  Inventorship

Inline argues that Fitzwater, Voyzey, and Graphic's chief intellectual property counsel,

Barry Biddle, Esq., all engaged in inequitable conduct because all three owed a duty of candor to

the PTO and knew that Fitzwater was not the first and sole inventor of the Asserted Patents.

In arguing that Fitzwater was not the first and sole inventor, Inline does not identify the

specific individual or individuals who allegedly co-invented the Asserted Patents.  Rather, Inline

and its expert contend that "someone at or associated with Nestlé," such as Brower or one of his

colleagues, contributed to the inventions claimed in the Asserted Patents and should have been

named as a co-inventor.  Hicks Decl. Ex. 4 [Docket No. 642] ("Kowalchyk Report") ¶¶ 8, 92;

Pl.'s Mem. Opp'n Summ. J. [Docket No. 812] at 37.  Graphic responds that neither Brower nor

anyone else at Nestlé has ever claimed to be an inventor or co-inventor of the Asserted Patents.

Graphic argues there can be no specific intent to deceive the PTO by failing to name an alleged

co-inventor when no person claims they are a co-inventor.

The Federal Circuit has held that "[w]hen an alleged omitted co-inventor does not claim

to be such, it can hardly be inequitable conduct not to identify that person to the PTO as an

inventor."  <u>Pro-Mold & Tool Co., Inc. v. Great Lakes Plastics, Inc.</u>, 75 F.3d 1568, 1576 (Fed.

Cir. 1996);  <u>see also</u> <u>Keystone Retaining Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.</u>,

No. 00-496, 2001 WL 951582, at *9 (D. Minn. Aug. 22, 2001) (finding non-disclosure of alleged

co-inventor did not constitute intent to deceive PTO where alleged co-inventor submitted an affidavit stating he was not an inventor); Brixham Sols. Ltd. v. Juniper Networks, Inc., No. 13-616, 2014 WL 250204, at *7 (N.D. Cal. Jan. 22, 2014) ("In the absence of allegations identifying the specific individual or individuals who allegedly co-invented the claimed invention and setting forth specific facts showing how each of these individuals contributed to the conception of a particular claim or claims, [a plaintiff's] inequitable conduct allegation based on this theory is insufficient as a matter of law.").

To this day, neither Brower nor anyone else at Nestlé claims to be an inventor of the Asserted Patents.  Brower testified in his deposition that he does not consider himself an inventor of the '078 Patent.  Hicks Decl. Ex. 19 [Docket No. 657] 74:11–24.  He also submitted a declaration stating that he "was not previously familiar with the legal standard for inventorship" and that he is "not prepared now, many years after the applications were filed, to determine whether [he] or anyone else at Nestlé is or is not an inventor."  First Lorentz Decl. Ex. 8 ("Brower Decl.") [Docket No. 543, Attach. 3] ¶ 19.  Lou Judge, head of packaging procurement for Nestlé, has testified that no one at Nestlé claims to be an inventor of the Asserted Patents. Judge Decl. [Docket No. 770] ¶ 111.  Despite Brower and Nestlé's knowledge of this lawsuit and Inline's allegations that Graphic intentionally excluded Nestlé personnel as inventors, no current or former Nestlé employee has challenged inventorship before the PTO.  Stoll Decl. [Docket No. 760] Ex. 1 [Docket No. 761] ("Stoll Report") ¶ 93.

Based on the absence of any person claiming to be a co-inventor with Fitzwater of the Asserted Patents, Inline cannot show that an individual associated with the filing or prosecution of the Asserted Patents acted with specific intent to deceive the PTO by failing to name an

alleged co-inventor.  Thus, Graphic's nondisclosure of joint inventors does not satisfy the first element of Inline's <u>Walker Process </u>sham litigation claim.

### b.  Prior Sales

Inline argues that Graphic engaged in inequitable conduct by not disclosing to the PTO the sales of the 50019D and 50019F design samples to Chef America in 2001.  Inline argues that the sales were material to the prosecution of the Asserted Patents.[5]  Graphic disputes that the prior sales were material or that it engaged in inequitable conduct.

The Court need not resolve the issue of whether the prior sales were material because even if they were, Inline has offered no argument or evidence (and certainly not clear and convincing evidence) that anyone at Graphic owing a duty of candor to the PTO knew that the prior sales were material yet deliberately chose not to disclose them.  The evidence shows that Biddle did not begin working for Graphic until 2004, years after Project Quantum and the sale of the 50019D and 50019F designs to Chef America had occurred.  Hicks Decl. Ex. 18 [Docket No. 656] ("Biddle Dep.") 12:21–13:1, 207:20–24.  Biddle has testified that he had no knowledge of Project Quantum, the 50019D and 50019F designs, or the sale of the designs, and there is no evidence to the contrary.  <u>Id.</u> 129:15–130:23, 207:20–24.

To the extent that Inline suggests Biddle was obligated to investigate Project Quantum—a project he did not know about—Inline must show that Biddle was presented with "sufficient information . . . to suggest the existence of specific information the materiality of which may be ascertained with reasonable inquiry."  <u>Brasseler, U.S.A. I, L.P. v. Stryker Sales</u>

---

[5] The sale of a purported invention more than one year prior to the filing of a patent application bars patentability.  35 U.S.C. § 102(a)–(b).

Corp., 267 F.3d 1370, 1382 (Fed. Cir. 2001).  In other words, Inline must prove that Biddle "had notice that a potentially invalidating event took place, and that [he] willfully ignored such notice in a conscious effort to avoid complying with [his] duty to disclose." Id. at 1385.  The record lacks any evidence to support such a finding.

Even if Inline could establish that Biddle had notice of the 50019D and 50019F designs and prior sales, Inline offers no evidence that Biddle knew they were material.  Indeed, Biddle continues to believe that the designs are not material to the Asserted Patents.  Biddle Dep. 207:6–208:10; see Biomed. Enters., Inc. v. Solana Surgical, LLC, No. 14-95, 2016 WL 4198305, at *5 (W.D. Tex. May 9, 2016) (finding that a patentee's continued assertion that references were not prior art "support[ed] the conclusion that no one with a duty to disclose knew [the references] to be material prior art").

Similarly, there is no evidence that Fitzwater had any knowledge of the 50019F design or the sales to Chef America in 2001.  Although she had knowledge of the 50019D design, she testified it was "very different" than the claimed design.  Hicks Decl. Ex. 17 at 145:18–25, 222:15–225:16.  Although Inline contends that 50019D served as a starting point for Fitzwater's work on Project Roxanne, Fitzwater testified that she "changed the whole package." Id. at 197:10–21.  Thus, clear and convincing evidence that Fitzwater had actual knowledge of (1) the materiality of the 50019D and 50019F designs, or (2) the prior sales is totally lacking.

Further, even if Voyzey could somehow be considered as owing a duty of candor to the PTO,[6] Inline offers no evidence or argument that he knew the designs were material or that he

---

[6] Under 37 U.S.C. § 1.56(c), persons owing a duty of disclosure to the PTO include the inventor named in the application, the attorney or agent who prepares or prosecutes the application, and "[e]very other person who is substantively involved in the preparation or

intended to deceive the PTO by not disclosing them.

Thus, Inline cannot show that the "single most reasonable inference" to be drawn is that Biddle, Fitzwater, or Voyzey intended to deceive the PTO by not disclosing the prior sales. Therasense, 649 F.3d at 1290.

Because Graphic's naming of Fitzwater as the sole inventor and nondisclosure of prior sales did not constitute inequitable conduct, Inline cannot satisfy the first element of its Walker Process sham litigation claim. Thus, Graphic is entitled to summary judgment on this claim.

### c. Additional Sham Litigation Theory

Inline argues that its sham litigation claim rests on a second theory in addition to Walker Process fraud. Specifically, Inline contends that antitrust liability for sham litigation can also arise if the litigation is (1) objectively baseless, and (2) brought with subjective bad faith. Pl.'s Mem. Opp'n Summ. J. at 23 (citing Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1068 (Fed. Cir. 1998)). Inline contends that it was objectively baseless for Graphic to threaten and then to pursue the patent litigation against Inline "in light of the known collaboration with Nestlé, the Joint Development Agreement, and the direct evidence demonstrating Fitzwater was not the first and sole inventor." Id. at 24.

This argument is a recycled version of Inline's argument that Graphic procured the Asserted Patents through fraud by not disclosing that others at Nestlé were joint inventors of the Asserted Patents. Just as Graphic cannot have engaged in fraud on the PTO by failing to name someone from Nestlé as a co-inventor when no one at Nestlé claims to be a co-inventor,

_____

prosecution of the application and who is associated with the inventor." Inline's own expert admits that the facts do not support a determination that Voyzey owes a duty of candor to the PTO. Hicks Decl. Ex. 16 [Docket No. 654] ("Kowalchyk Dep.") 31:22–32:4.

Graphic's pursuit of litigation on the Asserted Patents cannot be objectively baseless on inventorship grounds when no one at Nestlé claims to be a co-inventor.  Therefore, Inline's sham litigation claim must be dismissed.

## ii. Discount Bundling

Inline alleges that Graphic engaged in anticompetitive bundling of food susceptor packaging with other discounted paperboard packaging.  "Bundling is the practice of offering, for a single price, two or more goods or services that could be sold separately.  A bundled discount occurs when a firm sells a bundle of goods or services for a lower price than the seller charges for the goods or services purchased individually."  Cascade Health Sols. v. PeaceHealth, 515 F.3d 883, 894 (9th Cir. 2008).

Bundled discounts are generally pro-competitive because they result in lower prices to consumers.  Id. at 895.  Sellers also benefit through bundling by saving on consumer transaction costs and capitalizing on economies of scope.  Id. at 895–96.  The Supreme Court has observed that "[b]uyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act."  Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984).

However, bundled discounts have the potential to be anticompetitive if they exclude an equally or more efficient competitor who sells only a single product in the bundle.  PeaceHealth, 515 F.3d at 896.  The following hypothetical provides an example of how a bundled discounter can exclude single-product rivals without pricing its products below its cost to produce them:

> Assume for the sake of simplicity that the case involved the sale of two hair products, shampoo and conditioner, the latter made only by A and the former by both A and B.  Assume as well that both must be used to wash one's hair.  Assume further that A's average variable

cost for conditioner is $2.50, that its average variable cost for shampoo is $1.50, and that B's average variable cost for shampoo is $1.25. B therefore is the more efficient producer of shampoo. Finally, assume that A prices conditioner and shampoo at $5 and $3, respectively, if bought separately but at $3 and $2.25 if bought as part of a package. Absent the package pricing, A's price for both products is $8. B therefore must price its shampoo at or below $3 in order to compete effectively with A, given that the customer will be paying A $5 for conditioner irrespective of which shampoo supplier it chooses. With the package pricing, the customer can purchase both products from A for $5.25, a price above the sum of A's average variable cost for both products. In order for B to compete, however, it must persuade the customer to buy B's shampoo while purchasing its conditioner from A for $5. In order to do that, B cannot charge more than $0.25 for shampoo, as the customer otherwise will find A's package cheaper than buying conditioner from A and shampoo from B. On these assumptions, A would force B out of the shampoo market, notwithstanding that B is the more efficient producer of shampoo, without pricing either of A's products below average variable cost.

Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc., 920 F. Supp. 455, 467 (S.D.N.Y. 1996), as corrected (Mar. 22, 1996).

Bundled discounts are somewhat similar to predatory pricing and tying. PeaceHealth, 515 F.3d at 900; 3A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 749d2 at 325 (2008). Predatory pricing occurs when a seller prices its product below cost and has a reasonable probability of recouping its losses by charging monopoly prices after the predation period has ended. Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993). Tying occurs when a seller coerces buyers into purchasing two products by tying them together, thereby forcing buyers to purchase the "tied" product from that seller rather than from a rival. 3A Areeda & Hovenkamp ¶ 749d2 at 324.

But, there is an important distinction between bundling and tying claims. In a traditional tying claim a seller forces the buyer to purchase the products as a package and will not sell the

"tied" products separately.  In a bundling claim, the buyer has the option of accepting the cost savings by purchasing the bundle or forgoing the savings by purchasing the products separately. Id. at 325.  The buyer is only "coerced" into taking the bundle because of the lower prices.  Id. Due to this distinction, "an essential element of unlawful package discounting is that the purchaser be 'forced' to take the bundle—which means that a rational, profit-maximizing buyer did not have good competitive options."  Id. ¶ 749d3 at 326.

To determine whether bundled discounts have the potential to exclude an equally efficient rival from the market, the Ninth Circuit has developed the "discount attribution" standard.[7]  Under this cost-based rule:

> the full amount of the discounts given by the defendant on the bundle are allocated to the competitive product or products.  If the resulting price of the competitive product or products is below the defendant's incremental cost to produce them, the trier of fact may find that the bundled discount is exclusionary for the purpose of § 2.  This standard makes the defendant's bundled discounts legal unless the discounts have the potential to exclude a hypothetical equally efficient producer of the competitive product.

Peace Health, 515 F.3d at 906 (emphasis in original).  The discount attribution standard has been recognized by multiple courts as the appropriate test to apply to bundling claims.  See, e.g., Collins Inkjet Corp. v. Eastman Kodak Co., 781 F.3d 264, 273–74 (6th Cir. 2015); Safeway Inc.

---

[7] There is no current Eighth Circuit precedent addressing the applicable standard for evaluating bundling claims.  In 2010, the Eighth Circuit analyzed a discount bundling theory in which the Court seemed to, at least implicitly, endorse a discount bundling test that requires a below cost pricing component after attributing the entire discount on all products within a package to the competitive product.  See Southeast Missouri Hosp. v. C. R. Bard, Inc., 616 F.3d 888, 893 (8th Cir. 2010) ("Bard I").  However, this decision was vacated shortly after its publication and decided on alternative grounds while making no reference to the discount bundling theory.  See Southeast Missouri Hosp. v. C. R. Bard, Inc., 642 F.3d 608 (8th Cir. 2011) ("Bard II").  Because Bard I was vacated, this Court gives it no precedential value in determining how, in the future, the Eighth Circuit may evaluate a discount bundling claim.

v. Abbott Labs., 2010 WL 147988, at *3–5 (N.D. Cal. Jan. 12, 2010).

Inline contends that its expert, Dr. Levinsohn, performed the discount attribution test for nine of Graphic's supply contracts with its customers and that all nine failed the discount attribution test.  See Levinsohn Report.  Graphic disputes this conclusion and argues that it is entitled to summary judgment on Inline's discount bundling claim because:  (1) Graphic did not bundle susceptor and paperboard products; (2) Inline has not shown that Graphic has monopoly power in the leveraging market (paperboard); (3) the discount attribution test shows Graphic's susceptor price is above cost; and (4) the alleged bundles have not harmed competition.

### a.  Whether Graphic Bundled

Graphic argues that it did not engage in bundling because the discounts on paperboard were not conditioned upon the purchase of susceptor packaging.  Graphic contends that Inline leaps to the conclusion that whenever susceptors and paperboard are included in the same contract, any discount, rebate, or signing bonus in the contract was necessarily conditioned on the purchase of susceptors and would not have been available if only paperboard had been purchased.  Graphic argues that this assumption lacks evidentiary support and is contradicted by the declarations and deposition testimony its customers.  Several customers have testified that their discounts were not conditioned on the purchase of susceptors, and that it was the customer, not Graphic, who made the decision of which products to include in its purchase from Graphic.  See Hicks Decl. Ex. 12 [Docket No. 650] ("Jones Dep.") 27:1–15, 109:1–111:9, 118:15–125:14; Hicks Decl. Ex. 13 [Docket No. 651] ("Sitterly Dep.") 180:18–181:4; Hicks Decl. Ex. 14 [Docket No. 652] ("Ferrara Dep.") 89:1–92:23, 97:5–17; Hick Decl. Ex. 15 [Docket No. 653] ("Dorman Dep.") 142:8–144:21.  Thus, argues Graphic, discounts cannot constitute

anticompetitive bundling when the customers ask for the discounts, deny that the discounts were conditioned on the purchase of susceptors, and deny that they were coerced into purchasing susceptors from Graphic.

Inline responds that because this is not a tying case, it need not show that discounts on one product were expressly tied to the purchase of another product.  This argument misses the mark.  Although Inline need not show that a customer who purchased paperboard was required to also purchase susceptors (a traditional tying claim), Inline must show that if customers had purchased only paperboard (and no susceptor packaging) from Graphic, they would not have received any discount on their paperboard purchases.  Thus, Inline must show that Graphic conditioned discounts and incentives on the purchase of susceptor and paperboard as a bundle.

That being said, Inline has adduced sufficient evidence to raise a fact issue about whether the discounts were conditioned on the purchase of susceptor and paperboard as a bundle.  The supply contracts at issue include both paperboard and susceptor products as well as discount terms that are specific to those contracts.  Levinsohn Report ¶ 109; Hicks Decl. Exs. 28–36 [Docket Nos. 666–674] (Supply Agreements).  Viewing this evidence in the light most favorable to Inline, a reasonable jury could conclude that the discounts were conditioned upon the purchase of both product categories as a discounted bundle.

### b.  No Monopoly or Market Power in Leveraging Market

Graphic also argues that even if Inline could show that bundling occurred, a bundling claim requires the plaintiff to also show the defendant had monopoly power in the leveraging market (here, the paperboard market) and Inline has failed to do so.  Inline responds that, although monopoly power or significant market power is required for a <u>tying</u> claim, the discount

attribution test imposes no such requirement for a plaintiff to prevail on a discount bundling claim.  Rather, contends Inline, courts look to the economic realities of a bundling claim to determine if the bundle is anticompetitive.  Inline argues that the economic reality here is that Graphic's paperboard volume was so massive that even a small discount on the paperboard component of the bundle dwarfed any discount a single-product susceptor competitor could feasibly offer on the purchase of susceptors alone.

The Tenth Circuit has recognized that there is no support in the caselaw for the proposition that the discount attribution test can properly be used to show coercion by a non-monopolist in the leveraging market.  Suture Express v. Owens & Minor Distrib. Inc., 851 F.3d 1029, 1043 (10th Cir. 2017) (citing Collins Inkjet, 781 F.3d at 270–78 (applying test to defendant with 100% market share in leveraging market); PeaceHealth, 515 F.3d at 891–92, 910 (applying test to near-monopolist in leveraging market)).

Regardless of whether monopoly power in the leveraging market is required, Inline's economic expert, Dr. Levinsohn, admits that at least some market power is needed in the leveraging market for Inline's discount bundling theory to be viable.  Hicks Decl. Ex. 10 [Docket No. 648] ("Levinsohn Dep.") 20:8–12; 38:16–24; 39:13–18.[8]  Despite admitting that some market power is needed, Dr. Levinsohn did not claim that Graphic possesses market power in paperboard in either of his expert reports.  See generally Levinsohn Report; Levinsohn Rebuttal.

---

[8] Dr. Levinsohn also opined that market power is not necessary for an incumbent to foreclose a new entrant when only a fraction of shares are contestable in a given time period. Hicks Decl. Ex. 6 [Docket No. 644] ("Levinsohn Rebuttal") ¶ 18.  However, the example he provides to support this proposition involves a single-product hypothetical.  Id.  This hypothetical does not support Inline's allegations that Graphic has willfully maintained its monopoly in susceptor packaging by bundling it with a second product—paperboard packaging. See Compl. ¶¶ 81–88.

Dr. Levinsohn's only opinion about Graphic's market power is that Graphic holds substantial market power in the <u>susceptor</u> market.  Levinsohn Report ¶ 101.

The only content in Dr. Levinsohn's Reports that arguably addresses Graphic's market power in the paperboard market is found in a footnote in Dr. Levinsohn's Rebuttal Report.  <u>See</u> Levinsohn Rebuttal at 5 n.20.  The footnote references selected statements in Graphic's sales and marketing documents regarding Graphic's market shares in various market segments such as "frozen pizza," "frozen foods," and "CRB/SUS food markets."  <u>See id.</u>  Dr. Levinsohn testified in his deposition that these documents "give context to Graphic's position in the folding market" and constitute "the evidentiary record on what Graphic's position in the folding carton market is."  Levinsohn Dep. 52:21–53:8.  However, Dr. Levinsohn provides no analysis of the documents, much less a conclusion stating what Graphic's market position is in the paperboard market.  Additionally, Dr. Levinsohn conceded that he was "not sure" whether the market shares referenced in some of the documents pertained to both paperboard and susceptor, or to paperboard only.  <u>Id.</u> 52:5–16.  He also stated that "[o]ne would need to do a little more research" to determine whether a document stating Graphic's position in the North American market was relevant to Graphic's market power in the U.S. paperboard market.  <u>Id.</u> 49:7–13.

After the submission of his expert reports, Dr. Levinsohn testified in his deposition that Graphic had sufficient market power to offer exclusionary bundles because Graphic's accounting margins in the paperboard market were large enough to absorb discounts on the bundle.  <u>Id.</u> at 24:5–25:5; 132:2–10; 133:21–136:25.  To the extent that this constitutes an expert opinion on Graphic's market power in paperboard, the opinion is untimely.  Additionally, accounting margins are not reliable evidence of market power.  3 Areeda & Hovenkamp ¶ 516f at 142

("[S]ubstantial accounting profits—say, 20%—may be consistent with trivial or zero economic profit and thus do not necessarily indicate any market power."); Bailey v. Allgas, Inc., 284 F.3d 1237, 1252 (11th Cir. 2002) (stating a company's profit margins "reveal[] very little about its market power"); Garnica v. HomeTeam Pest Def., Inc., 230 F. Supp. 3d 1155, 1159 (N.D. Cal. 2017) ("[I]nferring market power from gross margins is a dicey proposition, and high gross margins are generally not by themselves sufficient to prove such power.").  Thus, Inline has not produced sufficient evidence from which a reasonable jury could find that Graphic had the necessary  market power in the paperboard market to economically coerce a buyer into accepting the bundle.

Inline's failure to show that Graphic had market power in the leveraging paperboard market is fatal to its bundling claim.  "[A]n essential element of unlawful package discounting is that the purchaser be 'forced' to take the bundle—which means that a rational, profit-maximizing buyer did not have good competitive options."  3A Areeda & Hovenkamp ¶ 749d3 at 326.  The unrebutted evidence shows that a buyer does have good competitive options, because Graphic faces vigorous competition in the paperboard market.  Thus, buyers are not coerced to take Graphic's bundle.  Rather, they can purchase susceptors from Inline and purchase paperboard from another source at competitive prices.

Resisting this conclusion, Inline argues that market power in the leveraging market is not a required element of a bundling claim under PeaceHealth.  However, Inline's own economic expert admits that market power in paperboard is needed for Graphic's bundling claim to be anticompetitive.

### c. Discount Attribution Test

Even if Inline could show that Graphic held sufficient market power in paperboard to support a claim for unlawful bundling, Dr. Levinsohn did not correctly apply the discount attribution test to Graphic's allegedly bundled contracts. When the test is properly applied, it is undisputed that eight of the nine contracts pass the test.

As explained earlier, the discount attribution test is performed by allocating "the full amount of the discounts given by the defendant on the bundle . . . to the competitive product or products." PeaceHealth, 515 F.3d at 906. If the resulting price of the competitive product or products is below the defendant's average variable cost to produce them, the bundle has the potential to exclude an equally efficient rival who makes only the competitive product. However, if the resulting price of the competitive product remains above the defendant's cost to produce them, the bundle falls into a safe harbor and is not actionable as exclusionary. Id. at 906, 909.

Here, Dr. Levinsohn allocated the full amount of the discounts on the bundle to only 20% of the competitive product (susceptors), rather than to the full amount of susceptors in the bundle. Levinsohn Report Ex. 7. Dr. Levinsohn explained that he allocated the discounts to only a fraction of the susceptors in the bundle because large buyers are unwilling to "put all of their eggs in the basket" of a susceptor manufacturer who has not previously supplied susceptors to a given buyer, and thus "only a subset of a buyer's susceptor purchases are 'contestable' to an entrant." Levinsohn Report ¶ 97. Dr. Levinsohn estimated the "contestable share" here to be 20% because "Inline's share of a buyer's purchases . . . never exceeds 20 percent in the first year of supply, and Inline never supplied more than one new product line to a large buyer in the first

year of supply." Id.  Under Dr. Levinsohn's "contestable share" variation of the discount

attribution test, none of Graphic's contracts passed the test.  Id. ¶¶ 97, 114, 148–49, 161–62,

171–72, 183-85, Ex. 7.

No precedent exists for Dr. Levinsohn's "contestable share" variation of the discount

attribution test.[9]  Although the contestable share method might, in some instances, identify

discount bundles that are capable of excluding an equally efficient rival who cannot contest all

sales of the competitive product, the method is prone to error, would increase enforcement and

litigation costs, and would chill procompetitive price cuts.  See Barry Wright Corp. v. ITT

Grinnell Corp., 724 F.2d 227, 234 (1st Cir. 1983) ("Rules that seek to embody every economic

complexity and qualification may well, through the vagaries of administration, prove counter-

productive, undercutting the very economic ends they seek to serve. . . . [W]e must be concerned

lest a rule or precedent that authorizes a search for a particular type of undesirable pricing

behavior end up by discouraging legitimate price competition.") (internal citations omitted).

The contestable share method is prone to error because it has the potential to condemn an

overly broad category of bundled discounts that include non-predatory, above-cost discounts that

could be matched by an equally efficient rival.

A modification of the earlier referenced shampoo/conditioner hypothetical illustrates this

point.  Suppose Firm A prices shampoo (the competitive product) at $3 and conditioner at $5 if

---

[9] Inline argues that support for the contestable share analysis can be found in a
Competitive Impact Statement filed in U.S. v. United Regional Health Care Sys., No. 11–00030,
2011 WL 13054949 (N.D. Texas Feb. 25, 2011).  The Competitive Impact Statement is a
document filed in the case by the government in connection with a proposed final judgment.
Moreover, the document acknowledges that the contestable share method differs from the
PeaceHealth test, and that measuring the contestable share "may in some cases be impractical."
Id.

purchased separately, and sells the products as a bundle for $7.  Firm A's average variable cost for shampoo is $1.50.  Under the PeaceHealth discount attribution test, the entire packaged discount, $1, would be subtracted from the shampoo price of $3, resulting in an effective price of $2, which is above Firm A's average variable cost.  The bundled price of $7 thus passes the PeaceHealth test and falls within the safe harbor for packaged discounts that will not be condemned as anticompetitive, because the $7 bundle is not "below the defendant's incremental cost" and could be matched by an "equally efficient producer of the competitive product."  PeaceHealth at 909.

However, the same $7 bundle would fail Dr. Levinsohn's "contestable share" test.  For example, if Firm A sells 10 bundles of shampoo and conditioner, and the total discount of $10 ($1 per bundle x 10 bundles) were applied to only 20% of the shampoo sales (2 shampoos x $3 = $6), the effective price of the two shampoos would be $-4.

The contestable share analysis would also add to enforcement costs by fueling litigation over the proper percentage of contestable shares.  Mark S. Popofsky, Section 2, Safe Harbors, and the Rule of Reason, 15 Geo. Mason L. Rev. 1265, 1295 (2008).  Here, for example, Graphic's expert, Dr. Saravia, opines that Dr. Levinsohn's selection of a 20% contestable share is flawed for at least three reasons:  Inline has provided no evidence that it ever attempted to obtain more than 20% of a customer's susceptor purchases in the first year; there is no reason to assume that the asserted 20% first-year contestable share is appropriate to use during the entire term of the contracts; and if historic shares of sales volume rather than unit volume are measured, Inline's contestable share increases to over 40% for Inline's first-year contract with Schwan's.  Saravia Report ¶¶ 99–108.

Additionally, and perhaps most significantly, the contestable share analysis would chill competition by eliminating the safe harbor of the discount attribution test.  As Dr. Levinsohn admits, "[t]here is no basis to assume that Graphic would know exactly what portion of a buyer's demand is contestable to an entrant, and therefore there is no basis to assume Graphic would be able to exactly tailor its bundle offering to foreclose Inline with minimum amounts of discounts and incentives."  Levinsohn Rebuttal at 19, n.74.  Thus, it would be impossible for a seller to know whether its bundled discount conforms with antitrust law or has the potential to violate of the Sherman Act.  The Supreme Court has repeatedly cautioned that "the costs of erroneous findings of predatory-pricing liability [a]re quite high because 'the mechanism by which a firm engages in predatory pricing—lowering prices—is the same mechanism by which a firm stimulates competition,' and, therefore, mistaken findings of liability would 'chill the very conduct the antitrust laws are designed to protect.'"  Weyerhauser Co. v. Ross-Simmons Hardwood Lumber Co., Inc., 549 U.S. 312, 320 (2007) (quoting Brooke Grp., 509 U.S. at 226 (alterations omitted); accord Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438, 451 (2009).  "Because cutting prices in order to increase business often is the very essence of competition, . . . it 'is beyond the practical ability of a judicial tribunal to control [above cost discounting] without courting intolerable risks of chilling legitimate price cutting.'"  Concord Boat, 207 F.3d at 1061 (alteration in original) (quoting Brooke Grp., 509 U.S. at 223).

Inline does not dispute that if the contestable share analysis is not applied, only one of Graphic's nine challenged contracts fail the PeaceHealth test.  Moreover, Dr. Levinsohn admits that he has not analyzed whether this single contract has caused anticompetitive injury.  Levinsohn Dep. 171:20–172:9, 283:2–287:24.

36

### d. Harm

Even assuming all of Graphic's alleged bundles fail the discount attribution test, Inline has not shown antitrust injury, which is a required element in any private antitrust action. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  Antitrust injury means harm to competition, not merely harm to competitors.  See id. at 488 ("The antitrust laws . . . were enacted for the protection of competition, not competitors.") (internal quotations omitted). Thus, to prevail on its bundling claim, Inline must show that Graphic's conduct resulted in harm to consumers.

Inline argues that consumers have been harmed because Graphic's conduct has resulted in the exclusion of its only viable competitor, Inline, from 93% of the susceptor packaging market.  Inline thus contends that consumers were deprived of access to a budding secondary supplier that was capable of challenging Graphic's dominant market position with lower prices and innovative products.  However, "[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition." Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 341 (1990).  Indeed, "the mere fact that a market has few competitors does not transform every action by one of them into an antitrust violation.  Rather, even in a duopoly, a plaintiff must offer some other reason to think that the challenged behavior harmed competition." MacDermid Printing Sols. LLC v. Cortron Corp., 833 F.3d 172, 186 (2d Cir. 2016).

Harm to competition is measured by increased price, reduced output, or decreased quality.  See Brooke Grp., 509 U.S. at 242 (finding no antitrust injury where challenged practices did not threaten to restrict output or raise prices above a competitive level); MacDermid, 833

F.3d at 184 ("[P]roving an adverse effect on competition without showing increased price, reduced output, or reduced quality in the market has remained possible in theory but elusive in practice."). Here, other than arguing that prices would have been lower absent Graphic's bundling, Inline's expert, Dr. Levinsohn, performed no analysis. <u>See</u> Levinsohn Report ¶ 189; Levinsohn Rebuttal ¶¶ 11–13. Moreover, when Dr. Levinsohn was asked how there could be "any consumer harm" from Graphic's bundled discounts if another company such as Westrock was able to sell paperboard at competitive prices, his only response was that he "completely understand[s] the question" and would "need to think it through." Levinsohn Dep. 167:11–18. (quotations omitted).

Based on this record, no reasonable jury could conclude that Graphic's alleged discounted bundles resulted in harm to competition.

### iii. Exclusivity

In addition to opposing Graphic's summary judgment arguments on bundling, Inline argues that the contracts are anticompetitive for an additional reason: "they are exclusive, all-requirements contracts that have foreclosed in excess of 40% of the susceptor market for almost a decade." Pl.'s Mem. Opp'n Summ. J. at 812. Inline contends that Graphic's summary judgment does not address this aspect of Inline's challenge to Graphic's contracts.

The operative Complaint, even broadly construed, does not allege an exclusive dealing claim. Indeed, the word "exclusive" does not appear anywhere in the Complaint or in Inline's memorandum in opposition to Graphic's motion to dismiss in 2015. <u>See generally</u> Compl.; Pl.'s

Mem. Opp'n Mot. Dism. [Docket No. 31].[10]  The only reference in the Complaint to requirements contracts are Inline's allegations that "[s]upplier needs are often met through long-term requirements and related contracts," and that "Graphic's competitors operating in the susceptor food packaging market, but not the paperboard food packaging market, such as Inline, are precluded from securing contracts with food company buyers who purchase susceptor and paperboard packaging through Graphic's discounted bundle because, in order to do so, Inline and other smaller competitors would need to sell their susceptor food packaging at a loss." Compl. ¶¶ 66, 84.

Moreover, even if Graphic's antitrust claim could be construed as alleging exclusive dealing, such a claim would still be subject to a price-cost test such as the discount attribution test because the bundled discounts are the alleged mechanism by which Graphic induced its customers to enter into the contracts.  See ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 273 (3d Cir. 2012) ("[I]n the context of exclusive dealing, the price-cost test may be utilized . . . when the plaintiff alleges that price is the vehicle of exclusion.") (citing Concord Boat, 207 F.3d

---

[10] In January 2018, Inline moved to amend its Complaint to add a claim for punitive damages.  Among the changes in the Proposed Amended Complaint are 9 additional paragraphs in the "Discount Bundling" section.  See Redlined Proposed Am. Compl. [Docket No. 504, Attach 2] ¶¶ 29–37.  The added paragraphs describe Graphic's supply contracts as "bundled, exclusive requirements contracts" which gave Graphic the right to supply a customer for a multi-year term, and allege that "Graphic knew that the bundled requirements would tie up the vast majority of the market, thereby foreclosing Inline from selling susceptor food packaging to any contracted food company buyers, and that such a result would have anticompetitive effects." Id. ¶¶ 29, 35.  However, exclusive dealing is not among the theories of liability listed in the Proposed Amended Complaint.  Rather, the stated theories are:  discount bundling, sham litigation and threats thereof, interference with business relationships, misappropriation and misuse of intellectual property, and baiting/submarine patent activities.  See generally, id. Moreover, Inline's stated purpose in seeking to amend the Complaint was solely to plead punitive damages, not to add a claim for exclusive dealing.  See Pl.'s Mem. Supp. Mot. Am. Compl. [Docket No. 381] at 1, 42.

at 1060–63).  Inline's argument premised upon exclusive all-requirements contracts as anticompetitive conduct is rejected.

### b.  Tortious Interference Claims (Counts I and II)

Inline's tortious interference claims are predicated on Graphic's patent assertions and threats of litigation that allegedly impacted Nestlé's award of its Hot Pocket sleeve business in 2014 and 2016.  Pl.'s Mem. Opp'n Summ. J. at 39.  The contract claim relates to the 2014 award, and the prospective economic business advantage relates to both the 2014 and 2016 award.  Id.

Graphic seeks summary judgment on these claims, arguing that state law tort liability cannot arise from a patent holder's good faith conduct in warning about potential litigation. Graphic further argues that the tortious interference with contract fails for the additional reason that there was no contract with which to interfere.

To establish tortious interference with a contract under Minnesota law, a plaintiff must show:  (1) the existence of a contract, (2) the defendant's knowledge of the contract, (3) the defendant's intentional procurement of the breach of contract, (4) the defendant acted without justification, and (5) damages.  Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994).

A claim for tortious interference with prospective economic advantage also has five elements:  "(1) the existence of a reasonable expectation of economic advantage belonging to the plaintiff; (2) the defendant's knowledge of that expectation; (3) the defendant's wrongful interference with that expectation; (4) a reasonable probability that the plaintiff would have realized the expectation absent the defendant's conduct; and (5) damages."  Daum v. Planit Sols., Inc., 619 F. Supp. 2d 652, 658 (D. Minn. 2009) (citations omitted).  Liability for a tortious interference with prospective economic advantage claim rests on whether the actor's conduct

was improper.  Fox Sports Net N., L.L.C. v. Minn. Twins P'ship, 319 F.3d 329, 337 (8th Cir.

2003).  "For purposes of this tort, improper means are those that are independently wrongful

such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or any

other wrongful act recognized by statute or the common law."  Harman v. Heartland Food Co.,

614 N.W.2d 236, 241 (Minn. Ct. App. 2000).

Graphic's assertions of patent rights did not constitute improper conduct because, as

discussed above, the assertions were not objectively baseless.  "Federal patent law preempts

state-law tort liability for a patentholder's good faith communications asserting infringement of

its patent and warning about potential litigation."  Matthews Int'l Corp. v. Bosafe Eng'g, LLC,

695 F.3d 1322, 1332–33 (Fed. Cir. 2012).  "A plaintiff claiming that a patent holder has engaged

in wrongful conduct by asserting claims of patent infringement must establish that the claims of

infringement were objectively baseless."  Id. at 1332 (quoting Globetrotter Software, Inc. v. Elan

Computer Grp., Inc., 362 F.3d 1367, 1375 (Fed. Cir. 2004)).  Based on the absence of improper

conduct, Graphic is entitled to summary judgment on the tortious interference claims.

Inline's tortious interference with contract claim fails for the additional, independent

reason that no contract existed.  Inline argues that a contract with Nestlé was created by the

notification Inline received through the Ariba system stating that Inline had been awarded all lots

in the auction.  See First Watkins Decl. Exs. F, G [Docket Nos. 596, 597].  Inline contends that

the terms of the contract are set forth in the Terms and Conditions circulated by Nestlé before the

RFP process, as well as the supplemental terms that Nestlé circulated prior to the auction.  Id.

Exs. B, D [Docket Nos. 592, 594].

However, the Terms and Conditions for the RFP process include the following provisions

which establish that a business award through the Ariba system does not constitute a final award

or a contract:

- Bid format – Initial bid will be a request for proposal. Nestlé reserves the right to go to a second phase ranking event.

- Bidding Process – Bidding for this RFP package will be through an online bidding process.  Nestlé reserves the right  to continue negotiations post-RFP completion.

- Supplier Selection and Participation – Each supplier must honor its final bid pricing.  Additional volume may be added or removed due to changes in the business plan or as a result of allocation – it is expected that each supplier will support reasonable volume changes.  Any business award is contingent upon successful completion of the Nestlé qualification Process.  Business may be awarded individually or in aggregate based on competitive factors. **Lowest bid price does not guarantee a business award**.

- Contract – It is Nestlé's intent to draft a formal contract for the supply of cartons to each of these locations.  The terms of the contract, as agreed to and signed by both parties, shall take precedence over anything specified in this RFP.

Hicks Decl. Ex. 55 [Docket No. 693] at GPI_00008791 (emphasis in original).

"[T]he mere acceptance of a bid does not necessarily constitute a contract.  When a bid

requires certain formalities . . . , such as a written contract, or the furnishing of a bond, such

language often indicates that even after acceptance of the bid no contract is formed until the

requisite formality has been complied with." City of Lonsdale v. NewMech Cos., Inc., No. 07-

105, 2008 WL 186251, at *7 (Minn. Ct. App. Jan. 22, 2008) (internal citations and quotations

omitted).  Here, the RFP provision addressing the issue of  "Contract" explicitly states Nestlé's

"intent to draft a formal contract," the terms of which would "take precedence over anything

specified in this RFP."  Hicks Decl. Ex. 55 at GPI_00008794.  This language clarifies that no

contract was formed by the Ariba notification.  Nestlé also "reserve[d] the right to continue

negotiations post-RFP completion," and expressly stated that the "[l]owest bid price does not

guarantee a business award."  Id. at GPI_00008789–90.

Further, Nestlé included the following language in its emails to vendors when inviting

them to participate in the RFP and auction through Ariba:  "If you are not familiar with Ariba,

Nestlé uses Ariba as an information gathering tool to help us run and collect information and

price proposals from multiple suppliers in an efficient manner."  Hicks Decl. Ex. 52 [Docket No.

690]; Wolfe Decl. Ex. C [Docket No. 603] (emphasis added).  This language clearly expresses

Nestlé's intent that the Ariba auction, by itself, would not create a binding contract.  Thus, the

record unequivocally establishes that Nestlé's award notification through the Ariba system was

not a binding contract between Nestlé and Inline.

Summary judgment is granted to Graphic on Inline's tortious interference claims.

### c. Trade Secrets Claim (Count III)

Graphic argues that it is entitled to summary judgment on Inline's trade secrets claim

because there is no evidence that Inline's design meets Minnesota's standard for trade secret

protection.  Inline's trade secrets claim is based on allegations that in 2013, Graphic began

producing susceptor food packaging for Weight Watchers' Smart Ones pizza that copies a design

created by Inline.  Compl. ¶ 53.  Inline alleges that it shared the design with Heinz in 2008 under

the condition that it remain confidential.  Id.

A party seeking protection under the Minnesota's Trade Secrets Act must show both the

existence and the misappropriation of a trade secret.  Electro-Craft Corp. v. Controlled Motion,

Inc., 332 N.W.2d 890, 897 (Minn. 1983).  For information to be considered a trade secret, a party

must show that:  (1) the information is not generally known or readily ascertainable; (2) the

information derives independent economic value from being secret; and (3) the party made

reasonable efforts to maintain the information's secrecy.  Wilson v. Corning, Inc., 171 F. Supp.

3d 369, 881–82 (D. Minn. 2016) (citing Electro-Craft, 332 N.W.2d at 899–901).

Graphic argues there is no evidence that the design was a secret, that the design of a

product available for purchase at a grocery store derived economic value from being secret, or

that Inline took efforts to keep it secret.  Inline responds that Inline's president, Jeffrey Watkin,s

met with Richard Parysek of Heinz in Chicago in September 2008 and provided him with a

prototype of the "Micro-Bake II" design under the express terms that it be treated as confidential.

Second Watkins Decl. ¶¶ 1–3; Hicks Decl. Ex. 178 [Docket No. 889] (Pl's Resp. Interrogs.)

Resp. No. 30.  However, in his deposition testimony, Watkins could not recall whether it had

been communicated to Heinz that the design remain confidential.  Hicks Decl. Ex. 25[Docket

No. 663] ("Watkins Dep.") 306:9–23.  Nor could Watkins recall what specific confidentiality

agreements were in place with Heinz.  Id.  Similarly, a research and development employee from

Heinz testified in his deposition that he was not aware of a confidentiality agreement between

Heinz and Inline.  Hicks Decl. Ex. 13 [Docket No. 651] ("Sitterly Dep.") 195:6–9.  Thus, the

Court will not consider the conclusory statements in Watkins' declaration.  See Ballard v.

Heineman, 548 F.3d 1132, 1136 (8th Cir. 2008) ("[C]onclusory affidavits devoid of specific

allegations rebutting the moving party's evidence cannot defeat a summary judgment motion.");

Denson Int'l Ltd. v. Liberty Diversified Int'l, Inc., No. 12–3109, 2015 WL 5123262, at *5–6, n.4

(D. Minn. Sept. 1, 2015) (granting summary judgment on trade secrets claim and disregarding

conclusory allegations in corporate designee's declaration).

Other than Watkins' conclusory and inconsistent assertions that Inline took efforts to keep the information secret, Inline has not directed the Court to any evidence showing that the design was a secret, that Inline took efforts to maintain the design's secrecy, and that those efforts were reasonable.  Moreover, Inline provides no analysis of damages for its trade secrets claim.  Based on the absence of evidence for each element of the trade secrets claim, Graphic is entitled to summary judgment on this claim.

### d.  Damages Claims

Graphic also argues it is entitled to summary judgment on all damages claims because Inline cannot prove damages related to foreclosed customers or the Nestlé sales with a reasonable degree of certainty.  This issue need not be discussed because all claims have been dismissed on other grounds.

### 3.  Inline's Motion for Partial Summary Judgment

Inline moves for partial summary judgment on two issues:  (1) that the Asserted Patents are invalid due to incorrect inventorship, and (2) on the liability elements of Inline's tortious interference with contract claim.  Based on the conclusion that Graphic is entitled to summary judgment on Inline's antitrust and tortious interference claims, Inline's motion for partial summary judgment is denied.

## B.  Additional Motions, Pending Objection

Because summary judgment is granted to Graphic on all claims, the parties' Daubert motions, Graphic's Motion to Strike, and Inline's pending Objection are denied as moot.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Plaintiff Inline Packaging, LLC's Motion for Partial Summary Judgment [Docket No. 540] is **DENIED**;

2.  Inline's Motion to Exclude Expert Testimony [Docket No. 610] is **DENIED** as moot;

3.  Defendant Graphic Packaging International, LLC's Motion for Summary Judgment [Docket No. 635] is **GRANTED**;

4.  Graphic's Motion to Exclude Expert Testimony [Docket No. 773] is **DENIED** as moot;

5.  Graphic's Motion to Strike Pleading [Docket No. 788] is **DENIED** as moot; and

6.  Inline's Objection [Docket No. 538] to Magistrate Judge Leo I. Brisbois' March 8, 2018 Order [Docket No. 534] denying Inline's Motion to Amend to Plead Punitive Damages [Docket No. 504] is **DENIED** as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 5, 2018.